731 A.2d 1121

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. NATHANIEL HARVEY, DEFENDANT–APPELLANT.

Argued April 28, 1998—Decided June 3, 1999.

278

*Mordecai D. Garelick* and *Michael B. Jones,* Assistant Deputy Public Defenders, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

A jury originally convicted defendant Nathaniel Harvey of Irene Schnaps's murder and sentenced him to death in October 1986. This Court reversed that conviction because of errors in the admission of defendant's confession and in the failure of the trial court to give a "*Gerald* charge." [1] *State v. Harvey,* 121 *N.J.* 407,

---

[1] A "*Gerald* charge" is a charge that distinguishes murder with intent to kill from murder with intent only to cause serious bodily injury that resulted in death. *State v. Gerald,* 113 *N.J.* 40, 549 *A.2d* 792 (1988). The constitutional significance of the *Gerald* charge has been largely eliminated by the amendment to *N.J.S.A.* 3C:11–3, effective May 5, 1993, that defines "homicidal act" as

581 *A.*2d 483 (1990) (*Harvey I* ), *cert. denied,* 499 *U.S.* 931, 111
*S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991). At defendant's retrial, a jury
again convicted defendant of the purposeful or knowing murder of
Irene Schnaps, and imposed the death penalty. We affirmed
defendant's conviction and death sentence. *State v. Harvey,* 151
*N.J.* 117, 233, 699 *A.*2d 596 (1997) (*Harvey II* ). We granted
defendant's request for proportionality review of his death sen-
tence, *see N.J.S.A.* 2C:11–3e, and now find no disproportionality.

I

FACTS

The facts are set forth in detail in *Harvey II, supra,* 151 *N.J.* at
137–44, 699 *A.*2d 596. We repeat here only those facts relevant to
our proportionality review.

A. Discovery of the Body and the Crime Scene

Sometime in the evening of June 16, 1985, or during the early
morning hours of June 17, 1985, defendant broke into the apart-
ment of Irene Schnaps and "brutally murdered" her. *Harvey II,
supra,* 151 *N.J.* at 150, 699 *A.*2d 596. Schnaps, age thirty-seven,
lived alone in a ground-floor apartment in an apartment complex.
Although the investigating police detected no signs of forced
entry, the bedroom showed signs of a struggle. Bloodstains were
on the carpet and throughout the room. Schnaps's naked body
lay face-up on the floor. Despite the severe head and facial
wounds, no bloodstains were present on Schnaps's chest and
stomach, leading to the conclusion that before leaving her apart-
ment, defendant had undertaken measures to cover his tracks.

A white pillowcase bore a bloody sneaker-print with a chevron
pattern and the letters "PON." Although the bedding appeared
clean, blood stained the mattress, the underlying box spring, a

"conduct that causes death or serious bodily injury resulting in death." *N.J.S.A.*
2C:11–3.

cardboard box protruding from under the bed, and a towel. An empty Seiko–LaSalle watch box, an empty Olympus camera box, and an empty jewelry box were also found in the bedroom. In the bathroom, investigators found Schnaps's open pocketbook, containing no money.

### B. The Autopsy

Dr. Marvin Shuster, the Middlesex County Medical Examiner, determined that Schnaps had sustained approximately fifteen blows to the head. The largest wound, six-inches long and one-inch wide, extended from the front of her forehead to the top of her head. Some of the blows fractured Schnaps's skull and caused direct injury to the brain. Blows had been delivered from both the right and left sides, some from the front, but most from behind.

Triangular pressure marks appeared on both sides of the neck. Some of Schnaps's teeth were knocked out, and her jaw was broken. The right side of her neck, jaw, cheek, and forehead were bruised, and she was cut behind one ear.

Unable to attribute death to any particular wound, Dr. Shuster concluded that a combination of blows had killed Schnaps, that Schnaps's wounds had been caused by "quite a bit of force with a heavy object," and that Schnaps had bled profusely and died within a matter of minutes.

### C. The Arrest of Harvey and His First Conviction

On October 28, 1985, police investigating a series of unsolved burglaries and sexual assaults arrested defendant. One of the burglary victims identified defendant at a subsequent "show-up." During questioning, defendant confessed to committing a number of burglaries in West Windsor, as well as a sexual assault. Defendant accompanied the police to point out the locations of his crimes.

Defendant was charged with the purposeful or knowing murder of Schnaps, second-degree robbery, and second-degree burglary. The Middlesex County Prosecutor filed a Notice of Aggravating Factors. A jury convicted him and sentenced him to death. As previously mentioned, on direct appeal this Court reversed defendant's conviction and remanded for a new trial. *Harvey I, supra,* 121 *N.J.* at 414, 581 *A.2d* 483.

### D.   The Retrial

#### 1.   Guilt Phase

At the guilt phase of the retrial, investigating officers testified regarding the discovery of the bloody sneaker print, the empty Seiko–LaSalle watch box, the empty jewelry box, and the empty Olympus camera box—all of which were admitted into evidence.

Philip Beesley, a forensic scientist employed by the New Jersey State Police, testified that, based on blood work done on control samples from both defendant and Schnaps, the stains found on the box spring and on the piece of cardboard were consistent with Harvey's blood, and not Schnaps's.

Dr. Marvin Shuster testified about the nature of the wounds suffered by Schnaps and the cause of her death. Theodore Mozer, a forensic scientist employed by the New Jersey State Police, testified that one of the hairs recovered from Schnaps's back did not belong to her. Mozer testified that the hair was consistent with a control hair taken from Harvey. Mozer also testified that he had examined two pairs of sneakers seized from Harvey's ex-wife's West Windsor apartment and the size 6½ "Pony" sneakers Harvey was wearing when he was arrested, and explained that Harvey's "Pony" sneakers were consistent with the sneaker impression at the scene. Although Harvey's sneakers "could" have left the bloody mark, Mozer could not definitively conclude that they had done so.

In support of the admission of the DNA evidence, the State presented two witnesses from Cellmark: Julie Cooper, a senior

molecular biologist, and Dr. Charlotte Word, a microbiologist and supervisor of forensic casework. They testified that DNA tests conducted on the blood samples recovered at the crime scene were generally comparable to defendant's DNA.

Defendant did not testify. His guilt-phase case consisted of only two witnesses. First, a witness from Seiko testified that Seiko had made thousands of watches like the one seized from the trunk of defendant's car. Dr. Robert Shaler, Director of Forensic Biology for the Office of the Chief Medical Examiner for the City of New York, testified that he believed that the DNA tests were "scientifically indefensible."

After deliberating for three and one-half hours, the jury returned its verdict finding defendant guilty of purposeful-or-knowing murder, felony murder, first-degree robbery, and second-degree burglary.

### 2. Penalty Phase

The State relied exclusively on the evidence adduced at the guilt phase to support proof of three aggravating factors: the murder involved aggravated assault of the victim, *N.J.S.A.* 2C:11–3c(4)(c); the murder was committed to escape detection, *N.J.S.A.* 2C:11–3c(4)(f); and the murder was committed during the course of a robbery and burglary, *N.J.S.A.* 2C:11–3c(4)(g).

As a mitigating factor, defendant alleged the catch-all mitigating factor, "any other factor which is relevant to the defendant's character or record or to the circumstances of the defense," *N.J.S.A.* 2C:11–3c(5)(h) and submitted ten non-statutory factors to the jury. The ten factors are listed *infra* at 310, 731 *A.*2d at 1138.

Professor Richard Moran, a criminologist specializing in the correlation between age and crime, testified that because of defendant's age, if sentenced to prison rather than death, defendant would be so old when he was eligible for parole that his chances of committing another violent crime would be minute. A forensic

social worker testified about defendant's social history. Various family members testified that defendant was a caring father, who also comforted his developmentally-disabled brother. Defendant's family asked the jury not to sentence defendant to death. Defendant also exercised his right of allocution and asked that he be given thirty years so he could teach and communicate with his family.[2]

Some jurors found some of the non-statutory mitigating factors. *See infra* at 312, 731 *A.*2d at 1139. The jury returned a unanimous verdict that defendant had committed the murder for the purpose of avoiding apprehension, *N.J.S.A.* 2C:11–3c(4)(f), and in the course of a robbery and burglary, *N.J.S.A.* 2C:11–3c(4)(g). It did not find as an aggravating factor that the murder involved aggravated assault to the victim, *N.J.S.A.* 2C:11–3c(4)(c). The jury further found that the aggravating factors outweighed all of the mitigating factors and that each aggravating factor alone outweighed all of the mitigating factors. The trial court sentenced defendant to death.

Subsequently, the trial court sentenced defendant as a persistent offender on the non-capital counts of first-degree robbery and second-degree burglary. For those convictions, defendant received an aggregate sentence of life plus sixty-five years with a fifty-seven and one-half year parole disqualifier. *Harvey II, supra,* 151 *N.J.* at 146, 699 *A.*2d 596.

We affirmed defendant's convictions and death sentence. *Id.* at 233, 699 *A.*2d 596. The Court reserved decision with regard to defendant's disproportionality claim. *Ibid.*

On July 31, 1997, pursuant to Court orders, the Administrative Office of the Courts ("AOC") issued its revised statistical *Chew/Cooper/Harvey Report* (CCH Report). That report includes all death-eligible cases known to the AOC as of July 31, 1997. (Memorandum from Joseph J. Barraco, Esq., Acting Assistant

---

[2] For a more detailed explanation of defendant's defense at the penalty phase *see infra* at 310–12, 731 *A.*2d at 1139.

Director, AOC Criminal Practice Division and Nina Rossi, Esq., Assistant Chief, Criminal Court Services, Criminal Practice Division, to Stephen W. Townsend, Clerk of the Supreme Court 1 (Dec. 3, 1997)) (*Barraco Memorandum* ) (on file with the AOC). As of that date, there were 401 death-eligible cases, of which 163 or forty-one percent, proceeded to a penalty trial. CCH Report tbl. 3. Of the 163 penalty-trial cases, fifty, or thirty-one percent, resulted in a death sentence. *Id.* at tbl. 2. The overall death-sentencing rate was, therefore, twelve percent ($^{50}/_{401}$). *Id.* at tbl. 1.

## II

### PROPORTIONALITY REVIEW

In *State v. Loftin,* 157 *N.J.* 253, 265–277, 724 *A.2d* 129 (1999) (*Loftin II* ), we reviewed the fundamental principles of proportionality review. The principal goal of proportionality review "is to determine whether a particular defendant's death sentence is disproportionate" when compared to the sentences of other defendants who are similarly situated. *State v. DiFrisco,* 142 *N.J.* 148, 160, 662 *A.2d* 442 (1995) (*DiFrisco III* ); *see N.J.S.A.* 2C:11–3e. "A capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the defendant under review generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction." *State v. Martini,* 139 *N.J.* 3, 20, 651 *A.2d* 949 (1994) (*Martini II* ) (citing *State v. Bey,* 137 *N.J.* 334, 343, 645 *A.2d* 685 (1994) (*Bey IV* )); *State v. Marshall,* 130 *N.J.* 109, 131, 613 *A.2d* 1059 (1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). In conducting proportionality review, we seek " 'to ensure that the death penalty is being administered in a rational, nonarbitrary and even handed manner, fairly and with reasonable consistency.' " *Loftin II,* 157 *N.J.* at 265, 724 A.2d 129 (quoting *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.2d* 1059).

■ "We have declined to set a numerical standard to determine at what point defendants 'generally' receive the death penalty, because such a determination would introduce undesirable arbitrariness into proportionality review." *DiFrisco III, supra,* 142 *N.J.* at 160, 662 *A.*2d 442 (citing *Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949). *See Loftin II, supra,* 157 *N.J.* at 322–23, 724 *A.*2d 129. Instead we often make comparisons to the overall death sentencing rates, *see id.* at 173, 181, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 354, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 168, 613 *A.*2d 1059; and to previous proportionality review cases, *see DiFrisco III, supra,* 142 *N.J.* at 181, 183, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 34, 40–41, 45, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 353–54, 359, 645 *A.*2d 685.

■ There are two aspects to proportionality review: "substantive," or "offense-oriented," review; and "procedural," or "offender-oriented," review. *Marshall II, supra,* 130 *N.J.* at 126–27, 613 *A.*2d 1059. Offense-oriented review focuses on the offense to determine whether the punishment imposed is excessive in relation to the crime itself. *Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949 (citing *Coker v. Georgia,* 433 *U.S.* 584, 592, 97 *S.Ct.* 2861, 2866, 53 *L.Ed.*2d 982, 989 (1977)).

Conversely, procedural or offender-oriented review presumes that the death penalty is proportionate to the offense and focuses on the defendant, not the crime committed. *Pulley v. Harris,* 465 *U.S.* 37, 43, 104 *S.Ct.* 871, 876 .79 *L.Ed.*2d 29, 36 (1984). In such review, the question is "whether the 'punishment fits the criminal.'" *Marshall II, supra,* 130 *N.J.* at 129, 613 *A.*2d 1059 (additional internal quotations omitted).

■ Defendant bears the burden of proving that his death sentence is disproportionate. *DiFrisco III, supra,* 142 *N.J.* at 162, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 343, 645 *A.*2d 685. That burden is imposed on the defendant, rather than the State, because *N.J.S.A.* 2C:11–3e speaks in terms of proving that the sentence is disproportionate. *DiFrisco III, supra,* 142 *N.J.* at

162, 662 *A.*2d 442 (citing *Bey IV, supra,* 137 *N.J.* at 349, 645 *A.*2d 685).

## A. The Universe of Cases

■ We first define the universe of cases to which defendant's case shall be compared. In 1992, the Legislature amended *N.J.S.A.* 2C:11–3e to limit the universe to those cases in which a death sentence has actually been imposed. *P.L.* 1992, *c.* 5, § 1. The Legislature did not state whether the amendment was intended to apply to pending appeals. In *DiFrisco III, Bey IV,* and *Marshall II,* we declined to apply that amendment to those appeals, because those defendants' appeals were pending before the Legislature enacted the amendment. Likewise, we decline to apply that amendment to this case. Defendant's death sentence was first imposed in 1986, six years before the amendment took effect. Following this Court's reversal of his first conviction and after his retrial, defendant was again sentenced to death in July 1997. The genesis of this proceeding was defendant's first conviction, which occurred long before the statute was amended. *See DiFrisco III, supra,* 142 *N.J.* at 163, 662 *A.*2d 442. Additionally, given our rejection of the disproportionality challenge, the amendment would not affect the outcome of this case.

■ The universe of cases comprises all death-eligible homicides committed since the enactment of the death penalty statute regardless of whether a death sentence was imposed. In our ·earlier proportionality reviews, we determined that the death-sentenced pool will include those cases where the defendant's death sentence was reversed on appeal—due mostly to burden-of-proof errors or *Gerald* issues—and those cases where the prosecutor chose not to proceed capitally on remand. *See Martini II, supra,* 139 *N.J.* at 25–26, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345–47, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 194 n. 10, 613 ·*A.*2d 1059. We explained that burden-of-proof and *Gerald* errors "affect the procedural fairness of the trial, not the substance of the crime, [and] 'do not necessarily bear on the jury's

determination of deathworthiness.'" *Martini II, supra*, 139 *N.J.* at 26, 651 *A.*2d 949 (quoting *Bey IV, supra*, 137 *N.J.* at 347, 645 *A.*2d 685). Similarly, the "State's decision not to reprosecute a defendant capitally is not necessarily a reflection of that defendant's lack of deathworthiness." *Id.* at 27, 651 *A.*2d 949. For those reasons, and the reasons detailed in our earlier opinions, we continue to include such cases in the category of death sentence cases. *Loftin II, supra*, 157 *N.J.* at 324, 724 *A.*2d 129.

Additionally, we continue to present the data both including and excluding defendant. *Ibid.* " 'Using two sets of data, one including defendant's case and one excluding it, will give us the broadest picture of societal standards while alerting us to the bias produced by including defendant's case.'" *DiFrisco III, supra*, 142 *N.J.* at 165, 662 *A.*2d 442 (quoting *Martini II, supra*, 139 *N.J.* at 28, 651 *A.*2d 949). The universe does not, however, include the twenty-three cases that proceeded to the penalty phase despite not being death-eligible. *Marshall II, supra*, 130 *N.J.* at 138, 613 *A.*2d 1059; *CCH Report*, tbls. 2, 3. The AOC coded all 401 cases in the universe in the *CCH Report*. We refer to that universe as the "full universe" or "death-eligible universe." For some statistics, the AOC used a smaller universe of 163 death-eligible cases that proceeded to the penalty phase of a capital trial. We refer to that truncated universe as the "penalty-trial universe."

B.  Method of Classifying Cases

Once the universe of comparison cases is established, we must sort them in a database. As we have done in *Loftin II, supra*, 157 *N.J.* at 323, 724 *A.*2d 129; *DiFrisco III, supra*, 142 *N.J.* at 163–64, 662 *A.*2d 442; *Bey IV, supra*, 137 *N.J.* at 345, 645 *A.*2d 685; and *Marshall II, supra*, 130 *N.J.* at 141–42, 613 *A.*2d 1059, we use two approaches—an *a priori* approach and an empirical method. In the *a priori* procedure, we analyze cases based on those factors that experience has shown influenced the decision whether to sentence capitally. *Loftin II, supra*, 157 *N.J.*

at 323, 724 A.2d 129; *DiFrisco III, supra,* 142 N.J. at 164, 662 A.2d 442; *Martini II, supra,* 139 N.J. at 24, 651 A.2d 949; *Bey IV, supra,* 137 N.J. at 345, 645 A.2d 685; *Marshall II, supra,* 130 N.J. at 141–42, 613 A.2d 1059. "In the empirical method, we review life-sentenced and death-sentenced cases to identify those characteristics that determine the patterns of life sentencing versus death sentencing." *Loftin II, supra,* 157 N.J. at 323, 724 A.2d 129 (quoting *DiFrisco III, supra,* 142 N.J. at 164, 662 A.2d 442); *see also Martini II, supra,* 139 N.J. at 24, 651 A.2d 949; *Marshall II, supra,* 130 N.J. at 142–44, 613 A.2d 1059. "The empirical method reveals those factors that prosecutors and juries find determinative." *DiFrisco III, supra,* 142 N.J. at 164, 662 A.2d 442; *Martini II, supra,* 139 N.J. at 24, 651 A.2d 949; *Bey IV, supra,* 137 N.J. at 345, 645 A.2d 685.

## III

## COMPARISON OF CASES

The universe of cases that we rely on are those contained in the CCH Report. We adhere to our prior criteria for coding those cases as either death-sentenced or life-sentenced. Also, we group those cases according to their comparative levels of blameworthiness. *Loftin II, supra,* 157 N.J. at 324, 724 A.2d 129 (quoting *Martini II, supra,* 139 N.J. at 28, 651 A.2d 949). Further, we measure blameworthiness by relying on statutory mitigating and aggravating factors "as well as nonstatutory factors based on 'objectively verified measures of blameworthiness.'" *Bey IV, supra,* 137 N.J. at 350, 645 A.2d 685 (quoting *Marshall II, supra,* 130 N.J. at 145, 613 A.2d 1059); *DiFrisco III, supra,* 142 N.J. at 164, 662 A.2d 442.

We use two methods to evaluate a defendant's blameworthiness: frequency analysis and precedent-seeking review. Through both, we determine whether, compared to similar cases, a defendant's death sentence is disproportionate. *DiFrisco III, supra,* 142 N.J. at 166, 662 A.2d 442; *Martini II, supra,* 139 N.J.

at 28, 651 A.2d 949;· *Marshall II, supra,* 130 *N.J.* at 148, 613 A.2d 1059.

As we explained in *DiFrisco III, supra,* 142 *N.J.* at 166, 662 A.2d 442:

> In frequency analysis, we determine the rate of death sentencing in similar cases. This helps to reveal how jurors and prosecutors treat similar cases. Precedent-seeking review engages familiar judicial case-by-case analysis. We compare defendant's case to factually similar cases to discern whether defendant is deathworthy vis-a-vis other similarly situated defendants. We then compare the results of the two analysis to determine whether imposition of the death sentence in this instance is disproportionate.

We continue to emphasize, however, that "[p]roportionality review seeks to determine only whether a particular death sentence is aberrational, not whether it compares perfectly with other sentences." *DiFrisco III, supra,* 142 *N.J.* at 166, 662 A.2d 442 (quoting *Bey IV, supra,* 137 *N.J.* at 352, 645 A.2d 685) (citing *Marshall II, supra,* 130 *N.J.* at 131, 613 A.2d 1059)).

A. Adjustments in Comparison Group

The AOC maintains the database on which we base our proportionality review universe. It breaks the list of death-eligible defendants into various categories and subcategories. See *CCH Report,* tbl. 7. There are thirteen basic categories, each of which contains two to seven subcategories.[3]

---

[3] The thirteen basic categories are:

(A) Multiple victims;

(B) Prior Murder Conviction without A above;

(C) Sexual Assault without A–B above;

(D) Victim a Public Servant without A–C above;

(E) Robbery without A–D above;

(F) Arson without A–E above;

(G) Burglary without A–E [sic] above;

(H) Kidnapping without A–B above;

(I) Pecuniary Motive without A–H above;

(J) Torture/aggravated assault without A–I above;

(K) Depravity of Mind without A–J above;

(L) Grave risk of death as primary statutory aggravating circumstance without A–K above;

As we have done previously, "we defer generally to the AOC's expertise, and particularly to its unique assignment of defendants to only one comparison category: each case in the universe is assigned to only one comparison category, and within that category, to only one subcategory." *Loftin II, supra,* 157 *N.J.* at 327, 724 *A.*2d 129 (quoting *DiFrisco III, supra,* 142 *N.J.* at 167, 662 *A.*2d 442 (citations omitted)). The AOC has placed defendant in category E—designated "Robbery without A–D." That means defendant's case had only one victim who was not a public servant and who was not sexually assaulted and that defendant had no prior murder conviction. The AOC assigned defendant's case to subcategory 1 in category E, designated "residential forced entry with particular violence/terror." The AOC has identified 126 death-eligible cases in the E category, and 22 cases in the E–1 subcategory.[4] Two of the cases in the E–1 category represent defendant's initial death sentence and subsequent death sentence after reversal of the first.

The State has proposed no adjustment to the AOC's classification of defendant's case. Defendant, however, has proposed various adjustments to the AOC's categorization, suggesting that numerous cases should be added to defendant's comparison group. In addition to the E–1 cases, defendant seeks to compare his cases to twenty-four other cases he describes as factually similar. Specifically, defendant seeks to adjust the universe of comparable cases by including in it defendants in three category A cases (multiple victims), two category B cases (prior murders), eleven C–1 cases (sexual assault with particular violence/terror), and two C–2 cases (involving a sexual assault with one or more additional statutory aggravating circumstances). In *DiFrisco III, supra,* 142 *N.J.* at 169, 662 *A.*2d 442, the Court refused to compare the

---

(M) Escape Detection, etc., as sole factor without A–L above.
[*CHC Report*, tbl. 7.]

4 Summaries of the E–1 comparison group of cases are set forth in Appendix A. They are based on published opinions and on the discussion of cases found in the AOC's Detailed Narrative Summaries.

defendant's case to cases in higher blameworthiness categories. We likewise refuse to compare defendant's case to cases in higher blameworthiness categories. Moreover, consistent with this Court's principle of comparing only similar cases, the cases in defendant's suggested comparison group involving sexual assault murders should not be included. Cases of that kind are so dissimilar, both factually and in their levels of blameworthiness, "that they do not offer any insight into the proportionality of defendant's sentencing." *Martini II, supra*, 139 *N.J.* at 79, 651 *A.*2d 949.

Defendant also seeks to include six cases in the E–3 category (robbery, with forced entry, but with no particular violence/terror). One case in category E–2 (robbery, with no forced residential entry but with particular violence/terror); and one case in category G–3 (burglary, with no residential forced entry and no particular violence/terror).[5] Of those eight cases, four proceeded to the penalty phase, but none resulted in a death sentence. A comparison of those eight cases supports the conclusion that the E–1 category is the proper comparison group for defendant and that his death sentence is not disproportionate.

The dissent asserts that our decision to limit defendant's comparison group to subcategory E–1 cases rather than to the entire E category is far too restrictive and represents a serious departure from past practices. *Post* at 394, 731 *A.*2d at 1184. In prior cases, in applying the salient-factors test and precedent-seeking approach we have used as the comparison group an entire composite category. However, in those cases the subcategory was too small to be statistically productive and the total cases in the chosen category consisted of a much smaller number of cases than the 126 cases in the E category.

---

[5] Summaries of those cases are provided in Appendix B. The summaries are based on published opinions and on the discussions of the cases found in the AOC's Detailed Narrative Summaries.

In *Chew II, supra,* 159 *N.J.* at 203, 731 *A.*2d 1070, for example, we categorized Chew as a pecuniary-motive killer, other pecuniary advantage subcategory I–3. Because only one other defendant remained in that subcategory, we determined that any statistical analysis that consisted only of I–3 subcategory cases would be unproductive. *Id.* at 203, 731 *A.*2d 1070. Accordingly, we compared Chew with the entire group of pecuniary-motive killers that consisted only of sixteen eligible cases. In *DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A.*2d 442, where the defendant had also been placed in the pecuniary-motive, contract-killer subcategory, we compared him to the entire category of pecuniary-motive murderers to be able to have a productive statistical analysis. At the time of the DiFrisco proportionality review, the entire pecuniary motive category consisted of only fourteen eligible I category cases. *Id.* at 167, 662 *A.*2d 442.

In *Loftin II, supra,* 157 *N.J.* at 321, 724 *A.*2d 129, we found that the defendant's "essential attribute" was his prior murder conviction. However, because of the "exceedingly small number of cases" in the B–1 subcategory, we compared Loftin's case to all death-eligible cases in the B or prior murder category. *Id.* at 327, 724 *A.*2d 129. There were only sixteen eligible cases in category B.

Here, the twenty-two cases in the E–1 subcategory provide a sufficient basis for both the salient-factors analysis and precedent-seeking review. Moreover, a comparison of all 126 cases in the E category is impractical and would make proportionality review unmanageable. Such a review is also unnecessary. The cases that defendant proposes in the E–2, E–3 and G–3 subcategories are not factually similar to defendant's case.

Defendant was forty-four at the time of Schnaps' murder, with an extensive prior record. At the time of the murder, he was not under the influence of any emotional disturbance nor was his capacity to appreciate the wrongfulness of his conduct impaired as a result of a mental disease or defect. Defendant is not distinguished from the E–2, E–3 and G–3 defendants because of

differences in the brutality of their crimes, all of which were horrendous, but by the evidence those defendants presented of mitigating factors. Several presented evidence of either mental disease, defect or emotional disturbance. Many also were much younger than defendant and had no significant prior criminal records.

Of the eight cases, only Bushy and Huff, like Harvey, were charged with two aggravating factors. Busby, like Harvey, was charged with aggravating factors, c(4)(g), contemporaneous felony and c(4)(f), seeking to escape detention. However, the jury found that Busby, who attempted suicide after the murder, was under the influence of extreme mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his act was significantly impaired because of a mental disease or defect, or intoxication. Huff, who was twenty-three at the time of the murder, was charged with both c(4)(c), causing murder by extreme suffering and c(4)(g), contemporaneous felony. However, Huff's jury after hearing psychiatric testimony that Huff had an antisocial disorder, an antisocial personality and mentally was still an adolescent, found that his capacity to appreciate the wrongfulness of his conduct was significantly impaired as a result of a mental disease or defect, or intoxication.

In Busby and Huff, the prosecutor sought the death penalty, but the jury could not agree on a death sentence. Unlike Harvey where the jury found only catch-all mitigating factor, c(5)(h), in Busby and Huff, the jury found in addition to that factor, other mitigating factors. Accordingly, their cases are not factually similar to Harvey's and it is understandable why Harvey was the only one of the three sentenced to death.

There also were mitigating factors that distinguished defendant's case from cases of other defendants. Age was a mitigating factor for Dollard, Wolfe and Hart who were all twenty-two years or younger when they committed the murders for which they were charged. Wolfe, who also showed remorse, and Dollard had no significant prior records and Suarez had no prior record. The

jury also found that Wolfe and Hart suffered from a mental disease, defect or intoxication that impaired their capacity to appreciate the wrongfulness of their conduct.

In sum, unlike many of the life-sentenced E-2, E-3, and G-3 defendants, Harvey was not mentally or emotionally disturbed when he murdered his victims, nor was he a young man, without a significant prior criminal record. Because of those differences, such cases provide little insight into the propriety of the jury's decision in this case, and are inapplicable to our proportionality review. We therefore refuse defendant's request to expand his comparison cases. As we have previously commented, a "capital defendant is not entitled to a perfect universe of identical cases, but instead only the best that we can achieve." *DiFrisco III, supra,* 142 *N.J.* at 170–71, 662 *A.*2d 442 (quoting *Martini II, supra,* 139 *N.J.* at 31, 651 *A.*2d 949 (citing *Bey IV, supra,* 137 *N.J.* at 352, 362, 645 *A.*2d 685)). We find that defendant's comparison group consists of the twenty-two cases in subcategory E–1.

B. The Frequency Approach

"The principal inquiry here is whether the degree of blameworthiness in the present case 'reasonably supports an expectation that such a case will generally result in a death sentence.'" *DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442 (quoting *Martini II, supra,* 139 *N.J.* at 30, 651 *A.*2d 949). "Frequency analysis helps us to determine whether defendant is in a category that renders him or her more likely than other killers to receive the death penalty." *Ibid.* It is divided into two statistical tests to gauge a defendant's relative criminal culpability: the salient-factors test, and the index-of-outcomes test.

In *Loftin II, supra,* 157 *N.J.* at 266, 724 *A.*2d 129, we appointed Appellate Division Judge David S. Baime, as a Special Master, to conduct an extensive review and evaluation of the proportionate methodology that we have used for the last six years. We directed the Special Master to consider the following: (1) scope of the proportionality review universe of cases; (2) accuracy of the

AOC's data-coding techniques; (3) statistical reliability of frequency review results given the small size of the data base; (4) strengths and weaknesses of the index-of-outcomes test; (5) systemic proportionality review (specifically, the development of parsimonious models to measure the possible role of race discrimination in prosecuting and sentencing decisions); (6) possibility of reduction in the number of case classifications in salient-factors test; (7) possible appointment of a panel of judges to perform periodic assessments of penalty-trial outcomes; and (8) maintenance of proportionality review as a separate proceeding. *Loftin II, supra,* 157 *N.J.* at 454–56, 724 *A.*2d 129.

On April 28, 1999, the Special Master released his report, The Honorable David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* at 1–4 (Apr. 28, 1999) (*Special Master Report*). In that report, the Special Master determined that several aspects of our methodology are faulty and require revision. *Special Master Report* at 6–7. the Court scheduled oral argument on the Special Master's Report on June 7, 1999. Pending the Court's decision in that proceeding, we have determined that we will continue to analyze defendant's case according to the methodologies and procedures previously utilized, except that we no longer conduct the numerical-preponderance test previously used as part of our frequency approach.

Although the AOC has added thirty-two cases to the database since the *Loftin Report,* and the addition of cases "has had a positive impact on the stability of the models, [the AOC's] view is that the culpability estimate which purports to give a 'predicted probability of death sentence' is often still too soft, and little substantive reliance should be given to this statistic in the *Chew, Cooper* and *Harvey* cases." Barraco Memorandum at 4. Consequently, because frequency analysis is statistically based, and because the small sample sizes may undermine statistical reliability, we remain concerned about the statistical reliability of frequency analysis, and continue to place greater emphasis on the results of the precedent-seeking review. *Loftin II, supra,* at 157,

291–97, 724 *A*.2d 129; *DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A*.2d 442; *Martini II, supra,* 139 *N.J.* at 29, 651 *A*.2d 949; *Bey IV, supra,* 137 *N.J.* at 351, 645 *A*.2d 685.

### 1. The Salient–Factors Test

The salient-factors test enables us to compare defendant's sentence to sentences in factually similar cases to measure the relative frequency of defendant's sentence. *DiFrisco III, supra,* 142 *N.J.* at 172, 662 *A*.2d 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A*.2d 949. We first base comparability on the statutory aggravating factors, and then subdivide the group " 'according to circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases.' " *Loftin II, supra,* 157 *N.J.* at 328, 724 *A*.2d 129 (quoting *Martini II, supra,* 139 *N.J.* at 33, 651 *A*.2d 949). Because the salient-factors test compares sentences in cases that are factually similar, we find it the most persuasive of the frequency tests. *Ibid.; see also DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A*.2d 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A*.2d 949; *Bey IV, supra,* 137 *N.J.* at 353, 645 *A*.2d 685; *Marshall II, supra,* 130 *N.J.* at 168, 613 *A*.2d 1059. Harvey has been assigned to category E, designated "robbery killer." Harvey has been further classified in subcategory 1 in category E, designated "residential forced entry with particular violence or terror." *CCH Report,* tbl. 7. Of the twenty-two death-eligible cases in that group, eight proceeded to the penalty phase. Including defendant's cases, four of those penalty trial cases resulted in death sentences. Thus, the death-sentencing rate for robbery killers is eighteen percent and for those advancing to the penalty trial, it is fifty percent. The overall death-sentencing rate for the death eligible universe is twelve percent and the rate for those in the penalty-trial universe is forty-one percent. Therefore, the figures for E–1 defendants are higher than the overall death-sentencing rates, leading to the conclusion that society views those who commit particular violence or terror in a residential forced entry as significantly blameworthy. *See DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A*.2d 442 (stating that

higher sentencing rates for one category indicates society views those within that category as "significantly blameworthy").

Removing defendant's cases from the group lowers the rates somewhat, but still does not indicate that defendant's sentence is disproportionate. Without defendant's cases, the death sentencing rate for E–1 defendants is ten percent, and for those advancing to the penalty phase it is thirty-three percent. That ten percent figure is slightly lower than the general twelve percent rate for all death-eligible cases, but the thirty-three percent rate is slightly higher than the overall thirty-one percent rate for penalty trial cases. Those figures do not support defendant's claim that his sentence is disproportionate.

The following table summarizes the outcome of the salient-factors test with respect to the E–1 category:

### Salient–Factors Test: "E–1" Subcategory

|  | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Death–Eligible Cases | Proportion of Cases Advancing to Penalty Trial |
|---|---|---|---|
| Inc. D. | .50 ($\frac{4}{8}$) | .18 ($\frac{4}{22}$) | .36 ($\frac{8}{22}$) |
| Exc. D. | .33 ($\frac{2}{6}$) | .10 ($\frac{2}{20}$) | .30 (6/20 |

[*CCH Report*, tbl. 7.]

The entire E robbery category can be broken down as follows:
Salient–Factors Test: "E" Category

|  | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Death–Eligible Cases | Proportion of Cases Advancing to Penalty Trial |
|---|---|---|---|
| Inc. D. | .29 ($\frac{10}{35}$) | .8 ($\frac{10}{126}$) | .28 ($\frac{35}{126}$) |
| Exc. D. | .24 ($\frac{8}{33}$) | .6 ($\frac{8}{124}$) | .27 ($\frac{33}{124}$) |

[*CCH Report*, tbl. 7.]

Those numbers are somewhat below the overall rates for the death-eligible universe and the penalty trial universe. We do not, however, believe that such a deviation shows that robbery killings are viewed by society as less blameworthy. The mere fact that a statistical disparity exists does not establish disproportionality. *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685. "A low predicted value does not mean, *ipso facto,* that the imposition of the death penalty is disproportionate; it simply means we must more carefully scrutinize the other aspects of proportionality review." *DiFrisco III, supra,* 142 *N.J.* at 172, 662 *A.*2d 442. The death-sentencing rate for E–1 killers is higher than the rates for all robbery killers and is higher than the overall death sentencing rate. That signifies that society views those robbers who commit a residential forced entry with significant violence as particularly blameworthy. Also, notably, defendant does not argue that the salient-factors test reveals that his sentence is disproportionate.

## 2. The Index–of–Outcomes Test

The index-of-outcome test is the most statistically complex of the two frequency-analysis tests. Rather than merely calculating ratios, this test utilizes a multiple-regression analysis. The test seeks "to identify those characteristics that establish a degree of a defendant's blameworthiness." *DiFrisco III, supra,* 142 *N.J.* at 178, 662 *A.*2d 442. Further, the test "organize[s] the cases 'according to statistically-relevant measures of culpability, such as the infliction of severe pain or mental suffering on the victim, a contemporaneous sexual assault or robbery, and the commission of a prior murder.'" *Ibid.* (quoting *Bey IV, supra,* 137 *N.J.* at 362, 645 *A.*2d 685).

For each multiple regression the AOC has performed, each defendant receives a culpability score, which is based on the predicted probability of receiving a death sentence. *Id.* at 179, 662 *A.*2d 442. The culpability score ranges from .00 to .99. The

scores are evenly divided into five culpability levels. Cases with culpability level one are the least likely to receive a death sentence, and cases with a culpability level of five are most likely to receive the death penalty.

Four multiple regressions encompass the index-of-outcomes test. *Id.* at 179–82, 662 *A.*2d 442. The first regression considers both statutory and non-statutory factors in the penalty-trial universe. *Id.* at 179–80, 662 *A.*2d 442. The second appraises the same factors but utilizes the full universe. *Id.* at 180–81, 662 *A.*2d 442. Statutory aggravating and mitigating factors are the only variables in the other regressions. *Id.* at 181–82, 662 *A.*2d 442. Like the first two regressions, the third and fourth regressions employ the penalty-trial universe and the full universe, respectively. *Ibid.*

The results of the four regressions diverge considerably. This drawback of the index-of-outcomes test has revealed itself in each of this Court's proportionality review precedents. *See DiFrisco III, supra,* 142 *N.J.* at 211, 662 *A.*2d 442 (reporting culpability scores ranging from eleven percent to seventy-four percent); *Martini II, supra,* 139 *N.J.* at 43, 651 *A.*2d 949 (reporting culpability scores ranging from five percent to eighty-eight percent); *Bey IV, supra,* 137 *N.J.* at 362–64, 645 *A.*2d 685 (reporting culpability scores from the *Bey* data ranging from twenty-five percent to seventy-six percent and culpability scores from the *Martini* data ranging from thirty-three percent to eighty-one percent); *Marshall II, supra,* 130 *N.J.* at 173, 613 *A.*2d 1059 (reporting culpability scores ranging from seventeen percent to fifty-two percent). In this case, defendant's culpability scores range from thirteen percent, which places him in culpability level one, to forty-three percent, which places him in culpability level three.

The following chart shows all the relevant figures for the four index-of-outcomes tests:

| | Statutory & Non Statutory Factors | | Statutory Factors Only | |
|---|---|---|---|---|
| | Penalty Trial | Death Eligible | Penalty Trial | Death Eligible |
| Predicted Probability of Death Sentence | .35 | .13 | .43 | .19 |
| Range | .11 to .68 | .05 to .32 | .23 to .65 | .08 to .38 |
| Culpability Level | 2 | 1 | 3 | 1 |
| Death Sentencing Rate | .26 | .05 | .45 | .05 |

[*CCH* Report.]

In the first regression, which considers both statutory and nonstatutory factors for cases in the penalty-trial universe, defendant's predicted probability of receiving a death sentence is thirty-five percent. The probability range is eleven percent to sixty-eight percent. In other words, we are ninety-five percent certain that a defendant with characteristics similar to Harvey would have a predicted probability of receiving a death sentence of between eleven percent to sixty-eight percent. Defendant's culpability score places him in culpability level 2. Defendants in that culpability level have received a death sentence twenty-six percent of the time.

Defendant's results in that regression are significantly lower than those in *Martini II, supra,* 139 *N.J.* at 43, 651 *A.*2d 949 (eighty-eight percent predicted probability), *DiFrisco III, supra,* 142 *N.J.* at 180, 662 *A.*2d 442 (seventy-four percent predicted probability), *Bey IV, supra,* 137 *N.J.* at 362–63, 645 *A.*2d 685 (eighty-one percent predicted probability in *Martini Report* and seventy-six percent probability in *Bey Report* ), and *Marshall II, supra,* 130 *N.J.* at 173, 613 *A.*2d 1059 (fifty percent predicted probability). On the other hand, we have upheld a death sentence with a culpability score significantly lower than defendant's. *See Loftin II, supra,* 157 *N.J.* at 331, 724 *A.*2d 129 (fourteen percent predicted probability).

When the same variables are considered in the full universe, defendant's culpability score falls to thirteen percent and the confidence internal ranges from five percent to thirty-two percent. Accordingly, defendant's case occupies culpability level one, at which five percent of the defendants have been sentenced to death. Although those results are also low, they are within a range that the Court has previously held not disproportionate. *See DiFrisco III, supra,* 142 *N.J.* at 180–81, 662 *A.*2d 442 (eleven percent predicted probability of death); *Martini II, supra,* 139 *N.J.* at 43, 651 *A.*2d 949 (five percent predicted probability); *Marshall II, supra,* 130 *N.J.* at 173, 613 *A.*2d 1059 (seventeen percent predicted probability).

The third regression of the index-of-outcomes test utilizes only statutory aggravating and mitigating factors and is run with data from the penalty-trial universe. In that regression, the predicted probability of receiving a death sentence is forty-three percent, and the confidence interval ranges from twenty-three percent to sixty-five percent. That places defendant in culpability level three. At that culpability level, defendants are sentenced to death forty-five percent of the time. When a regression is run with data from the full universe and with the same variables as in the prior regression, defendant's predicted probability of death is nineteen percent. The confidence interval spans from eight percent to thirty-eight percent. Defendant is in culpability level one, in which, as noted above, defendants are sentenced to death five percent of the time.

Defendant argues that the index-of-outcomes frequencies are so low that they prove that defendant's sentence is disproportionate. We disagree. Although defendant's numbers are low in some of the scenarios, in the other scenarios they are within the range that the Court has previously held to be not disproportionate. Moreover, even in the scenarios where defendant's score is lowest, defendant's numbers are not the lowest score of a defendant whose claim of disproportionality we have denied. Accordingly,

we are satisfied that the index-of-outcomes test indicates no disproportionality.

### 3. Frequency Approach Conclusion

We are satisfied that defendant's "results produce no showing of randomness or aberration. Defendant has failed to offer reliable evidence of disproportionality, and we do not find that for cases such as his a sentence other than death is generally imposed." *DiFrisco III, supra*, 142 *N.J.* at 183, 662 *A.*2d 442 (quoting *Martini II, supra*, 139 *N.J.* at 46, 651 *A.*2d 949) (citing *Bey IV, supra*, 137 *N.J.* at 365, 645 *A.*2d 685; *Marshall II, supra*, 130 *N.J.* at 174, 613 *A.*2d 1059).

Although in some of the scenarios defendant's predicted probability of death is low, we do not believe that evidences that his sentence is an aberration. We remain wary of the frequency approach because of its noted defects, and therefore continue to place greater emphasis on the precedent-seeking approach. *See Loftin II, supra*, 157 *N.J.* at 334–35, 724 *A.*2d 129; *DiFrisco, supra*, 142 *N.J.* at 182–83, 662 *A.*2d 442.

### C. The Precedent–Seeking Approach

The precedent-seeking approach is the second component of proportionality review. *Loftin II, supra*, 157 *N.J.* at 335, 724 *A.*2d 129; *DiFrisco III, supra*, 142 *N.J.* at 183, 662 *A.*2d 442; *Martini II, supra*, 139 *N.J.* at 46, 651 *A.*2d 949. "Here we engage in traditional case-by-case review in which we compare similar death-eligible cases, considering the cases individually." *DiFrisco III, supra*, 142 *N.J.* at 183, 662 *A.*2d 442; *Bey IV, supra*, 137 *N.J.* at 366, 645 *A.*2d 685. This approach seeks to determine whether defendant's death sentence is excessive in comparison to other similar life-sentenced and death-sentenced defendants. *Id.* at 184, 662 *A.*2d 442.

Precedent-seeking reviews "complement frequency analysis." *Ibid.* As we have noted, "[T]he lower the overall rates and the reliability of our frequency analysis, the greater the need for

precedent-seeking review." *Id.* at 183–84, 662 *A.*2d 442. In each of our prior proportionality review cases, we have consistently placed greater reliance on precedent-seeking review than on frequency review. *Id.* at 184, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 28–29, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 159, 613 *A.*2d 1059. We continue to do so. The Special Master has recommended methods by which to select a representative number of cases within the group of similar cases for consideration and comparison to defendant's case. Special Master Report at 68–70. Although some of the Special Master's comments are valid, until the Court has a hearing and issues its opinion regarding the Special Master's Report, "we will continue to analyze defendant's case according to the methodologies and procedures previously utilized." *Supra* at 300, 731 *A.*2d at 1133.

██ Precedent-seeking review considers statutory and nonstatutory aggravating and mitigating factors that are " 'rooted in traditional sentencing guidelines.' " *DiFrisco III, supra,* 142 *N.J.* at 184–85, 662 *A.*2d 442 (quoting *Marshall II, supra,* 130 *N.J.* at 159, 613 *A.*2d 1059 (citing *N.J.S.A.* 2C:44–1)). That approach divides criminal culpability into three categories: defendant's moral blameworthiness, the degree of victimization, and defendant's character. *Id.* at 185, 662 *A.*2d 442.

██ We begin application of the precedent-seeking approach by identifying the cases that we will use. They consist of those cases categorized by the AOC as E–1. *CHC Report* tbl. 7. Including Harvey's two death sentences, the total number of cases is twenty-two. *Ibid.* By comparing Harvey to those other nineteen defendants in the traditional manner of review, we seek to determine the existence of any aberration in defendant's sentencing. *Bey IV, supra,* 137 *N.J.* at 369, 645 *A.*2d 685. The goal is to ensure that defendant has not been unfairly singled out for capital punishment. However, because each case involves different facts, defendants, juries, and legal issues, to be proportionate even closely-similar cases do not require identical verdicts. *DiFrisco*

*III, supra,* 142 *N.J.* at 186, 662 A.2d 442; *Bey IV, supra,* 137 *N.J.* at 369, 645 A.2d 685.

The components by which we measure defendant's culpability are as follows:

1. Defendant's moral blameworthiness
   a. Motive
   b. Premeditation
   c. Justification or excuse
   d. Evidence of mental disease, defect or disturbance
   e. Knowledge of victim's helplessness
   f. Knowledge of effects on nondecedent victims
   g. Defendant's age
   h. Defendant's involvement in planning the murder
2. Degree of victimization
   a. Violence and brutality of the murder
   b. Injury to nondecedent victim
3. Character of defendant
   a. Prior record
   b. Other unrelated acts of violence
   c. Cooperation with authorities
   d. Remorse
   e. Capacity for rehabilitation.

*Marshall II, supra,* 130 *N.J.* at 155, 613 A.2d 1059; *accord DiFrisco III, supra,* 142 *N.J.* at 203, 662 A.2d 442.

## 1. Defendant's Case

Late in the evening of June 16, 1985, or in the early morning hours of June 17, 1985, defendant broke into the apartment of Irene Schnaps, a woman whom he did not know, and brutally murdered her. The scene of the attack, Schnaps' bedroom, was left in disarray. Blood was throughout the room. Defendant struck Irene Schnaps fifteen times on the head with such force that her skull was fractured open. Some of the blows lacerated her brain. She suffered numerous lacerations to her head, as well as bruises and contusions to her face, a broken jaw, several broken teeth and pressure marks on her neck. Some of the blows were delivered from the front, but most were from behind. The

murder weapon was a blunt instrument: a hammer, which left curving wounds; and an item, such as a tire iron, two-by-four, or a dull axe, which left linear wounds. After he murdered Irene Schnaps, defendant washed the blood off the front of her body and changed the sheets on the bed in an apparent attempt to avoid detection. He then left her lying naked on the floor.

At the penalty phase in 1994, the State relied on the relevant guilt phase evidence to prove the c(4)(c), c(4)(g), and c(4)(f) aggravating factors. Defendant alleged one mitigating factor, the catch-all factor under c(5)(h). Within that factor, he itemized the following ten, non-statutory factors:

1. defendant's age at the time of the offense;

2. defendant had been traumatized at an early age when he witnessed the tragic death of his older sister;

3. defendant was uprooted from his home and sent to live with grandparents who physically and verbally abused him and resented his presence;

4. defendant suffered feelings of abandonment when his parents did not take him with them as promised, yet continued to have other children;

5. defendant was exposed to domestic violence in the home of his grandparents;

6. defendant was exposed to domestic violence in the home of his parents;

7. defendant is a caring and loving father;

8. defendant's continuing relationship with his children and the financial contribution that he still makes to them;

9. defendant's relationship with his mentally disabled daughter;

10. any other factor that relates to

defendant's childhood or family background.

At the penalty phase, defendant focused on his childhood, his family background, and his role as a parent. Professor Moran, a criminologist specializing in the correlation between age and crime, testified that if defendant were sentenced to prison rather than death he would not be eligible for parole prior to age sixty-four, and by that time defendant would be of an age group less likely to commit violent crime.

Carmetta Alabarus, a forensic social worker, testified about defendant's social history. Albarus had interviewed defendant, as well as some family members. Her testimony focused on the

years from defendant's early childhood to adolescence, and on his marriage up to the separation from his wife. Defendant was one of twelve children; defendant and his wife Joyce had four children together. Defendant and Joyce separated, and she later bore a child with another man.

Albarus recounted for the jury how, at age four, defendant lit a match to generate heat on kerosene-laden coal in order to keep himself and his five-year-old sister, Mary, warm. Unfortunately, Mary got severely burned when some kerosene splashed on her and ignited. She died a few days later from her burns. Albarus also recounted how defendant was left to live with his grandparents in Georgia in 1956 when his parents left the south to look for work in the north. Albarus said defendant's grandparents were resentful about having to take care of so many children. Albarus further testified that defendant's grandfather was abusive to his wife and to defendant. Defendant eventually ran away and lived with an uncle before reuniting with his parents in New Jersey. Also, Albarus said it was hurtful to defendant that his parents said there was no room for him.

Once defendant was reunited with his parents, Albarus stated that defendant acted as a "big brother" to his younger siblings. However, his father was abusive toward defendant's mother and fathered children outside the marriage. Defendant was devoted to his mother, and it pained him to see her suffer at the hands of his father.

Albarus also characterized defendant as sharing a "special relationship" with his brother James, who had developed signs of being developmentally disabled. She added that defendant showed sensibility toward his daughter Tanya, who is developmentally disabled.

Albarus spoke with defendant's wife, who told her that defendant was "very responsible" as a father and husband at the beginning of their marriage. Even while incarcerated, Albarus said defendant maintained a "close relationship" with his children, sending them money, writing to them and sending them cards.

Defendant treats Taliah, Joyce's child with another man, as his own.

In addition to the professor and the social historian, members of defendant's family, his father, his brother James, his sister-in-law, his wife, and Taliah testified.

Defendant also exercised his right of allocution and made the following, terse statement to the jury: "I'm going to ask you to give me thirty years so I can stay around about [sic] do the best I can, teaching my family and communicate with them. Thank you."

On rebuttal, the State produced evidence that in 1994 defendant had no visitors at the jail. On surrebuttal, defendant's wife testified that she did not bring the children to the jail pursuant to defendant's wishes.

Each juror deliberated on the non-statutory mitigating factors submitted by defendant. No juror found defendant's age, exposure to domestic violence in his grandparent's home, exposure to domestic violence in his parent's home, defendant's relationship with his brother James and his daughter Taliah, or any other factor relating to defendant's childhood or background to be in mitigation. However, in mitigation, jurors found the following facts: six jurors—that defendant was traumatized when he witnessed the death of his older sister; one juror—that defendant was sent to live with grandparents who physically and verbally abused him; four jurors—that defendant suffered feelings of abandonment and that defendant was a loving father; and two jurors—defendant's relationship with his children. The jurors, however, unanimously found aggravating factors c(4)(f), escape detection, and c(4)(g), contemporaneous felony, to be present and that they outweighed the mitigating factors beyond a reasonable doubt. They sentenced defendant to death as a result.

2. Analysis of Defendant's Moral Blameworthiness.

An analysis of defendant's moral blameworthiness reveals that he is indeed quite blameworthy. He broke into someone's home

at night to rob. Clearly, defendant could not have been surprised to find the occupant at home. He then brutally murdered the occupant so he could escape apprehension. Irene Schnaps, a helpless victim, was sleeping in her bedroom. As the medical examiner opined, she was hit mostly from behind. She was attacked with blunt instruments and struck so hard that her skull was fractured, her brain lacerated, and her jaw broken. She was beaten about the face and sustained many bruises in a brutal murder.

There is no justification or excuse for the murder. Unlike many of the other E–1 defendants, there is no evidence that defendant suffered from a mental disease, defect or disturbance.

With respect to age and maturity, defendant's age was presented as a non-statutory mitigating factor, and all twelve jurors rejected it. Unlike most of the defendants in E–1, defendant was over forty years old at the time of the murder, and he can be categorized only as a mature, full-grown man.

Although defendant may not have known specifically that Irene had family and friends, we have previously recognized that "[w]hile a defendant might be unaware of the specific characteristics of his victims or of the particular survivors that the victim will leave behind, it is completely foreseeable that the killing will eliminate a unique person and destroy a web of familial relationships." *State v. Muhammad*, 145 *N.J.* 23, 46, 678 *A.*2d 164 (1996). Moreover, defendant must have realized that Irene had family and friends because there were personal photographs in her apartment and he stole a man's Seiko LaSalle watch. Unquestionably, defendant entered the privacy of Irene Schnaps's bedroom to rob her. He then killed her to avoid detection, and had the cold, calculating presence of mind to wash her body and change the sheets to further avoid detection.

3. Victimization

Victimization consists of "the extent of mutilation of the victim and injury to surviving victims." *Bey IV, supra,* 137 *N.J.* at 366,

645 A.2d 685. In this case, Irene Schnaps was struck repeatedly in the head. Although the medical examiner opined that Schnaps was rendered unconscious, she was conscious when defendant began his brutal assault upon her. Even when the victim is not aware of impending death, as was the case in *DiFrisco III*, this Court has observed that "at the end of the day there is still a victim, a [woman] who was [brutally] murdered...." *DiFrisco III, supra,* 142 N.J. at 205, 662 A.2d 442. There were no other victims.

### 4. Defendant's Character

Defendant's character contributes greatly to his moral blameworthiness. Defendant's prior record is extensive and involves convictions for serious, violent crimes. On May 31, 1979, defendant pleaded guilty to rape, atrocious assault and battery. In October 1988, he pleaded guilty to first degree kidnapping and aggravating sexual assault. He also pleaded guilty to second degree attempted kidnaping, second degree burglary, and third degree burglary. He also was convicted of receiving stolen property. Defendant has broken into homes other than Schnaps's: on the day of his arrest he broke into two homes. In one house, he attacked a couple with an ax; in another, he attempted to abduct a teenaged girl. Also, he later confessed to committing a number of burglaries in West Windsor. *Harvey II, supra,* 151 N.J. at 117, 699 A.2d 596. Suffice it to say, Nathaniel Harvey is a very dangerous man who has kidnaped, raped, robbed and killed.

With respect to remorse, there is scant, if any, evidence of it. In his statement in allocution, he expressed no remorse for murdering Irene. Nor did he express any shame or humility for the pain and suffering he inflicted on Schnaps's family.

Finally, there in little hope of rehabilitation for Harvey. His prior record reveals that he has chosen for himself a life of violent crime. He has multiple convictions for rape, assault and kidnapping. The murder of Irene Schnaps was the culmination of an escalating pattern of violence. Defendant had been paroled in

May 1983 for his sentence of fifteen to twenty years for rape. Irene Schnaps was killed a little over two years later. Unfortunately, his four years in prison had little deterrent or rehabilitative effect on defendant.

With respect to defendant's moral blameworthiness and character, defendant is highly culpable. In contrast, with respect to defendant's degree of victimization, defendant is moderately culpable.

### 5. Summaries of Similar Cases

The starting point of the comparative-culpability analysis is the comparison group used in the salient-factors test. *Bey IV, supra,* 137 *N.J.* at 367, 645 *A.*2d 685 ("Initially, from the universe of all death-eligible cases, we select a class of cases according to their salient factors."); *see also DiFrisco III, supra,* 142 *N.J.* at 186, 662 *A.*2d 442 (using pecuniary-motive murderers to form defendant's comparison group); *Martini II, supra,* 139 *N.J.* at 51, 651 *A.*2d 949 (using same salient-factors comparison group). By using the salient-factors test's comparison group for precedent-seeking review, the Court ensures that the two analyses are complementary, can confirm each other, and can be compared to each other. *Chew II, supra,* 159 *N.J.* at 214, 731 *A.*2d 1070; *DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 366–67, 645 *A.*2d 685.

As noted earlier, the AOC placed defendant in the E–1 subcategory. When defendant's case is compared to the others in the E–1 category, summaries of which are set forth in Appendix A, we find that defendant's criminal culpability is high and his death sentence is not disproportionate. Defendant asserts that his level of culpability is more like the life-sentenced cases in his comparison group than the death-sentenced cases. We reject that assertion and observe that "[d]isparity alone does not demonstrate disproportionality." *Chew II, supra,* 159 *N.J.* at 214, 731 *A.*2d 1070 (quoting *Bey IV, supra,* 137 *N.J.* at 386, 645 *A.*2d 685).

Rather, we search for some impermissible factor or pattern that has been broken. *Id.* at 214, 731 *A.*2d 1070.

Aside from Harvey, two defendants in the E–1 category received death sentences: Gerald and Mejia. Defendant argues that Gerald and Mejia are more culpable than he. We disagree. Both Gerald, *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), and Mejia, *State v. Mejia,* 141 *N.J.* 475, 662 *A.*2d 308 (1995), were sentenced to death. In *Gerald,* we reversed the capital murder conviction. The Court concluded that the state constitution precluded the imposition of the death penalty on a defendant who purposely or knowingly caused serious bodily injury (SBI) that resulted in death. 113 *N.J.* at 89, 549 *A.*2d 792. After reviewing the evidence produced at Gerald's trial, this Court was unable to discern whether Gerald purposely or knowingly caused death by his own conduct or whether he caused SBI that resulted in death. *Id.* at 91–92, 100–101, 549 *A.*2d 792. According to defendant's confession, he hit and "stepped on" the victim, but one of the codefendants "went off" on the victim and threw the TV on him. *Id.* at 100, 549 *A.*2d 792.

Moreover, in *Gerald,* the jury found several mitigating factors not found here. Defense psychiatrists testified that Gerald was drug dependent and depressed and suffered severe personality disorder. Moreover, one expert claimed that his desire for drugs made Gerald unable to control his behavior. Gerald testified and expressed sorrow for the murder. Gerald's sisters testified about their family life, how their father's death affected Gerald and Gerald's use of alcohol and drugs. *Id.* at 62–63, 549 *A.*2d 792. The jury found that Gerald was emotionally disturbed and suffered from a mental disease and defect. He also had no significant prior criminal activity.

Mejia was a kitchen worker at a hotel caught up in an angry dispute with a co-worker whom the defendant thought was leaving the country without paying Mejia the $750 owed him. Based on Mejia's defense that the shooting was an accident, that his gun fired accidentally and that he never intended to kill, the Court

found a rational basis for SBI murder. *Mejia, supra*, 141 *N.J.* at 489–90, 662 *A.*2d 308.

In both those cases, the Court found that there was a rational basis for a jury to find that each defendant had not purposely and knowingly intended to kill, but had merely intended to inflict serious bodily injury that resulted in death. In this case, the evidence was clear that defendant purposely and knowingly intended to kill Irene Schnaps by his own conduct.

Other cases in the E–1 group contain similar problems of proof. Caviness and his cohorts entered the victim's apartment, tied the victim up, and ransacked the apartment. A codefendant said Caviness killed the victim by hitting him numerous times with a baseball bat. But, Caviness said that this codefendant had the bat, and that he left the codefendant with the victim. ·

Gerald Williams's conviction for felony murder was reversed because the Appellate Division held that the trial court's charge on causation was deficient under *State v. Martin*, 119 *N.J.* 2, 573 *A.*2d 1359 (1990). The Appellate Division concluded that a jury could have found that the burglary and robbery were not the direct cause of the victim's death. Williams had testified that the victim awoke during the burglary and was at the window with his legs dangling outside and that he, Williams, had tried to help the victim, but was unsuccessful. Here, defendant caused Schnaps's death by repeatedly striking her on the head with a blunt instrument. There is no issue that he did not commit the murder by his own conduct or that the killing was accidental.

In comparing the relative blameworthiness of defendant and the other E–1 defendants, the dissent focuses on the brutality of the crimes. Undoubtedly, all the murders in the E–1 category are brutal and savage. But, many of those cases involved mitigating factors that are not present in defendant's case. In Reigle, the jury found the defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired as the result of mental disease, or defect, or intoxication. There were facts in Felder, Brown, Mann, Lee, and Britton that also would allow a jury to

conclude that the defendant's capacity to appreciate the wrongfulness of his conduct was impaired by mental disease or defect or intoxication. No such evidence is presented here. Defendant's act of breaking into Irene's apartment was not an impulsive act. He previously had committed numerous burglaries.

Brunson also elicited substantial mitigating evidence about his abusive early life and his extreme emotional disturbance. As a child he had been treated by psychiatrists and psychologists, often including treatment by psychoactive medications. He had twice attempted suicide. He had been diagnosed as being paranoid and schizophrenic, and as having a conduct disorder. Not surprisingly, the jury found as mitigating factors, that at the time of the crime he was mentally disturbed. Szadorski also had severe mental illness, including substance abuse. Mendez was mentally retarded with learning disabilities and a mental age of six. He does not read, write or speak English. He also had no prior criminal record. Herman Williams viciously shot his victims to death. However, Williams was characterized as "culturally retarded." Harvey suffered from no such infirmities. He was not emotionally disturbed or mentally ill when he killed Schnaps. Moreover, when Harvey committed the murder he was significantly older than several of the other defendants were when they committed their murders. Brunson, Caviness, Felder, Phillips, Ploppert, and Szadorski were all much younger than defendant. Because Harvey was more mature than the other E–1 killers, he is more blameworthy.

Finally, Gerald, Brown, Caviness, Felder, Mendez, and Reigle also had no significant history of prior criminal activity. Indeed, aside from Gerald Williams, Harvey's criminal record is more extensive than the other E–1 killers' records. As noted above, *see infra* at 380 – 81, 731 *A*.2d at 1176 – 77, Harvey has been convicted of kidnapping and rape. The danger that Harvey poses to society, as evidenced by his violent criminal record, makes him more blameworthy than the other E–1 killers.

Defendant is a cold and calculating murderer. He invaded the privacy of Irene Schnaps's home at night and brutally murdered her to escape detection. To conclude, the facts surrounding each of the above cases in the E–1 category demonstrate that they are distinguishable from defendant's case. Moreover, to the extent they are comparable to defendant's case, this Court has not required identical verdicts in all similar cases. *State v. Martini (II), supra,* 139 *N.J.* at 47, 651 *A.*2d 949. Defendant was not singled out unfairly for capital punishment. His death sentence cannot be seen as an aberration. Defendant has failed to show that his death sentence is in any way disproportionate.

### B. Precedent–Seeking Review Conclusion

Proportionality review seeks only to assure that defendant's sentence is not an aberration. *See DiFrisco III, supra,* 142 *N.J.* at 166, 662 *A.*2d 442. It is not intended to ensure that one killer's sentence is identical to all other similarly categorized killers. *Ibid.* Additionally, the mere fact that one or two comparison cases may be more deathworthy than Harvey does not establish that Harvey's sentence is disproportionate. *See DiFrisco III, supra,* 142 *N.J.* at 209, 662 *A.*2d 442. A comparison between defendant's case and other similar cases reveals no disproportionality in defendant's sentence.

### IV

### Other Arguments

Defendant asserts that the death penalty is unconstitutional because black defendants are more likely to receive the death penalty than white defendants. In *Loftin II, supra,* 157 *N.J.* at 154–55, 724 *A.*2d 129, we rejected that claim. There is no major statistical change since *Loftin II, supra.* Therefore, we continue to reject that claim.

Defendant also claims that the geographic distribution of capital charging and sentencing renders the death penalty unconstitution-

al, and that the overall death sentencing rate is so low that any death sentence is arbitrary, excessive, and unprincipled. This Court has previously rejected those claims, *see DiFrisco III*, 142 *N.J.* at 210, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 80, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 396, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 195–200, 613 *A.*2d 1059, and we do so again today.

## V

### CONCLUSION.

Defendant has not demonstrated that his death sentence is disproportionate. Accordingly, defendant's death sentence is affirmed.

### *APPENDIX A*

### Comparison of E–1 Case Summaries

### A) Walter Gerald

This case is reported at *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988).

John Matusz, eighty-nine years old, lived with his fifty-five year-old son, Paul Matusz. John was disabled as the result of a stroke. Neither John nor Paul were self-sufficient, so two of John's daughters took turns staying at the house to care for them.

On August 13, 1982, John's daughter, Lottie, was staying at the house. John retired for the evening at 6:30 p.m. Paul went to his room to watch television, and later retired. Lottie watched television until she went to bed at 9:30.

The defendant and his two co-defendants broke into the home. Lottie heard noise from the other first-floor bedroom, and as she opened the door to that room, Lottie was struck in the eye by someone standing behind the door. Lottie was then attacked by two males. One of the intruders had a knife or blade. The

intruders threw Lottie to the floor, punched and kicked her and threw her into the bathroom. One of the intruders continued to stomp on her and she was told "shut up or I'll kill you." She suffered a broken nose and contusions of the face, neck, and chest. When asked where her money was kept, she told him the location of her purse. Paul heard the commotion and came down the stairs to investigate. Two of the intruders attacked Paul, and one struck Paul in the face with a television set.

Not knowing whether the intruders were still in the house, Lottie telephoned the police and her sister. She then saw Paul lying on the floor with a television overturned on his face. After removing the television set, Lottie found Paul dead. Paul died of blunt force injuries to the head. He suffered contusions and swelling in the brain and he drowned in the blood from his broken nose. Meanwhile, John had been dragged from his bed to the hallway and was left there bleeding profusely. John suffered bruises and lacerations of the face resulting from being hit by a blunt object. Those injuries required continued hospital care and convalescence treatment. John died on October 2, 1982, never having returned home. The intruders stole a new color television set, an old portable black-and-white television set, and Lottie's purse, which contained about $60.

The police received a tip that Gerald had committed the murders. They arrested him on outstanding warrants. After failing a polygraph, Gerald confessed. He stated that he, Eddie Walker, and John Bland had entered the Matusz house, intending to steal a television set that they previously had seen from outside the house. Gerald "had" the woman, and admitted striking her a couple of times. Walker "had" the younger man (Paul), while Bland roused the old man (John) from bed. The young man was giving Walker a lot of trouble, so Gerald and Bland went to assist Walker. They beat the younger man with their hands, then left him alone. Gerald went back to the woman, and Bland returned to the older man. Bland beat the older man with a lamp and a cane, or both. Gerald said that Walker "just went off" on the

younger man, hitting him with a trophy, punching him, and throwing a television set on his face. Gerald also admitted that, on the way out of the house, he stepped on Paul's face.

Walter Gerald was twenty-four years old. He graduated from high school and entered college on an athletic scholarship. He lost the scholarship because of a leg injury. He then completed three semesters at a community college. Gerald suffered from drug addiction. His record reveals one conviction for theft, for which he was sentenced to sixty days in jail and one year probation.

Gerald was tried for murder, felony murder and aggravated assault, conspiracy to commit burglary, robbery with bodily injury, aggravated assault, and two counts of aggravated assault. The jury convicted defendant on all counts except aggravated assault. At the penalty trial, the jury found aggravating factor c(4)(c), outrageously vile and c(4)(g), contemporaneous felony. It found mitigating factor c(5)(a), emotional disturbance; c(5)(d), age of defendant; c(5)(f) no significant prior record; and c(5)(h), the catch-all factor. The jury found that the aggravating factors outweighed the mitigating factors and sentenced the defendant to death. The court imposed a custodial term for the other convictions.

We reversed Gerald's conviction on the capital count on the ground that the State constitution precluded the imposition of the death penalty on a defendant who purposely or knowingly caused serious bodily injury (SBI) that resulted in death. After reviewing the evidence, we were unable to determine whether Gerald purposely or knowingly caused death by his own conduct or whether he caused SBI that resulted in death. According to Gerald's confession, he hit and "stepped on" Paul, but one of the co-defendants "went off" on the victim and threw the television set on him. The jury also had not been instructed that it must find that aggravating factors outweighed the mitigating factors beyond a reasonable doubt. The Court sustained the conviction on the

non-capital count. On prosecutor's motion, the capital indictment was dismissed. Defendant was then sentenced to life imprisonment.

## B) Rijoberto Mejia

. This case is reported at *State v. Mejia*, 141 *N.J.* 475, 662 *A.*2d 308 (1995).

In the summer of 1991, Mejia and Balbino Garcia were co-workers at a hotel. Before Mejia was fired, he asked Garcia to safeguard his savings of $750. After moving to Brooklyn, Mejia called Garcia to recover his money, but Garcia refused to return the money. Mejia then learned that Garcia intended to return to Mexico on December 8, 1991. Three hours before the flight, Mejia, armed with a .357 Magnum, and an accomplice armed, with a knife, confronted Garcia in the hotel basement.

Mejia chased Garcia into a bedroom occupied by Garcia's brother-in-law and nephew. Mejia pointed the gun at the three men. Garcia tried to take the pistol from Mejia, but Mejia struck Garcia, fracturing his skull. Garcia fled down the hallway with Mejia in pursuit, and Mejia shot and killed him. According to the State's ballistics expert, the gun was within inches of Garcia's head when he was shot. Mejia was arrested three days later after Garcia's nephew spotted him walking on the boardwalk.

Mejia was thirty-two years old at the time of the crime. He was an illegal immigrant and had worked as a dishwasher, painter and construction worker. He was educated through the eighth grade and had received an honorable discharge from the Honduran Army after having served for five years. He had no prior criminal record. Mejia had an alcohol and drug problem and had been abused as a child.

Mejia was convicted of capital murder, felony murder, armed robbery, aggravated assault, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. At the penalty trial, the jury found aggravating factor c(4)(g), that the murder was convicted during the course of a robbery, and mitigating

factor c(5)(h), the catch-all factor. Under c(5)(h), the jury found that Mejia had suffered psychological and physical abuse at the hands of his father, and that he was the victim of emotional deprivation from his parents. The jury sentenced Mejia to death. The court imposed a custodial term on the other convictions.

We reversed Mejia's death sentence finding plain error with the trial court's failure to instruct the jury that it could return a non-unanimous verdict that defendant intended only to cause SBI that resulted in death. Relying on Mejia's confession in which he claimed that his gun fired accidentally and that he never intended to kill, we found that there was a rational basis for a jury to find that Mejia did not purposely and knowingly intend to kill Garcia but only intended to cause him serious bodily injury that resulted in death. *Mejia, supra,* 141 *N.J.* at 506, 662 *A.*2d 308. Mejia's convictions were affirmed.

### C) Will Alexander

On July 28, 1993, the victim, a thirty-five-year-old man, was at home with his girlfriend and her two small children. Alexander and two or three male co-defendants knocked on the victim's apartment door and gained entry by stating that they were police officers conducting a drug raid. After gaining entry to the apartment, one of the men pushed the girlfriend to the floor and ordered her to stay there. As the victim attempted to flee, Alexander shot him in the lower back, killing him. Alexander and his co-defendants then rummaged through dresser drawers and took the victim's wallet and the girlfriend's purse. The girlfriend and her children were forced into the front room and ordered to lay on the floor. Alexander and his co-defendants then went to other apartments in the complex, informed the residents that they were conducting a drug raid, and took cash from one of those apartments.

The AOC narrative classifies this case as having aggravating factor, c(4)(g), contemporaneous felony, and mitigating factor c(5)(h), the catch-all factor. Alexander was not capitally prosecut-

ed. He was convicted of conspiracy, one count of burglary, two counts of robbery, felony murder, murder, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, and criminal trespassing. For felony murder, Alexander was sentenced to life imprisonment with a thirty-year parole disqualifier. For murder, he was sentenced to life imprisonment with a thirty-year parole bar, concurrent to the felony murder. For burglary and robbery he was sentenced to ten years each, concurrent with the sentence for felony murder. Alexander was also sentenced to eighteen months for criminal trespassing and five years for unlawful possession, both concurrent to the felony murder sentence.

Alexander was a high school graduate and had received training in air conditioning and heating.[1] He was unemployed at the time of the arrest, but had worked in the past as a factory worker. He denied alcohol or drug abuse. Alexander had previous convictions for simple assault and burglary.

### D) Jerry Britton

On March 13, 1995, the victim, a twenty-four-year-old woman, was in her apartment. Jerry Britton climbed through the window into the victim's apartment. The victim confronted Britton and said that she had known that he was the one breaking into apartments. She then telephoned the police. Britton took two knives from the kitchen and stabbed the victim sixteen times in the area of the head, neck, back, and shoulders, killing her. It also appears that the victim was beaten. Britton later told a friend that he had hoped he killed her so that she could not be a witness. Britton stole a video and Sega game machine, which he immediately sold for money to buy drugs.

Britton was arrested after a witness stated that Britton had admitted to killing the victim. After his arrest, Britton gave a

---

[1] The AOC Narrative does not provide Alexander's age at the time of the offense.

sworn statement to the police about the murder. Britton also admitted to having previously burglarized the victim's apartment.

Britton lived in a second-floor apartment in the same complex as the victim. He was widely suspected among the residents as being responsible for multiple thefts. He was a high school graduate and had worked assembling air conditioners. However, at the time of the murder, he had been unemployed for about a year. Britton was a heroin addict. He had been previously convicted of robbery, which had been downgraded to simple assault.

The AOC classifies Britton as having two aggravating factors, c(4)(f), murder to escape detection, and c(4)(g), contemporaneous felony, and two mitigating factors, c(5)(d), mental disease, defect or intoxication and c(5)(h), the catch-all factor. Britton was charged with two counts of burglary, robbery, murder, felony murder, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. Britton pleaded guilty to burglary, robbery, murder, felony murder, unlawful possession of a weapon and possession of a weapon for an unlawful purpose. He was sentenced to life imprisonment with a thirty-year parole bar for felony murder. The remaining charges were merged and dismissed for sentencing purposes.

### E) David Brown

On November 16, 1995, David Brown and two co-defendants were at a co-defendant's apartment drinking alcohol and using drugs. When they ran out of beer, drugs, and money, one of the co-defendants suggested that they rob a fifty-eight-year-old drug dealer known to have both drugs and money. Brown and one co-defendant went to the drug dealer's apartment. When the dealer partially opened the door, one of the co-defendants kicked in the door. Once inside, a struggle ensued. The dealer attempted to throw them out of the apartment. The AOC narrative states that the "victim pulled a knife and defendant stabbed him several times." According to Brown's co-defendant, the defendant "pulled

out a ginzu and stabbed the victim several times." The victim died from multiple stab wounds all over his body.

Brown was twenty-seven years old at the time of the killing. He was a high school graduate and had attended technical school. At the time of the killing, he worked as a freelance car painter and was employed as a security guard. He had no prior record. He had received outpatient drug and alcohol treatment and claims to have stopped using drugs three years prior to the killing. However, he continued to drink alcohol and it appears that he was intoxicated at the time of the offense.

The AOC narrative classifies Brown as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(d), mental disease, defect or intoxication, c(5)(f), no significant prior record, and c(5)(h), the catch-all factor. Brown was charged with conspiracy to commit robbery/murder, murder, felony murder, robbery, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. Brown pleaded guilty to conspiracy, aggravated manslaughter, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. He was sentenced to an aggregate sentence of thirty-five years with a seventeen-and-one-half year parole bar.

### F) Alphonso Brunson

Between November 28, 1987, and December 3, 1987, Alphonso Brunson broke into an eighty-two-year-old woman's home three times. The third time, the woman surprised him. The woman was found two days later, having died from several severe blows to the head. Brunson later admitted to burglarizing the woman's home three times, but claimed that on the third occasion he was accompanied by a companion who panicked and hit the woman with a table leg. The companion, however, had an alibi.

At the time of the murder, Brunson was twenty-one years old. He was a high-school dropout and had a sparse employment history. He had a history of mental disorders. From the age of seven to eighteen he was in over thirty institutions, hospitals,

schools, and foster homes. He had tried to kill himself twice and was diagnosed as being extremely paranoid and schizophrenic. Psychiatrists testified that he lacked impulse control and had the maturity level of a juvenile. He was abused as a child. At the time of his arrest, Brunson was homeless and indigent. Brunson had three prior arrests, two for burglary and one for attempted escape.

Brunson was convicted of several charges, including purposeful murder, felony murder, robbery and burglary. At the penalty phase, the jury found that the aggravating factors did not outweigh the mitigating factors. The jury found two aggravating factors, c(4)(f), escape detection, and c(4)(g), that the murder was committed during the course of a burglary. The mitigating factors found by the jury were c(5)(a), emotional disturbance; c(5)(d), mental disease, defect or intoxication; c(5)(c), defendant's age; and c(5)(h), the catch-all. Brunson was sentenced to an aggregate prison term of life imprisonment plus fifty years with a mandatory minimum of fifty-one years before becoming eligible for parole.

### H) Duane Vance Caviness

On or about June 8, 1984, Duane Caviness and two co-defendants entered the apartment building where Caviness's stepfather lived. Caviness later acknowledged that they had intended to rob and kill his stepfather until they discovered that the alarm system was operating in the stepfather's apartment. Instead, they broke into an apartment belonging to a fifty-five-year-old man. The assailants tied up the man and Caviness hit him with a baseball bat. They ransacked the apartment looking for items with resale value and they took some items. They then ransacked another apartment in which no one was home. The fifty-five-year-old man was later found dead with his hands and feet bound. The autopsy revealed ten wounds and identified the cause of death as physical assault with multiple head, neck, and chest injuries caused by blunt force.

Caviness was nineteen years old at the time of the murder. He was educated through the tenth grade. He had a sporadic work history and was unemployed at the time of the offense. He had a history of cocaine, marijuana, and "pill" abuse. His adult police record consists of two arrests for burglary, but no convictions.

Caviness and the co-defendants blamed each other. The prosecutor initially sought the death penalty against Caviness, and charged him with purposeful-or-knowing murder. Ultimately, Caviness pleaded guilty to felony murder and two counts of burglary. He was sentenced to life imprisonment with thirty-years parole ineligibility on the murder, and four years in prison for each burglary.

The AOC classifies this case as having two aggravating factors, c(4)(f), murder to escape detection, and c(4)(g), contemporaneous felony, and three mitigating factors, c(5)(c), defendant's age, c(5)(f), no significant prior record, and c(5)(h), the catch-all factor.

### I) Albert Carrow Fains

Arthur Williams was confined to a wheelchair, so he lived with a home health aide, Ella Johnson. Williams was known to keep large amounts of cash in the apartment and gave people money to run errands for him. On March 14, 1984, Johnson left Williams alone so that she could care for another patient. Early that evening, Lisa Daniels visited Williams. Albert Fains, who lived next door to Williams, went to Williams' apartment about fifteen minutes later. Williams gave Fains money to buy cigarettes, sandwiches, and marijuana. Fains, Williams, and Daniels spent the evening in Williams' apartment. Fains was the first to leave the apartment, but was later seen returning to the apartment in the middle of the night.

When Johnson returned to the apartment, she found Williams' dead body on the floor with a knife in his back. A plastic bag had been pulled over Williams' head. The cause of death was later determined to be a contusion of the brain caused by three fractures on the right side of the skull, a wound on the bridge of

the nose, and eight wounds on the side of the head. The wounds corresponded to the shape of the head of a hammer. A search of Fains's apartment revealed a blood stained pair of pants and Williams' wrist watch.

Fains was twenty-six at the time of the murder. He is a high school graduate. He had been unemployed for four to five years preceding the crime. Fains used marijuana, but had never been treated for drug abuse. He was diagnosed as having an adjustment disorder with depressed mood and avoidance personality.

Fains was convicted of knowing murder, robbery, felony murder, and possession of a weapon for an unlawful purpose. On the murder count, Fains was sentenced to life imprisonment with a thirty-year parole bar. He was sentenced to fifteen years for the robbery count, concurrent to the murder conviction. The remaining convictions were merged.

The AOC classifies this case as having aggravating factor, c(4)(g), contemporaneous felony, and mitigating factor, c(5)(h), the catch-all factor.

### J) Carlton Felder

On September 14, 1989, Carlton Felder had smoked approximately ten "jumbo" vials of crack cocaine and was "extremely wired." Felder went to a neighbor's apartment where a seventy-five-year-old woman was babysitting three small children. Felder rang the door bell, and when the woman opened the door, Felder pushed her inside and started stabbing her in the chest, killing her. When she stopped resisting, he grabbed the gold chains from her neck and went upstairs looking for money. When he could not find any more money, he took a VCR and left the apartment. Felder stated that he killed the women in an act of desperation to obtain money for crack.

Felder was initially charged with purposeful-or-knowing murder, felony murder, robbery, burglary, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. Felder pleaded guilty to aggravated manslaughter, robbery and bur-

glary. He was sentenced to thirty years with a fifteen year minimum for the aggravated manslaughter, a twenty-year consecutive sentence with a ten-year parole bar for robbery, and a five-year concurrent sentence for the burglary.

The AOC classifies this case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors, c(5)(c), defendant's age, c(5)(d), mental disease, or defect or intoxication, c(5)(f), no significant prior criminal record, and c(5)(h), the catch-all factor. Felder was eighteen years old at the time of the killing. He dropped out of high school in ninth grade. Prior to the killing, he had been working at a fast-food restaurant for about a month. Felder stated that he was addicted to crack cocaine and had used it daily since the age of fifteen.

### K) Franklin Flowers Hudson

On September 1, 1986, Franklin Flowers Hudson broke into a home through the basement window. When the homeowner walked down to the basement to do laundry, Hudson forced her at knife-point to the master bedroom, where he tied her up and gagged her. Hudson took a small amount of cash and jewelry. Hudson told her he wanted her boarder's money and car keys. The boarder, a sixty-year-old man, returned home shortly thereafter. Hudson told the woman to stay put, and he went downstairs to confront the boarder. The boarder offered his keys and money, but a struggle ensued. Hudson stabbed the boarder multiple times. The boarder ran up the stairs with Hudson following him. Hudson then kicked the boarder, causing him to fall. Hudson then hit the boarder over the head with a baseball bat. On November 16, 1986, four days before Hudson was sentenced, the boarder died from his injuries. Hudson took approximately $200 and the car keys.

A witness spotted Hudson fleeing from the scene. After his arrest, Hudson admitted to everything except stealing the woman's jewelry. He also stated that he was under the influence of cocaine and beer at the time of the crime.

Hudson pleaded guilty to felony murder. Charges of aggravated assault and burglary were dismissed. Hudson was sentenced to life imprisonment with a thirty-year parole bar.

The AOC classifies this ' case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factor c(5)(d), mental disease, defect or intoxication, and c(5)(h), the catch-all factor. Hudson was twenty-one years of age at the time of the killing. He was living with his mother, sisters and brother at the time of the offense. As noted above, Hudson was under the influence of cocaine and alcohol at the time of the crime. He had no history of mental illness. Prior to the crime, Hudson had worked as a groom at two race tracks and as a sanitation worker for a disposal company. Hudson had two prior convictions for aggravated assault.

### L) Timothy Paul Lee

On the morning of March 18, 1988, Timothy Paul Lee woke up feeling the need for heroin. He took a knife and drove his mother's car to the home of a sixty-five-year-old man. Lee kicked in the back door of the home. The man woke from the noise, so Lee approached him and stabbed him in the chest, killing him. Lee then took the man's wallet and a bottle of Valium and left. Lee used the money to purchase heroin and was stopped by the police while in possession of the heroin, Valium and the victim's wallet. He gave a full confession to the police.

Lee was initially charged with two counts of murder, robbery, burglary, possession of CDS, possession of a weapon for an unlawful purpose, and felony murder. Lee pleaded guilty to felony murder and was sentenced to life imprisonment with a thirty-year parole bar.

At the time of the killing, Lee was thirty-five years old. He was a plumber by trade and had also worked as a carpenter and computer repair man. He is a high school graduate and had completed a computer repair course. He had no mental health problems. Lee was addicted to heroin, and had four prior convic-

tions for possession of marijuana, importing cocaine, shoplifting, and theft by deception.

The AOC classifies this case as having aggravating. factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(d), mental disease, defect or intoxication and mitigating factor c(5)(h), the catch-all factor.

### M) Dwayne Mann

On October 3, 1988, Dwayne Mann and two co-defendants were high on crack cocaine after a three-or-four-day binge. The three broke into the apartment of a thirty-one-year-old man to steal his car keys and take his car. The man was asleep on the couch while the three were searching for the keys. One of the co-defendants gave Mann a loaded gun to hold. When the man woke up, Mann panicked and shot him in the head, killing him. The three then took the man's car. The victim's brother later saw Mann driving the victim's car. After Mann was subsequently arrested, he gave a full statement to the police.

Mann was convicted of murder, murder in the commission of a robbery, murder in the commission of a burglary, and possession of a weapon for an unlawful purpose. For murder, Mann was sentenced to life imprisonment with a thirty-year parole bar and for unlawful possession, Mann was sentenced to five years with a two and one-half year parole bar. The other counts merged.

At the time of the murder, Mann was twenty-one years old. Mann had been educated through the tenth grade, at which point he dropped out because of his drug problem. Mann was addicted to crack cocaine, and he used PCP heavily. Mann claimed he "worked off the books" renovating apartments. He has an extensive prior record, including nine prior arrests and six convictions for possession of narcotics. For one prior arrest, he was charged with attempted murder with a firearm.

The AOC classifies this case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(d),

mental disease, defect, or intoxication, and c(5)(h), the catch-all factor.

### N) Incenzio Mendez

On September 25, 1983, Incenzio Mendez was planning to rob the home of the owner of the farm on which he was working. The owner of the farm was Ms. Lum, a ninety-five-year-old woman. Mendez checked to see if Ms. Lum was home. He then saw Ms. Lum approaching, so he came up behind her with a stick he found near the house. Using the stick, Mendez knocked her down with three blows to the head. When Ms. Lum attempted to get up, Mendez kneed her in her side and struck her in the neck. She died from her injuries. After killing Ms. Lum, Mendez went into her house looking for money and jewelry.

Mendez later gave two statements to the police. In the second statement, he admitted that he struck Ms. Lum to kill her so that she could not identify him later.

Mendez was twenty-seven years old at the time of the murder. He is mentally retarded, with learning disabilities and a mental age of six years old. Mendez was one of fifteen children, and his parents were second cousins. Mendez was a resident of Puerto Rico, but periodically came to the United States to work as a migrant farm laborer. He left the sixth grade at the age of twenty-two and does not read, write, or understand English. Mendez had no prior criminal record.

In a capital trial, defendant was convicted of purposeful-or-knowing murder, felony murder (two counts), aggravated assault with a deadly weapon, armed robbery, burglary, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. The jury found aggravating factors c(4)(c), outrageously vile, and c(4)(g) contemporaneous felony, and mitigating factors c(5)(f), no significant criminal record, and c(5)(h), the catch-all factor. The jury found that the mitigating factors outweighed the aggravating factors. Mendez was sentenced to life imprisonment for the murder conviction. He also was sentenced to consecutive

terms of twenty years with a ten-year parole bar on the armed robbery count, and ten years with a five year period of parole ineligibility on the burglary count.

## O) Lance Philips

On July 21, 1991, the victim, a twenty-year-old male, and a seventeen-year-old female were at the home of an eleven-year old girl preparing cocaine for distribution. That afternoon, Lance Philips paid them a visit. The seventeen-year-old continued preparing the cocaine as Philips spoke. The twenty-year-old male showed Philips a blue bag containing approximately one-half kilogram of cocaine. Philips then left. The seventeen year old female went to sleep in the living room, while her sister and the twenty-year-old went out on the front porch.

Later that day, Philips and two co-defendants went to the house dressed in black, with black hoods, ski masks, or other material covering their faces. The twenty-year-old ran into the house and attempted to close the door. Two of the men ran after the twenty-year-old, while Philips grabbed the sister, pointed a gun at her head, and fired. The shot missed, and she fled and hid.

Philips struggled with the twenty-year-old, and then shot him five times. Philips and one of his co-defendants each shot the seventeen-year-old. Another of the men shot the eleven-year-old in the chest. They then shot the twenty-year-old again. Only the twenty-year-old died from his injuries. The assailants left with the bag of cocaine.

Philips eventually gave a statement to the police in which he admitted his involvement in the shooting. He also named the two men that accompanied him. One of the co-defendants also gave a statement, and he led the police to a storage bin containing more than three hundred vials of cocaine, drug paraphernalia, handguns, rifles, and a variety of ammunition.

Philips was convicted of murder, felony murder, armed robbery, two counts of attempted murder, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. Philips

had been indicted on three counts of attempted murder; however, for one of the counts of attempted murder, the jury found Philips guilty of the lesser included offense of aggravated assault. For murder, Philips was sentenced to a term of life imprisonment with a thirty-year parole bar. The remainder of his sentence is as follows: for armed robbery, twenty years with a ten-year parole bar, consecutive to the sentence for murder; for the first count of attempted murder, twenty years, with a ten-year parole bar, consecutive to the other sentences; for the second count of attempted murder, a concurrent twenty-year term with a ten-year parole bar; for aggravated assault, a concurrent eighteen-month term; and for unlawful possession of a weapon, a concurrent five-year term. The remaining convictions merged.

The AOC classifies this case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(c), defendant's age, and c(5)(h), the catch-all factor. At the time of the offense, Philips was nineteen-years-old and living with his mother. He is the father of one child. He is a high school dropout. It is not certain whether Philips was employed at the time of the crime, though he had previously worked as a cleanup person at a restaurant. Philips denied ever having used drugs or alcohol, though he has tested positive for cocaine and marijuana in the past. Additionally, police reports from a prior arrest note that Philips was under the influence of alcohol. As a juvenile, Philips was adjudicated delinquent on seven occasions. As an adult he had prior convictions for possession of a controlled dangerous substance and for possession of a weapon for an unlawful purpose.

### P) Charles Ploppert

On November 19, 1987, Charles Ploppert and a co-defendant went to the residence of a forty-one-year-old blind man, with the intention of robbing him. Ploppert and the co-defendant had intended to hit the man over the head with a baseball bat when he answered the door; however, the screen door was locked and

Ploppert was forced to identify himself to gain entrance to the man's house.

After entering the house, Ploppert and the co-defendant sat at the table talking with the man. Then Ploppert approached the man from behind and struck him on the head with his fist. After the man fell to the ground, Ploppert beat and kicked the man in the head, rendering him unconscious. Ploppert and the co-defendant searched the house for money, finding approximately $1500, which they later split between them. Ploppert then piled wood on the man and poured lighter fluid on the wood and around the house. Ploppert then ignited the wood. The man died.

The co-defendant gave a statement to the police detailing Ploppert's role in the killing. Also, Ploppert's live-in girlfriend stated that Ploppert and his co-defendant had told her that they were both involved in the assault and the fire.

Ploppert was twenty-four-years old when he committed the crime. Ploppert was a high school graduate, but had a learning disability. At the time of the murder, Ploppert was living with his girlfriend and five-year-old daughter. Ploppert had a serious drug abuse problem, and though he had been through three drug rehabilitation programs, he continued to use drugs. A clinical psychologist diagnosed Ploppert as perceptually impaired with a low range of intelligence and an addiction to methamphetamine and cocaine. Ploppert had no previous convictions.

Ploppert was charged with two counts of knowing-or-purposeful murder, one count of felony murder, two counts of robbery, and two counts of aggravated arson. He pleaded guilty to purposeful-or-knowing murder, robbery, and aggravated arson. At the penalty trial, the jury found aggravating factors c(4)(c), extreme suffering; c(4)(f), escape detection; and c(4)(g), contemporaneous felony. The jury found the following mitigating factors: c(5)(a), emotional disturbance; c(5)(c), the defendant's age; c(5)(d), mental disease or defect; and c(5)(h), the catch-all factor. The jury found that the mitigating factors outweighed the aggravating

factors. Ploppert was sentenced to a life term with a thirty-year parole bar for murder, a concurrent twenty-year term for robbery, and a concurrent ten-year term for aggravated arson.

### Q) Thomas Reigle

On September 1, 1984, Thomas Reigle and his girlfriend returned to Reigle's home after purchasing drugs. Reigle was high on speed and needed money to purchase additional drugs. Reigle resided in a house with his mother, a seventy-three-year-old aunt, and a sixty-two-year-old uncle. The house was a two story home, and the aunt and uncle shared an upstairs apartment.

Reigle asked the aunt to allow him to enter the apartment so that he could borrow money. After she refused, Reigle broke into the apartment. Reigle entered the aunt's room and broke her glasses. He took her purse into the bathroom, but before he could get any money, he heard her stirring. Reigle returned to the aunt's room and hit her several times with the bat. He then went to his uncle's room and struck him several times with the pipe, killing him. Reigle's mother and girlfriend saw Reigle with the pipe. He fled to another state, but was apprehended shortly thereafter. Reigle eventually gave a full confession.

Reigle was twenty-four years old and high on speed at the time of the offense. He has a history of drug and alcohol abuse dating back to his childhood years. Reigle is a high school dropout. There was evidence that Reigle had emotional and psychiatric problems. At the age of seven or eight, he was put on Ritalin for hyperactivity. Reigle was unemployed at the time of the crime. He had two prior convictions for drug possession and damage to property.

Reigle was convicted of purposeful-or-knowing murder, two counts of felony murder, aggravated assault, robbery, and burglary. At the penalty trial, the jury found aggravating factor c(4)(g), contemporaneous felony. The jury found mitigating factors c(5)(d), mental disease, defect or intoxication; c(5)(f) no significant prior record; and c(5)(h), the catch-all factor. The jury did not

find that the aggravating factors outweighed the mitigating factors. Reigle was sentenced to life imprisonment. ·

### R) Anthony Szadorski

Anthony Szadorski met a seventy-six-year-old woman at an Alcoholics Anonymous meeting. They became friends and Szadorski did yard work for the woman. On May 25, 1993, Szadorski and a co-defendant broke into the woman's apartment.· When the woman jumped up and asked Szadorski what he was doing, Szadorski pulled a knife from his pocket and stabbed her multiple times. As the woman tried to crawl away, Szadorski continued stabbing her. The co-defendant then entered the room and Szadorski asked for the BB gun the co-defendant was carrying. Szadorski then beat the woman in the head with the gun until she stopped moving. The woman died from her injuries. Szadorski and the co-defendant took items from the woman's house and car. Szadorski later told an acquaintance that he had killed the woman by slashing her throat, and that once he started stabbing her he could not stop.

Szadorski was charged with four counts of purposeful-or-knowing murder, felony murder, robbery, burglary, possession of a weapon for an unlawful purpose, possession of a knife for an unlawful purpose, unlawful possession of a weapon, possession of a weapon without a permit, auto theft, and hindering apprehension. Szadorski pled guilty to felony murder, robbery, possession of a knife for an unlawful purpose, theft of auto, and hindering apprehension. For felony murder, Szadorski was sentenced to life imprisonment with a thirty-year parole bar. For auto theft, he was sentenced to five years concurrent, and for hindering apprehension, he was sentenced to five years consecutive. The robbery and weapons offenses merged. ·

The AOC has classified this case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(c), defendant's age; c(5)(d), mental disease, defect, or intoxication;

c(5)(g), gave substantial evidence to the police; and c(5)(h), the catch-all factor.

Szadorski was twenty years old at the time of the crime. He has an extensive history of mental illness and substance abuse. Szadorski began drinking and using drugs at the age of nine. The drinking and drug abuse continued throughout his life, except during periods of institutionalization. Beginning at the age of thirteen, Szadorski was hospitalized several times for mental illness and substance abuse. He had also attempted suicide several times. Szadorski was diagnosed with psychotic disorders. He was abused by his mother, father and stepfather. Szadorski dropped out of school in the eighth grade and never went to high school. He has a sporadic work history doing landscaping and dishwashing. Szadorski was arrested several times as a juvenile and was adjudicated delinquent for two theft and burglary offenses.

### S) Gerald I. Williams

On the evening of November 23, 1984, Gerald Williams was walking home with his eight year old daughter after buying her ice cream. They came upon Williams' friend J.C. Boyd. Williams and Boyd had some drinks and decided to purchase some drugs. They went to Boyd's wife's home to borrow money; however, she was not home. They then went to an apartment belonging to a friend of Boyd.

On the way, they noticed that a door to one of the other apartments was ajar. Hearing a television, they knocked on the door. When there was no answer, they entered the apartment. Williams' daughter remained at the door. Upon entering the apartment, Williams and Boyd found a fifty-one-year-old male asleep on the couch. There were two television sets in the apartment. As Williams turned off the television in the bedroom to steal it, the man awoke. Boyd punched the man and pushed him toward Williams, who threw a cover over the man and banged the man's head against a windowsill. The man broke free, went to

the window, and called for help. Williams hit the man over the head. He put down the television and threw the man out of the window. The man fell three floors. The medical examiner concluded that the man died from being struck on the head by a blunt instrument, and would have died even had he not been thrown from the window. Williams searched through a pair of pants draped over a chair, took some money, and left the apartment with the newer of the television sets.

After a police investigation revealed that Williams and Boyd may have been responsible for the crime, the police took a statement from Williams' daughter. She admitted seeing Williams throw the man out the window.

The AOC narrative classifies this case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(d), mental disease, defect or intoxication, and c(5)(h), the catch-all factor. Williams was thirty-four years old at the time of the murder. Williams was the father of six, by five different women. Although previously being addicted to drugs, Williams underwent a treatment program from 1978 to 1980, and denied any addiction at the time of the murder. However, prior to the murder, Williams had been drinking. Williams dropped out of school in the tenth grade because he was arrested and subsequently incarcerated. Over the years, Williams was arrested thirty times and served twelve different terms of incarceration as an adult and juvenile.

Williams and Boyd were indicted for felony murder, burglary, and robbery. After being granted immunity, Boyd testified against Williams. Williams testified in his own defense, and claimed that the victim accidentally fell out the window as the victim attempted to call for help. Williams was convicted on all three counts. For felony murder, he was sentenced to life imprisonment with a parole ineligibility of thirty years. The two other convictions merged. Defendant's conviction for felony murder was reversed because the trial court's charge on causation was

deficient under *State v. Martin,* 119 *N.J.* 2, 573 *A.*2d 1359 (1990). The Appellate Division concluded that a jury could have found that the burglary and robbery were not the direct cause of the victim's death. Williams had testified that the victim awoke during the burglary and was at the window with his legs dangling outside and that he, Williams, had tried to help the victim, but was unsuccessful.

### T) Herman Williams

On February 3, 1984, Herman Williams and an accomplice (who was a minor and thus not a co-defendant) broke into the Spencer home. Williams was armed with a handgun. They went there to rob one of the family members who was not yet home. There were six people at the Spencer home at the time. Williams hit one person in the face with the handgun. Benjamin Spencer, an older handicapped man, awoke and struggled with Williams. Benjamin died seventeen days later in the hospital from an infection resulting from the release of contaminated materials from his bowels into his bloodstream. Williams and his accomplice took money, jewelry, a case of wine, and a television set.

Benjamin's daughter selected a photo of Williams and said that he had killed their father. Later, the accomplice gave a statement claiming that Williams forced him to participate in the robbery and murder. At trial, in response to the State's promise not to move for waiver of juvenile jurisdiction and not to seek the maximum sentence, the accomplice testified against Williams.

Williams was convicted of murder, felony murder, burglary, robbery, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. For murder, Williams was sentenced to life with a thirty-year parole bar. For robbery, Williams was sentenced to a consecutive fifteen-year term with a seven-and-one-half-year parole bar. For unlawful possession, he was given a concurrent four-year term, and he was sentenced to a seven-year concurrent term for the other weapons offense.

Williams was twenty-two at the time of the murder. At the time of the offense, Williams lived with his mother and had been unemployed for about four years. Williams left school at the age of fifteen and is barely literate. He had attended a school for those classified as emotionally disturbed or mentally retarded. Also, Williams scored low on I.Q. tests, and a doctor viewed him as "not mentally retarded, but culturally retarded." He has an extensive criminal record, with convictions for burglary, theft, and breaking and entering, as well as five disorderly persons convictions. The AOC has classified this case as having aggravating factor c(4)(g), contemporaneous felony, and c(5)(h), the catch-all factor.

## APPENDIX B

Comparison of Other E and G Cases that Defendant
Asserts Should Be in the E–1 Category

### A) Jesus DeJesus

On March 31, 1995, Jesus DeJesus entered the apartment of a forty-nine-year-old woman who lived in the apartment below his. DeJesus stabbed the woman to death and set the woman on fire. DeJesus took some jewelry from the apartment. The woman's remains were identified by her dental records.

DeJesus's brother informed the police that DeJesus was selling jewelry. The jewelry was subsequently identified as belonging to the victim. When confronted by the police with the jewelry that he had stolen, DeJesus stated that he had not cut the woman. When the police informed him that the cause of death had not been determined, DeJesus put his head down and requested an attorney.

DeJesus was charged with murder, felony murder, armed robbery, arson, and armed burglary. He was convicted of all charges and was sentenced to life imprisonment with a thirty year parole bar for murder, a concurrent twenty-year term with a ten year parole bar for armed robbery, a consecutive five-year term with a

two-and-one-half year parole bar for arson, and a consecutive ten-year term with a two-and-one-half year parole bar for armed burglary. The AOC has classified DeJesus as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factor c(5)(h), the catch-all.

At the time of the murder, DeJesus was forty-four years old and living with one of his two daughters. DeJesus left school after the fourth grade and later attended a printing school to learn to operate a printing press. Although he had worked as a Hi-lo driver in the past, DeJesus had been unemployed for two years prior to the crime. DeJesus admitted drinking alcohol three times a week but denied having a drug problem. He had prior convictions for robbery, theft, criminal trespass, possessing drug paraphernalia, and motor vehicle violations.

### B) Wayne Busby

On April 9, 1985, Wayne Busby had been on a twenty-four-hour binge of drinking and smoking crack. Needing more money to purchase drugs, Busby broke into the apartment of a seventy-four-year-old female neighbor. As the woman went downstairs to see who was at the door, Busby hit the woman in the face, broke her ribs, and strangled her to death. The force applied by Busby caused the broom to break. During the struggle, the woman managed to scratch Busby on the neck. After strangling the woman, Busby went to the woman's bedroom and her son's bedroom, and took money, a camera and film, and other items.

Busby was charged with knowing-or-purposeful murder and felony murder. Defendant was convicted of both counts. The prosecutor served a notice of aggravating factors for c(4)(g), contemporaneous felony, and c(4)(f), seeking to escape detection. At the penalty trial, the jury found both aggravating factors, and also found mitigating factors c(5)(a), emotional disturbance; c(5)(d), mental disease, defect or intoxication; and c(5)(h), the catch-all. Additionally, the jury found that the aggravating fac-

tors did not outweigh the mitigating factors. Busby was sentenced to life imprisonment with a thirty-year parole bar.

Busby was thirty-one-years old at the time of the murder. As a child, he was "an embarrassment to his family" and was subjected to physical and psychological abuse. At age fifteen, Busby began using marijuana, and he eventually started abusing crack, PCP, and alcohol. Relatives thought that he was emotionally unstable. After the murder, Busby attempted suicide. Busby had a prior robbery conviction and two disorderly person convictions.

### C) Thomas Dollard

On July 14, 1990, Thomas Dollard and two co-defendants, Dwayne Knight and Leon Durhan, entered an apartment building in search of someone to rob of money or drugs. Dollard was armed with a handgun and Knight with a shotgun. The trio encountered a couple in the stairwell of the building, and asked the couple if they had drugs. The couple stated that they did not, and the three made the couple take down their pants and the three searched the couple for drugs. The three forced the couple to knock on an apartment door and to try to use the resident's familiarity with the couple to get them to open the door. When that did not work, Knight kicked in the door. Dollard ran into the apartment while Knight and Durham brought the couple into the apartment. One of the residents of the apartment, a forty-seven year old man, began to get out of bed. Dollard told the man to lie down. When the man asked why Dollard was doing it, Dollard shot the man in the chest. The man asked why he did it, and then collapsed. He died from his wounds.

Durhan later gave a statement to the police in which he implicated Knight and Dollard. Knight gave a statement implicating Durhan and Dollard.

Dollard was charged with burglary, two counts of aggravated assault, three counts of robbery, felony murder, murder, possession of a weapon, two counts of unlawful possession of a weapon, and two counts of possession of a weapon for an unlawful purpose.

He was convicted of all counts and was sentenced to an aggregate sentence of life plus ten years with a thirty-five-year parole bar.

At the time of the murder, Dollard was twenty-one years old. He lived with his grandmother and worked as a "material handler." Dollard dropped out of high school in the eleventh grade. He is in good mental health, but suffers from bleeding ulcers, sickle cell anemia, and an old shotgun wound to the leg. Dollard admits to using cocaine, hits, and "p-dope." Dollard had one prior conviction for unlawful possession of a weapon. The AOC narrative classifies this case as having aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(c), the defendant's age, and c(5)(h), the catch-all.

### D) Larry Durden

Larry Durden worked as a part-time security guard in an apartment building. Durden changed the locks on the door of a seventy-two-year-old tenant's apartment, and the woman invited Durden for dinner. Durden went to dinner at her apartment and sometime during the evening, Durden stabbed the woman. The woman died from the stab wounds to her forehead and abdomen. A small ax-type object found in the victim's apartment was believed to be the murder weapon. Durden took the woman's groceries, television set, and radio.

Durden went to another apartment in the same building and asked the family if they wanted to buy groceries that he had gotten for free. Later that day, Durden went back to the same apartment to try to sell the radio and television. Eventually, Durden admitted to stealing the television and radio, but he stated that the woman was dead when he went to the apartment.

Durden was charged with purposeful-or-knowing murder, felony murder, and burglary, and was convicted on all counts. The prosecutor submitted aggravating factor c(4)(g), contemporaneous felony, to the jury. The jury found that factor and the catch-all mitigating factor, c(5)(h). The jury determined that the aggravating factor did not outweigh the mitigating factor. Durden was

sentenced to life imprisonment with a thirty-year parole bar for murder and a seven-year consecutive sentence for burglary.

Durden was thirty-one years old at the time of the crime. He had received a general equivalent diploma and had been honorably discharged from the United States Navy. He was employed at the time of his arrest and had no mental problems or drug addiction. He had prior convictions for armed robbery, felony breaking and entering, and a parole violation.

### E) Aaron Huff

On February 4, 1984, Aaron Huff, age twenty-three, broke into the apartment of a seventy-four-year-old man to steal money that Huff knew the man had. The man had always withdrawn cash from his bank account to pay his rent on the first of the month. When Huff entered the apartment, the man was sitting in a chair. The man started to get up and move towards Huff, but he changed his mind and sat down. As Huff began to disconnect the man's television set, the man charged at Huff. Huff then beat the man until he stopped moving. The man was later found dead, bloodied, and beaten, with bruises and lacerations on his hands, neck, nose, ears, chest, and the top of his head. Huff took $270, the television set, and a clock radio.

Huff was charged with purposeful-or-knowing murder, felony murder, and burglary, and he was convicted of all charges. The prosecutor filed a notice of aggravating factors for c(4)(c), extreme suffering, and c(4)(g), contemporaneous felony. The jury found both aggravating factors and found mitigating factors c(5)(d), mental disease, defect, or intoxication; and c(5)(h), the catch-all factor. The jury also found that the aggravating factors did not outweigh the mitigating factors. Huff was sentenced to life imprisonment with a thirty-year parole disqualifier.

Huff had been drinking heavily on the day of the murder. A psychiatrist testified that Huff "goes wild" when drunk. Huff was raised in poverty. After living in a shack, Huff and his family eventually began living in a car. His mother was an alcoholic and

his father was incarcerated. Huff started drinking at age fourteen and started using drugs shortly thereafter. At some point during his adolescence, Huff attempted suicide. There was psychiatric testimony that Huff had an antisocial disorder, an antisocial personality and mentally was still an adolescent. Between 1978 and 1984, Huff was convicted of eight disorderly persons offenses, conspiracy, larceny, and two counts of burglary.

### F) Michael Suarez

On October 3, 1991, Michael Suarez entered the apartment of his twenty-five-year-old neighbor to rob him. Suarez went to the man's bedroom and stabbed him eleven times in the neck, back, and chest. The man also sustained cutting wounds to the face, scalp, and neck. Suarez stole the victim's wallet containing $5 and a money access card. The victim was discovered in a fetal position on top of a pile of blood-soaked clothes, lying between the wall and bed.

In a taped statement, Suarez gave a full confession to the police. Suarez was charged with murder, felony murder, robbery, two counts of burglary, and unlawful possession of a weapon, and was convicted of all charges. For robbery he was sentenced to twenty-years' imprisonment with a ten-year parole bar; for burglary, he was sentenced to a concurrent ten-year term with a five-year parole bar; and for murder, he received a consecutive term of life with a thirty-year parole bar. The remaining convictions merged.

At the time of the crime, Suarez was twenty-three years old and was employed as a video distributor. Suarez had been residing with his uncle and aunt for approximately one year. He quit school at the age of sixteen, and he received his general equivalent diploma in 1994. Suarez admits to daily usage of marijuana, LSD and alcohol, and he was under the influence of alcohol when he committed the murder. Suarez had no prior record. The AOC classifies this case as having aggravating factor c(4)(g), contempo-

raneous felony, and mitigating factors c(5)(f), no significant prior record, and c(5)(h), the catch-all.

## G) Thomas Wolfe

On September 23, 1990, Thomas Wolfe had been drinking and using drugs throughout the day. He went to the home of a seventy-two-year-old female and broke in through a rear window. Wolfe was surprised by the woman, and a struggle ensued. Wolfe slashed the woman's throat three times. The woman also suffered numerous puncture wounds to her back. A neighbor found the woman's body lying in a pool of blood and covered by a blanket. An autopsy determined that the woman bled to death.

Wolfe's mother, stepfather, and brother gave statements to the county prosecutor in which they stated that Wolfe had come home with blood on his clothes and confessed that he broke into the woman's home and killed her. Subsequently, Wolfe surrendered to the police.

Wolfe was charged with purposeful-or-knowing murder, murder in the commission of a crime, burglary, robbery, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. He was convicted on all counts. In the penalty phase, the jury found aggravating factor c(4)(g), contemporaneous felony, and mitigating factors, c(5)(c), the defendant's age; c(5)(d) mental disease, defect, or intoxication; c(5)(f), no significant prior record; and c(5)(h), the catch-all. The jury could not unanimously agree on a sentence and, thus, defendant was sentenced to life imprisonment with a thirty-year parole bar for murder, a consecutive ten-year term for burglary, and twenty years with a seven-year parole bar for robbery to run consecutive to the life sentence and concurrent to the sentence for burglary.

At the time of the murder, Wolfe was twenty-two years old, living with his parents, and unemployed. As a school age child, Wolfe was classified as emotionally disturbed and was placed in special education classes. Wolfe dropped out of school in the eleventh grade and had training in heating/air conditioning repair.

Wolfe had an extensive history of drug abuse, for which he repeatedly received treatment. At the penalty trial, several people testified that Wolfe was a good person and that drugs and alcohol had ruined him. Wolfe also testified that he hated himself for letting his life get out of control and for not having the power to stop taking drugs. He also expressed remorse for killing the woman.

### H) Daniel Hart

On January 22, 1990, Daniel Hart and William Hoffman were at Hoffman's home drinking alcohol and getting high on PCP and marijuana. Hoffman came up with the idea to kill a twenty-three-year-old woman whom they believed to be a "snitch." Hoffman had taken a key to the woman's apartment building from the woman's ex-boyfriend. To get the woman out of her apartment, Hoffman rang the buzzer at the main entrance. When the woman went to the main entrance, Hart tried to sneak into her apartment. The woman saw Hart enter her apartment when she and Hoffman were returning to the apartment. Hoffman and the woman went into the bedroom to talk while Hart waited in the living room. Hoffman told her that he and Hart had been in a fight and needed a place to hide. Sensing that he was lying, the woman asked Hoffman to leave. Hoffman then tried to smother her with a pillow. The woman tried to fend off the attack, and Hart entered the room and slashed the woman's throat thirty times, killing her. An autopsy revealed that the woman had numerous stab wounds to the neck, head and back. Hoffman took $25 from the woman. He also put a VCR in a bag, but decided not to take it because they were going to have to walk home.

Hoffman gave a statement to the police detailing the crime. Hart was charged with two counts of murder, felony murder, robbery, burglary, possession of a weapon for an unlawful purpose, and possession of a weapon other than a firearm. Pursuant to a plea agreement, Hart pled guilty to aggravated manslaughter, robbery and burglary. He was sentenced to thirty-years' impris-

onment with a fifteen-year parole bar for manslaughter, a consecutive twenty-year term with a ten-year parole bar for robbery, and a ten-year term for burglary, to run concurrent the manslaughter and robbery charge.

At the time of the crime, Hart was twenty years old. For a few months prior to the murder, Hart had been employed by an airline. Hart's father was an abusive alcoholic and Hart quit school in the tenth grade. Hart began drinking beer at twelve years of age, smoking marijuana on a daily basis at thirteen years of age, and by the time he was seventeen, he was using various drugs on a daily basis. Hart has multiple convictions as a juvenile and as an adult, including a conviction for aggravated assault. The AOC has coded this case with aggravating factor c(4)(g), contemporaneous felony, and mitigating factors c(5)(c), the defendant's age; c(5)(d), mental disease, defect, or intoxication; and c(5)(h), the catch-all factor.

HANDLER, J., dissenting.

In October 1986, on a retrial, Nathaniel Harvey was convicted by a jury for the murder of Irene Schnaps. Schnaps was found alone in her apartment, having been struck on the head several times with a blunt instrument—killed in an apparent burglary. There were no signs of forced entry and no signs of a struggle in the bedroom where she was discovered. The jury found defendant guilty of purposeful-or-knowing murder, felony murder, first-degree robbery, and second-degree burglary.

At the penalty phase, the jurors determined that the State had proven beyond a reasonable doubt two statutory aggravating factors: *N.J.S.A.* 2C:11–3c(4)(f) (murder committed to escape apprehension for another offense) and *N.J.S.A.* 2C:11–3c(4)(g) (murder committed during the course of a robbery and burglary). The jury did not find as an aggravating factor the State's submission that the murder involved aggravated assault of the victim, *N.J.S.A.* 2C:11–3c(4)(c). Several of the jury members found some of the ten non-statutory mitigating factors presented by defendant

pursuant to *N.J.S.A.* 2C:11–3c(5)(h), the "catch-all" mitigating factor. *See ante* at 312, 731 *A.*2d at 1139. Finding that the aggravating factors outweighed the mitigating factors, the jury sentenced defendant to death for the capital charges. The trial court sentenced defendant to an aggregate sentence of life plus sixty-five years with a fifty-seven and one-half-year parole disqualifier for the non-capital counts of first-degree robbery and second-degree burglary. The Court affirmed defendant's convictions and death sentence. *State v. Harvey,* 151 *N.J.* 117, 233, 699 *A.*2d 596 (1997) (*Harvey II* ).

This appeal is based on defendant's request for a proportionality review. In *State v. Loftin,* 157 *N.J.* 253, 724 *A.*2d 129 (1999) (*Loftin II* ), the Court appointed a Special Master to evaluate its proportionality review methodology and make recommendations for improvements.[1] The Court then proceeded to apply the existing methodology to Loftin's case, stating, "Until we have had the benefit of [the Special Master's] report, ... we will continue ... to carry out proportionality review as before." *Id.* at 266, 724 *A.*2d 129.

The Special Master released his report on April 28, 1999. The Honorable David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* (Apr. 28, 1999) (*Special Master Report* ). In that report, the Special Master determined that several aspects of our methodology are faulty and require revision. *Id.* at 6–7. Despite the Special Master's recommendations, the Court goes ahead with defendant Harvey's case, applying existing methodology. This course of action, in addition to its needless inefficiency and unfairness, can only further confuse and undermine the accuracy and integrity of our proportionality review.

---

[1] The Court directed the Special Master to examine eight substantive areas. *See ante* at 299, 731 *A.*2d at 1132 (citing *Loftin II, supra,* 157 *N.J.* at 454–56, 724 *A.*2d 129).

The Court, in proceeding with this review, makes it pointless to delve into the *Special Master Report* in detail here. Suffice it to say that the proposed revisions would—I predict, will—have a significant impact on defendant's proportionality review. The Court's decision to proceed with defendant's ·review when oral arguments on a new methodology are scheduled to occur the week of this decision's filing, *see ante* at 300, 731 *A.*2d at 1133, does a grave disservice to both defendant and this Court's commitment to justice.

The Court holds that defendant's sentence is not disproportionate. *See ante* at 283, 731 *A.*2d at 1124. First, the Court has previously decided not to apply the Legislature's 1992 capital murder statute amendment, which severely limits the universe of cases constituting a basis for comparison among defendants, until the appointed Special Master reviewed the validity of such a limitation. *See Loftin II, supra,* 157 *N.J.* at 265–66, 724 *A.*2d 129. In this case, even though the Special Master has spoken on the issue, the majority again defers judgment on the constitutionality of the statutory amendment. *See ante* at 288 – 289, 731 *A.*2d at 1126 – 27. Further, the Court holds that defendant has not relentlessly documented with adequate evidence that racial discrimination influences this State's imposition of the death penalty. *See ante* at 319 – 20, 731 *A.*2d at 1143 – 44. Finally, the Court affirms the proportionality of defendant's death sentence, holding that when defendant is compared to other similarly situated death-eligible defendants, defendant's sentence is not disproportionate. *See ante* at 319, 731 *A.*2d at 1143.

I disagree with the Court's holdings regarding systemic issues in the application of the New Jersey capital murder statute. First, I reiterate that consideration of the constitutionality of the 1992 amendment should not be postponed. *Accord Loftin II, supra,* 157 *N.J.* at 373, 724 *A.*2d 129 (Handler, J., dissenting). This Court has expressed a strong commitment to meaningful proportionality review and has firmly rejected the possibility that

a universe limited to cases in which the death penalty has been imposed could form the basis for such review. *See State v. Marshall,* 130 *N.J.* 109, 137, 613 *A.*2d 1059 (1992) (*Marshall II* ). In light of the Special Master's strong statement that "a universe limited to cases in which the death sentence was imposed cannot support a coherent proportionality review system," *Special Master Report, supra,* at 10, the Court should act at this time by declaring the 1992 amendment unconstitutional.

Second, I believe the statistical evidence before the Court, already presented in *Loftin II, supra,* demonstrates a constitutionally impermissible risk that race discrimination infects our State's imposition of the death penalty. This risk is especially great in transracial cases like this one, involving black defendants and white victims. Given the startling evidence of race discrimination before us, the Court should declare the death penalty statute unconstitutional or, at the very least, place a moratorium on the imposition of the death penalty until such time as the evidence demonstrates that race is not playing a role in capital prosecuting and sentencing. *Accord Loftin II, supra,* 157 *N.J.* at 446, 724 *A.*2d 129 (Handler, J., dissenting).

With regard to defendant's individual proportionality review, I object to the majority's novel decision to limit the class of cases to which defendant is compared in precedent-seeking review to his salient-factors subcategory (E–1), a step that renders the Court's proportionality review incomplete. Further, I find the Court's statistical analyses and its precedent-seeking review extremely subjective, arbitrary, and ultimately unreliable. I strongly disagree with the Court's conclusion and find defendant's sentence to be disproportionate.

I, therefore, dissent.

I

Proportionality review has always been an integral and indispensable part of this Court's review of capital sentences. It is meant "to ensure that the death penalty is being administered in a

rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Loftin II, supra,* 157 *N.J.* at 275, 724 *A.*2d 129 (quoting *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059); *see State v. Ramseur,* 106 *N.J.* 123, 327, 524 *A.*2d 188 (1987); *Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976). Our emphasis on the dual tasks of ensuring uniformity and accounting for the individual circumstances of each defendant's crime, *see Ramseur, supra,* 106 *N.J.* at 330–31, 524 *A.*2d 188, has been, in my view, irreparably hampered by our inability to reconcile these two aims.

Proportionality review consists of a two-pronged approach: statistical frequency analysis and precedent-seeking review. Both of these methods, however, suffer from deficiencies. *See Loftin II, supra,* 157 *N.J.* at 413–15, 724 *A.*2d 129 (Handler, J., dissenting) (citing *State v. DiFrisco,* 142 *N.J.* 148, 212, 245, 662 *A.*2d 442 (1995) (*DiFrisco III* ) (Handler, J., dissenting)); *State v. Martini,* 139 *N.J.* 3, 81–82, 651 *A.*2d 949 (1994) (*Martini II* ) (Handler, J., dissenting) (discussing flaws in universe of cases used for comparison, failure to use workable standard by which to judge general imposition of death penalty, and inherently subjective nature of precedent-seeking review).

. I now reiterate the most problematic of these deficiencies, namely, (1) the lack of an objective, numerical standard for frequency analysis determinations of when a death sentence is "generally" imposed; (2) deficiencies in the data base of comparison cases; and (3) the subjective nature of precedent-seeking review.

### A.

The Court persists in refusing to attempt to quantify its standard for determining what constitutes a "generally" imposed sentence when examining frequency analysis measurements of disproportionality. *See Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949 ("A capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the

defendant under review generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction."). This failure to bring some objectivity and consistency to its determinations renders meaningful proportionality review an illusory goal. *See Loftin II, supra,* 157 *N.J.* at 415, 724 *A.2d* 129 (Handler, J., dissenting) (stating that Court's standard of review is inherently subjective, as evidenced by the majority's shifting principles for proportionality determinations).

Not only is the purely subjective standard of "general imposition" difficult to pinpoint for any particular case, it is only one of a number of substantively different, yet equally imprecise standards this Court has attempted to apply, often within the same case. The Court thus attempts the impossible: to ascertain "proportionality" without a stable benchmark or measure. The Court has, in fact, since its first proportionality review, invoked fourteen different amorphous standards and substandards when discussing the test for determining proportionality: (1) " 'The principal inquiry [in frequency analysis] is whether the degree of blameworthiness in the present case reasonably supports an expectation that such a case will generally result in a death sentence.' " *Ante* at 299, 731 *A.2d* at 1132 (quoting *DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.2d* 442) (internal quotes and citation omitted); (2) " 'A capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the defendant under review generally receive sentences other than death for committing factually similar offenses in the same jurisdiction.' " *Ante* at 289, 731 *A.2d* at 1127 (quoting *Martini II, supra,* 139 *N.J.* at 20, 651 *A.2d* 949 (citing *State v. Bey,* 137 *N.J.* 334, 351, 645 *A.2d* 685 (1994) (*Bey IV*) (other citation omitted)); (3) "[W]e seek to determine the existence of any aberration in defendant's sentencing." *Ante* at 308, 731 *A.2d* at 1137 (citing *Bey IV, supra,* 137 *N.J.* at 369, 645 *A.2d* 685); *see also ante* at 307, 731 *A.2d* at 1137 ("[W]e do not believe that evidences that [defendant's] sentence is an aberration."); (4) " 'Frequency analysis helps us to determine whether defendant is in a category that renders him or her more likely than other killers to receive the death penalty.' " *Ante* at 299, 731

*A*.2d at 1132 (quoting *DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A*.2d 442); (5) "If the death sentence is imposed often enough in a category of comparable cases, then we feel confident that there exists a societal consensus that death is the appropriate punishment." *DiFrisco III, supra,* 142 *N.J.* at 172, 662 *A*.2d 442; (6) "[T]he figures for E–1 defendants are higher than the overall death-sentencing rates...." *Ante* at 301, 731 *A*.2d at 1133; (7) "[D]efendant's numbers are not the lowest score of a defendant whose claim of disproportionality we have denied." *Ante* at 306, 731 *A*.2d at 1136; (8) "[D]efendant's 'results produce no showing of randomness....'" *Ante* at 307, 731 *A*.2d at 1137 (quoting *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A*.2d 442) (citations omitted); (9) "[Proportionality] review ... is [ ] a vehicle to ensure that the penalty-phase jury's decision is not insupportable." *Martini II, supra,* 139 *N.J.* at 22, 651 *A*.2d 949, (10) "[O]ur goal is to determine whether the jury's decision to sentence a defendant to death is comparable to decisions reached in the appropriate capital cases in our universe of cases." *Ibid.;* (11) "[T]his salient-factors analysis reveals that a significant portion of defendants in the pecuniary-motive category ... have received the death penalty." *DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A*.2d 442, (12) "The index-of-outcomes results in defendant's case are not consistently higher or lower than results generated for prior cases...." *Loftin II, supra,* 157 *N.J.* at 334, 724 *A*.2d 129, (13) disproportionality is measured by looking at whether defendant's culpability is "more like that of defendants who received death sentences or of those who received life terms." *Martini II, supra,* 139 *N.J.* at 50, 651 *A*.2d 949; *see DiFrisco III, supra,* 142 *N.J.* at 186, 662 *A*.2d 442; and (14) "As in *Marshall II* and *Bey IV,* 'we do not [here] find a pattern of life sentencing or the taint of an invidious factor that would require us to reverse [defendant's] death sentence.'" *Loftin II, supra,* 157 *N.J.* at 345, 724 *A*.2d 129 (quoting *Bey IV, supra,* 137 *N.J.* at 386, 645 *A*.2d 685).

The Court must acknowledge that its "generally imposed" standard, already inherently subjective and unquantifiable, has evolved into a range of equally vague and immeasurable, but substantively *different*, standards, rendering proportionality review unworkable. The two standards employed by the Court in this case could not be more different: when one declares that a death sentence is disproportionate if similarly situated defendants "generally" receive a sentence other than death, one imposes a very different standard than when one seeks to determine if such a sentence is "random" or "aberrational." The Court's errant application of these inconsistent standards only highlights their susceptibility to manipulation.

I reiterate my contention that the Court should use a numerical preponderance standard to determine when a death sentence is proportionate. *Accord Loftin II, supra,* 157 *N.J.* at 419, 724 *A.*2d 129 (Handler, J., dissenting). "Without the doctrinal discipline and certainty of a defined numerical majority consistent with the concept of generality to demonstrate proportionate sentences, it is inevitable that arbitrary death sentences of individual defendants will be lost in the verbiage that rationalizes a death sentence as proportionate." *Ibid.* Verbal thresholds may work in other areas of the law, but they cannot be determinative when death is the outcome.

### B.

Second, there are deficiencies in the database used as a basis for comparison to defendant's case that undermine the Court's proportionality review. This case involves data presented previously by defendant Loftin and incorporated into the database of the Administrative Office of the Courts (AOC). *See Chew, Cooper, Harvey Report* (Dec.1997) (*CCH Report*). Previously indicated problems with the database still exist: "[it] remains too small to provide a reliable review," *Loftin II, supra,* 157 *N.J.* at 414, 724 *A.*2d 129 (Handler, J., dissenting); the universe of cases still erroneously includes death sentences that were reversed, *id.* at

416 n. 16, 724 *A*.2d 129 (Handler, J., dissenting) (citations omitted); and the Court continues to erroneously include in its analysis data including defendant's case, *see id.* at 420 n. 19, 724 *A*.2d 129 (Handler, J., dissenting) ("[P]lacing defendant's case on both sides of the comparison, gauging the proportionality of a defendant's sentence by comparing it to a group of which he is a member, skews the analysis.").

## C.

The standards circumscribed by the Court for frequency review are not particularly suited to its precedent-seeking review. The Court's precedent-seeking analysis suffers from a different deficiency: by putting the defendant under a microscope the Court employs a review so individualized that it becomes impossible to gather a class of cases that can be compared with the defendant's and against which defendant's sentence can be measured. *Id.* at 419, 724 *A*.2d 129 (Handler, J., dissenting).

Defendant's case starkly demonstrates this problem: Harvey is the only defendant in his subcategory who currently faces the death penalty. Yet, the Court finds his sentence is proportionate, in spite of the fact that his crime is not among the most egregious in the group. The Court fails to recognize the necessity of drawing a connection between its quantitative frequency analysis and the more quality-driven precedent-seeking review in order to reduce the subjectivity in our application of the latter. If the salient-factors test results indicate that cases like defendant's yield death sentences only ten percent of the time,[2] the precedent-seeking review should then be used to determine if defendant is among the one or two most blameworthy in his category of 20

---

[2] I disagree with the AOC's inclusion in the database of two defendants whose death sentences were reversed. Without inclusion of these cases, the death sentencing rate for E–1 defendants would be zero percent, lower still than the ten percent cited by the majority. However, even under the Court's use of the AOC's coding decisions, I contend that the Court misapplies and underestimates the evidence of disproportionality.

defendants. Without linking the two analyses, the salient-factors test fails to inform the Court at all: the test tells us that the death penalty is not generally imposed for defendant's category; if we fail to conclude from this that defendant's sentence is disproportionate, the test loses all value unless the results are then used to serve as a backdrop for our precedent-seeking review.

In addition, the AOC-designated comparison subcategories, used by the Court to assess defendant's disproportionality claim, do not always include all relevant cases. The Court defers to the AOC's judgment in defining the comparison groups, *ante* at 294, 731 *A.*2d at 1130, failing to recognize that these groupings can be overly limiting; it is crucial that we look beyond them in precedent-seeking review in order to gain as much insight as possible into a defendant's sentence.

### D.

Given these problems, and the availability of the recommendations for improvement by the Court's appointed Special Master, I object to the application of our current methodology to defendant's case. In light of the Court's concession that the system of review requires evaluation and perhaps reconfiguration, one must assume that any death sentence reviewed and found proportionate by existing methods, including Harvey's, will be reconsidered in the event that the Court adopts some or all of the Special Master's suggestions. The only just alternative is to postpone all proportionality reviews until such time as the Court has had the opportunity to consider and evaluate the Special Master's findings towards the creation of a more sound method by which to judge the proportionality of a defendant's death sentence. It is grossly unfair, profoundly misleading, and patently prejudicial to determine, upon faulty methodology, that defendant's death sentence is proportionate. By doing so, the Court moves the defendant further down the path toward execution; simultaneously it erects another high and unfair hurdle—the need to have the Court reconsider and then reverse this determination of proportionality.

To put defendant through such an obstacle course to save his own life and secure a just sentencing result offends fundamental fairness.

## II

Because the Court has applied our system of proportionality review to defendant's case, I have attempted to determine the proportionality of his sentence. *See infra* at 374 – 415, 731 *A.*2d at 1173 – 96. There is, however, an issue that should be addressed first that is even graver and more importunate than defendant's individual proportionality review. That compelling issue is posed by recurring evidence of a persistent risk of systemic race discrimination in the administration of the death penalty, particularly in the prosecution of cases such as this one and *Loftin II,* transracial murders in which the defendant is black and the victim is white.

The majority finds that defendant has failed to prove that New Jersey's death penalty statute is implemented in a racially discriminatory manner. *See ante* at 319 – 20, 731 *A.*2d at 1143 – 44. We are faced here with the same data compiled in the AOC's *CCH Report, supra,* presented by defendant Donald Loftin. Given certain methodological concerns with the statistical models employed to assess whether or not racism plays a role in this State's prosecution and sentencing of capital cases, the Court in *Loftin II* asked the appointed Special Master to evaluate and, if necessary, redevelop the statistical methodologies or models to more accurately accomplish this important intended purpose of proportionality review. *Loftin II, supra,* 157 *N.J.* at 456, 724 *A.*2d 129. At the same time, however, the Court applied the existing models to defendant Loftin's case in spite of their identified flaws. In doing so, the majority discounted as unreliable the overwhelmingly consistent and persistent results derived from numerous models that have indicated a race effect in our implementation of capital punishment.

Here, again, in spite of the addition of the Special Master's findings that the development of more parsimonious models must be pursued if we are to be resolved in our long-held commitment to eliminating racism in our justice system, *Special Master Report, supra*, at 108, the Court applies our existing system of proportionality review to the case at hand, finding, as in *Loftin II,* that the statistics do not indicate an unconstitutional risk of race discrimination. *Ante* at 319 – 20, 731 *A.*2d at 1143 – 44.

I deeply disagree. I oppose the application of our existing system of proportionality review to Harvey's sentence given that the methodology is currently under review. Second, I find that the evidence of racism demonstrated by the data, when supplemented by what we know through human experience and common knowledge, to be so compelling that it demonstrates an unconstitutional risk that New Jersey's sentencing scheme singles out minority defendants (particularly those guilty of killing white victims) for the death penalty. The presence of this risk requires us to invalidate the death penalty statute.

### A.

Defendant presents statistics highlighting a race effect in New Jersey's prosecution and sentencing of death-eligible defendants. The raw data alone reveal worrisome, indeed ominous, trends: of the death-eligible black defendants who killed nonblack victims, over forty-eight percent ($^{33}/_{68}$) were charged capitally, while none of the six nonblack defendants who killed black victims proceeded to a penalty trial. *Loftin II, supra,* 157 *N.J.* at 383, 724 *A.*2d 129 (Handler, J., dissenting). Over forty-eight percent ($^{107}/_{221}$) of cases involving nonblack victims were capitally tried, while only twenty-eight percent ($^{40}/_{141}$) of black-victim cases were. Discrepancies in jury sentencing are startling as well: eighteen percent of all death-eligible black-defendant, nonblack victim cases ($^{12}/_{68}$) resulted in death sentences, while none of the six nonblack-defendant, black-victim cases did. *Ibid.*

The logistic regressions demonstrate the same very real potential that race discrimination is at work in our capital sentencing scheme, revealing for the first time a statistically significant race effect. In the three AOC models used to measure prosecutorial and jury sentencing decisions from the *CCH Report, supra,* a statistically significant black-defendant effect is reflected in the first and second models (Schedules 2 and 5), and a statistically significant white-victim effect is reflected in the first and third (Schedules 2 and 8). *Id.* at 379–80, 724 *A.*2d 129 (Handler, J., dissenting). These statistics are more alarming in light of the fact that the AOC's culpability ratings indicate that white defendants are, on average, more culpable than black defendants (compare 1.43 and 1.32, respectively). *Id.* at 383, 724 *A.*2d 129 (Handler, J., dissenting).

The AOC multiregression analyses once again confirm the indications that racism pervades the capital system. "Differences in percentages of black and nonblack defendants sentenced to death are as high as thirty-three percent when the culpability levels are divided into five categories with equal ranges ... and thirty-six percent when the culpability levels are divided into levels with equal numbers of cases." *Id.* at 386, 724 *A.*2d 129 (Handler, J., dissenting) (citations omitted).

The statistical models created by Dr. John Tukey, the acknowledged expert retained as a consultant by Special Master Richard S. Cohen, attempted to correct for what the Special Master found to be methodological flaws in the AOC models.[3] These new models also revealed a race effect: the third model demonstrates a statistically significant black-defendant effect on the likelihood that a defendant will be sentenced to death. The second model, when reconfigured by the Public Defender's statistician to include

---

[3] The primary concern with the AOC models is that they suffer from a problem known as overfitting—that is, the small number of cases in the database and the large number of variables in each model serves to undermine the results. Dr. Tukey employed fewer variables by pooling various factors together, attempting to solve the overfitting problem with more parsimonious models.

the white victim variable, also reveals a statistically significant black-defendant effect. *Id.* at 389, 724 *A.2d* 129 (Handler, J., dissenting).

The results in model two after the Public Defender's modification highlight the effect that the race of the victim seems to have on sentencing outcomes, in particular in cases involving minority defendants, or transracial, white-victim cases. The disparity in capital prosecutions between transracial cases involving black defendants and those involving white defendants is forty-nine percent, and the disparity in capital sentencing (as a percentage of all death-eligible cases) is eighteen percent. *Id.* at 383, 724 *A.2d* 129 (Handler, J., dissenting).

While the number of cases in defendant's AOC-assigned offense subcategory, E–1, is an inadequate sample from which to draw conclusions (nor should this category alone be used to do so in a systemic race discrimination claim), the prosecutorial and sentencing results in this group of cases underscore what the numbers on a system-wide scale seem to indicate about the intensified attention paid to cases involving white victims and, more specifically, those with minority defendants. The E–1 category consists of twenty-two cases (including both of defendant's), eighteen of which involve minority defendants (black or Hispanic) and four which involve white defendants. Twelve of the cases involve minority victims and ten involve white victims. Over seventy-eight percent of the cases ($^{11}\!/_{14}$) that were either not capitally prosecuted or that resulted in plea agreements involve minority victims, in spite of the fact that minority-victim cases comprise only about fifty-four percent of the total number of cases. At the same time, almost eighty-eight percent of those cases that were capitally tried without resulting in a plea agreement ($^7\!/_8$) involve white victims, in spite of the fact that white-victim cases comprise less than fifty-six percent of the total—a disturbing suggestion of some form of prosecutorial profiling. When the race of the defendant is factored in as well, we see that five of the six transracial cases (all

involving minority defendants and white victims) were capitally prosecuted.[4]  Further, three of the four death sentences resulting from capital prosecutions (Walter Gerald's and both of defendant Harvey's) were for transracial cases in spite of the fact that these cases comprise only twenty-seven percent of the total number of cases.  Finally, all four of the cases resulting in a death sentence involve minority defendants.

While, admittedly, there are methodological flaws in the models created by Dr. Tukey, the Public Defender and the AOC, the Court's decision to apply them to defendants Loftin and Harvey implies, at least, a level of confidence in the methodologies employed without the benefit of the Special Master's recommendations.  Even without perfected models, the Court has compelling raw data findings recounted herein to which it can refer.  Its conclusion, therefore, that the numbers do not make out an adequate case for a risk of race discrimination, given the startling consistency throughout the data and across the models indicating a race effect, belies and betrays the Court's long-professed position that it "could not, consistent with our State's policy, tolerate discrimination that threatened the foundation of our system of law."  *Marshall II, supra,* 130 *N.J.* at 209, 613 *A.*2d 1059 (rejecting Supreme Court's statement in *McCleskey v. Kemp,* 481 *U.S.* 279, 312, 107 *S.Ct.* 1756, 1778, 95 *L.Ed.*2d 262, 291 (1987), that "disparities in sentencing are an inevitable part of our criminal justice system.").

---

[4] One transracial case not capitally tried is Walter Gerald's on retrial.  Gerald was originally tried capitally and sentenced to death.  After this Court's reversal of his sentence, the prosecutor declined to conduct another penalty trial, so Gerald's life sentence was not challenged.  The fact that the State attempted to capitally prosecute Gerald the first time, in spite of the lack of evidence at its disposal to prove intent to murder, only heightens the argument that race might be playing a role in prosecutorial decisions.  The State's decision not to try to obtain a capital sentence on retrial after the Court's reversal reflects, perhaps, simply the prosecutor's appropriate realization that the case was never death-worthy in the first place.

## B.

This Court has always paid scrupulous attention to minority-defendant cases, fully acknowledging the need to provide specific protections to ensure that racism does not infect the sentencing process. In the death penalty arena, we must be especially careful not to ignore signs, both statistical and social, that racism may be at work. From the outset, in this State's first death penalty case under the new death penalty statute, the Court intoned against the dangers of racism:

We are sensitive to the reality of racial prejudice, and to the possibility that jurors may prejudge a defendant because of his or her race, even in the absence of an interracial crime. Racial prejudice may operate, for instance, when the defendant is black simply because the defendant is black and regardless of the victim's color. We must be particularly sensitive to this possibility in a capital case. As the Supreme Court has recognized, "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected."

[*State v. Ramseur, supra,* 106 *N.J.* at 247, 524 *A.*2d 188 (quoting *Turner v. Murray, supra,* 476 *U.S.* 28, 35, 106 *S.Ct.* 1683, 1687, 90 *L.Ed.*2d, 27, 35 (1986)).]

Our remedy in *Ramseur* was to require enhanced protections in death penalty trials in the form of a thorough *voir dire,* examining the potential racial biases of the jury pool members in cases involving minority defendants or other issues of race. *Id.* at 246, 524 *A.*2d 188; *see also State v. Williams,* 113 *N.J.* 393, 428, 550 *A.*2d 1172 (1988) (*Williams II* ) ("Racial prejudice may be either blatant and easy to detect or subtle and therefore more difficult to discern. A probing *voir dire* that elicits more than a "yes" or "no" response will aid the trial court in excusing prospective jurors for cause and will assist the defense in exercising its peremptory challenges. When the defendant is a member of a cognizable minority group, a more searching *voir dire* should be conducted, if requested.").

The sharply disproportionate representation of transracial, white-victim cases among those that are capitally prosecuted and result in death sentences seems to reflect a particular societal value placed on white life and a concurrent degradation of minority life. The Court has specifically noted that when the crime is

interracial, a more thorough *voir dire* should be conducted by the trial court. *Ramseur, supra,* 106 *N.J.* at 245–46, 524 *A.*2d 188; *see also State v. Harris,* 156 *N.J.* 122, 237, 716 *A.*2d 458 (1998) (Handler, J., dissenting) (stressing need to delve into both blatant and latent racial bias, particularly in interracial cases and, even more specifically, in one involving a white suburban woman and inner-city, black, male defendant). To this remedy may be added a specific jury instruction admonishing against racial bias to be given in all such cases. *See Special Master Report, supra,* at 7.

The Court's early acknowledgment that protections need to be established to guard against racism bespeaks an understanding that racism is virulent, though not always obvious, and, more crucially, that it is so likely to infect a jury pool that when requested, a potentially time-consuming *voir dire* must be conducted to try to uncover it. Given that when we decided *Ramseur,* we had no data from which to gather statistical evidence that race might be a factor in jurors' sentencing of capital defendants, this solution seemed the only viable one for addressing the risk of racial bias that might occur in an individual case. But we must now acknowledge that this remedy is not efficacious to weed out jurors who may be subject to inarticulable and subconscious racial biases. In addition, the remedy cannot, and was never intended to, address the biases of prosecutors. *See Marshall II, supra,* 130 *N.J.* at 144, 613 *A.*2d 1059 ("[W]e believe ... that the charging decisions of prosecutors, as well as the sentencing decisions of juries, both representing society's interest in punishing crime, will demonstrate when a death sentence is excessive....").

Because the stakes are so high in death penalty cases, we must be willing to supplement attempts to eradicate racism, such as vigorous *voir dires* and clear curative jury instructions. These should be combined with our continued efforts to create methodologically sound statistical models and simplified and realistic readings of the resultant data informed by what we know about human nature and have learned from history, *see Loftin II, supra,* 157 *N.J.* at 405–10, 724 *A.*2d 129 (Handler, J., dissenting) (recounting

history of racially discriminatory laws in New Jersey and around the United States, as well as discriminatory enforcement of racially neutral laws). This comprehensive approach is vital if we are to avoid the risk that individuals will be singled out for death simply because of their race.

Our perception, beginning in *Ramseur*, that racism is likely to take hold without adequate *voir dire*, has now been augmented and sharpened in ways that strongly suggest that our curative solution for warding off the inevitable has not sufficed. Governor Whitman recently acknowledged that some State Troopers engage in racial profiling on the New Jersey Turnpike—that is, they single out black and Hispanic drivers based on ostensible traffic violations and subject them to criminal searches. *See* Iver Peterson, *Whitman Says Troopers Used Racial Profiling, N.Y. Times,* Apr. 21, 1999, at A1, B8. Are we to assume that racism begins and ends with the New Jersey State Troopers? We must acknowledge that the risk of prosecutorial and jury-based racism is supported by the numbers we have before us and its documentation in all sectors of our society, and that our attempts to keep racial biases out of our capital sentencing scheme may well have failed.

In prior cases, in areas of law bearing significantly less risk of injustice than in life and death decisions, we have been willing to look beyond the numbers when they are inadequate to give us conclusive proof of a causal relationship. Most recently, this Court in *State v. Cromedy,* 158 *N.J.* 112, 727 *A.2d* 457 (1999), allowed for a flexible standard of knowledge in determining the usefulness of social science evidence as a basis for requiring specific jury instructions in transracial crimes. The Court held that a jury instruction explaining the potential unreliability of transracial identifications was appropriate in a case in which a black defendant was tried for rape based solely on a white victim's identification of him. In spite of the prosecutor's presentation of evidence that some researchers do not subscribe to the idea that

cross-racial impairment affects real-life identifications, the Court held that

consistent with [various cases]; the Task Force Report; and our review of the professional literature of the behavioral and social sciences, we hold that a cross-racial identification ... requires a special jury instruction in an appropriate case.... We conclude that the empirical data encapsulate much of the ordinary human experience and provide an appropriate frame of reference for requiring [such an] instruction.

[*Id.* at 131–32, 727 *A.2d* 457.]

We must not be reluctant to follow this path in an arena where the stakes are significantly higher—where the ultimate, irreversible penalty is implicated. *See Loftin II, supra,* 157 *N.J.* at 399, 724 *A.*2d 129 (Handler, J., dissenting) ("Nowhere in the law is more at stake or is there a greater need for positing a definitive resolution on a sound and understandable basis than in a capital case, even if that resolution errs by falling on the side of fairness rather than accuracy.") (citing *Woodson v. North Carolina,* 428 *U.S.* 280, 303–04, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976).)

The Court continues to insist that scientific certainty—statistical significance—should be required before it will accept the notion that racism plays a role in our capital sentencing scheme. Even as it demands, however, that we must be ninety-five percent sure that race plays a role in death sentencing before it will consider such death sentences to be tainted by racial bias, the Court allows liability to be imposed on tortfeasors in toxic-tort cases when the causal relationship between the alleged harmful conduct and the plaintiff's injury is much less clear. *See Rubanick v. Witco Chemical Corp.,* 125 *N.J.* 421, 434, 593 *A.*2d 733 (1991) (Because "plaintiffs in toxic-tort litigation, despite strong and indeed compelling indicators that they have been previously harmed by toxic exposure, may never recover if required to await general acceptance by the scientific community of a reasonable, but as of yet uncertain theory of causation," strict scientific standards may be relaxed.); *see also Loftin II, supra,* 157 *N.J.* at 400, 724 *A.*2d 129 (Handler, J., dissenting) (citing *Rubanick, supra* ). In juxtaposition, the Court's diametrically opposing views leave it in an irrational and nonsensical posture. The widely accepted standard of ninety-five percent certainty may be appropriate in the scientific community of statisticians, but we should be willing to adjust

and modify the norms of that community when our focus is a decidedly non-scientific one and when insistence on near-certainty opens the doors of injustice.

Other disciplines question the value of inflexible and arbitrary line-drawing and the use of science to the exclusion of common-sense observations in circumstances less threatening than death. They stress the need to look beyond the hard sciences to non-quantifiable factors when evaluating certain relationships.

Economists, for example, are often faced with the almost impossible task of evaluating the likely effects of policy on the economy. Nobel Laureate Robert M. Solow believes that when science is inadequate to make the necessary evaluations, we must broaden our tools of reference for identifying and explaining causal relationships:

> [Solow] argue[s] against thinking of economics as science with a capital S. 'That is perfectly consistent,' he wr[ites], 'with a strong belief that economics should try very hard to be scientific with a small s. By that I mean only that we should think logically and respect fact.' Fact ... should be enlarged 'to include, say, the opinions and casual generalizations of experts and market participants, attitudinal surveys, institutional regularities, even our judgments of plausibility. My preferred image is the vacuum cleaner, not the microscope.'
>
> [Louis Uchitelle, *A Challenge to Scientific Economics, N.Y. Times*, Jan. 23, 1999, at B7, B9.]

Even in the hard sciences, blind adoption of the scientific certainty threshold has been challenged. Robert J. Levine, *Ethics and Regulation of Clinical Research* 200–01 (2d ed. 1986) ("We have chosen *arbitrarily* to say that something is true when probability is less than 0.05 that it could have occurred by chance ....") (emphasis added). For example, some have challenged the notion that in order to preserve the value of medical trials, researchers should not disclose the suspected potential benefits of one treatment over another to trial participants until there is statistical certainty (ninety-five percent) that one treatment is superior to the others. *See, e.g., ibid.* (suggesting that participants be able to choose a less exacting level of certainty in deciding whether clinical trials can be concluded).

Here, the Court itself must decide whether the values of the scientific community ought to be employed when the failure to scientifically pinpoint a causal relationship that may be at work results in the unfair execution of an individual. Statistical significance cannot displace all knowledge, or override basic understanding, or be dispositive in all contexts. Mahesh K.B. Parman & David Machin, *Survival Analysis, A Practical Approach* 15 (1995) (stating that results may be "clinically" significant even though not statistically significant); Michael D. Maltz, *Deviating From the Mean: The Declining Significance of Significance*, 31 *Journal of Research in Crime and Delinquency* 434, 440 (Nov.1994) ("Statistical significance does not imply substantive significance, and most researchers know this—but this does not stop them from implying that it does.").

The Court's failure to look not only beyond statistical significance—which even scientists agree is an arbitrary cut-off point—but also beyond the statistical results themselves, has the capacity to result in the gravest of injustices.

> Th[e] ideal of mechanical objectivity, knowledge based completely on explicit rules, is never fully attainable. Even with regard to purely scientific matters, the importance of tacit knowledge is widely recognized. In efforts to solve problems posed from outside the scientific community, informed intuition is all the more crucial.
>
> [Theodore M. Porter, *Trust in the Numbers: The Pursuit of Objectivity in Science and Public Life* 7 (1995).]

This Court should no longer wait for the optimum statistical model or the statistically ideal number of cases. It has, in fact, rejected such a rigid, mathematical approach to proportionality review in developing its methodology for analyzing frequency analysis results in a defendant's individual claim:

> Several courts have expressed concern that the application of a strictly quantitative approach to the subject could lead to arbitrary line drawing and limit the legitimate exercise of judicial discretion. More importantly, such an approach may inappropriately suggest that the complex judgments involved in proportionality determinations can be expressed with mathematical precision.

[*Marshall II, supra,* 130 *N.J.* at 153, 613 *A.*2d 1059 (quoting David C. Baldus, *Death Penalty Proportionality Review Project: Final Report to the New Jersey Supreme Court,* 1, 42–43 (Sept. 24, 1991).)] [5]

The crucial question here is not whether we are certain racism plays a role in capital sentencing, but whether there is "a constitutionally significant risk of racial bias affecting the ... capital sentencing process." *McCleskey v. Kemp, supra,* 481 *U.S.* at 313, 107 *S.Ct.* at 1778, 95 *L.Ed.*2d at 292. The Special Master himself acknowledges that "[i]t is entirely possible that our efforts will come to naught because the problem [of identifying the role of race discrimination, if any,] may be beyond the reach of the social sciences." *Special Master Report, supra,* at 108–09. Given that the various models indicate a serious risk of race discrimination, we are adjured to consider all sources of potentially relevant knowledge and information.

We should look to other jurisdictions to determine whether these indications have been duplicated elsewhere. We are justified in doing so because defendant is not charged with proving that he alone was the victim of race discrimination, or even that racism on a systemic level is definitely at work. To determine if the diverse and numerous statistical indications of race discrimination form the basis for an unconstitutional *risk,* it is perfectly appropriate to expand our inquiry to examine the findings of other states given the limitations on our universe. *See* Note, *Easing the Fear of Too Much Justice: A Compromise Proposal to Rinse the*

---

[5] While, unlike the Court, I believe a numerical preponderance cut-off is a necessary means for quantifying and fairly applying our "general imposition" standard, this is because we are not attempting to actually *prove* a causal relationship with numbers in individual proportionality review, we are merely defining a standard using a numerical base. In our attempt to quantify systemic racism, however, such a cut-off point is unrealistic. The numbers will never be able to prove or disprove the presence of racism. The Court, therefore, should be at least as adamant about its reluctance to rely on statistical models in its examination of race discrimination as it is in its individual proportionality review analysis. I do not suggest that we do away with the models or give up on our attempts to perfect them, but rather that we supplement them with common sense and experience.

*Racial Justice Act*, 30 *Harv. C.R.-C.L. L.Rev.* 543, 564 (1995) ("Because the [Racial Justice Act] requires statistical significance, it will have absolutely no effect on jurisdictions where the number of death sentences is so small as to preclude any statistically reliable conclusions.").

That inquiry is instructive. A 1990 Government Accounting Office report, based on the examination of twenty-eight state-specific studies on the role of race in death penalty sentencing, reveals alarming consistency across states in racial disparities. In eighty-two percent of the studies, the race of the victim influenced charging and sentencing patterns in capital cases (*i.e.,* white-victim cases were more likely to result in death sentences). Further, more than three-fourths of the studies that identified a race-of-the-defendant effect found that black defendants were more likely to receive the death penalty than white defendants. United States General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (Feb.1990), reprinted in 136 Cong. Rec. S6889-90 (daily ed. May 24, 1990).

The Nebraska Legislature recently passed a bill imposing a two-year moratorium on executions until further study on the possible role that the race and/or economic status of defendants and victims is playing in the state's capital sentencing process.[6] Dirk Johnson, *Legislature of Nebraska Votes Pause in Executions, N.Y. Times,* May 21, 1999, at A14. Republican Senator Kermit A. Brashear, while still unwilling to say racism has taken hold in Nebraska, notes that "there is clearly a racial component and a socioeconomic component nationwide" in death sentencing. *Ibid.* Black defendants, who account for thirteen percent of the country's population, occupy forty-two percent of its death row cells. *Ibid.*

---

[6] Republican Governor Mike Johanns vetoed the bill five days later, stating that "it would allow death row inmates to 'advance further unnecessary appeals.'" *Nebraska Leader Vetoes Suspension of Executions, N.Y. Times,* May 27, 1999, at A21.

We must finally acknowledge that the consistent results of our statistical models are not an aberration, nor can they be explained away by rejecting not only the models themselves, but the common experience of a significant majority of other states that impose capital punishment. We must act now before we execute our first capital defendant under a legislative scheme that has likely been infected with race discrimination.

### III

The Court's decision to review the proportionality of defendant's death sentence and its determination that the sentence is not disproportionate impels, again, an assessment of the soundness of proportionality review and the validity of defendant's death sentence. I believe that application of our current methodology, employing only a "generally imposed" standard (to the extent possible) coupled with precedent-seeking review, reveals that defendant's sentence is indeed disproportionate and should be vacated.

### A.

The first step in proportionality review is frequency analysis. Here, we attempt, through statistical representation, to examine how often defendants who have committed offenses similar to that of defendant are sentenced to death. The Court recognizes the limitations of a statistically-based approach to determining proportionality and thus emphasizes that the statistics are not determinative. " '[T]he lower the overall rates and the reliability of our frequency analysis, the greater the need for precedent-seeking review.' " *Ante* at 307, 731 *A.*2d at 1137 (quoting *DiFrisco III, supra,* 142 *N.J.* at 183–84, 662 *A.*2d 442). Results indicating disproportionality "require us to place greater emphasis on precedent-seeking review." *Ante* at 308, 731 *A.*2d at 1137.

### 1. Salient–Factors Test

Since the Court's rejection of the numerical-preponderance test, *see Loftin II, supra*, 157 *N.J.* at 295, 724 *A*.2d 129, only two tests remain, the salient-factors and index-of-outcomes tests.

The majority concludes that the salient-factors test does not establish disproportionality. *See ante* at 303, 731 *A*.2d at 1134 ("[T]he mere fact that a statistical disparity exists does not establish disproportionality.")(citing *Bey IV, supra*, 137 *N.J.* at 352, 645 *A*.2d 685). The Court's methodology in doing so, however, is faulty in two significant ways.

### a.

For the first time, the Court relies only on the defendant's subcategory, E–1,[7] for its analysis of salient factors. *See ante* at 295 – 96, 731 *A*.2d at 1130 – 31. The Court's decision to so drastically limit the universe of comparison cases has significant consequences for the accuracy and fairness of our proportionality review. The Special Master, in fact, recognizes the problem in maintaining the subcategories at all for purposes of statistical analysis:

> Our reading of the 433 death-eligible cases indicates that many of the subcategories contained in the current [salient-factors] model lack resonance in terms of factual comparability and sentencing outcome.... While the subcategories are descriptive in terms of the particular circumstances surrounding the crime, our statistics reveal that they have no relevance in determining death outcome....
>
> [*Special Master Report, supra*, at 56–57.]

The Special Master recommends that the subcategories be eliminated due to their inability to predict deathworthiness, *id.* at 57, adding that specific changes to defendant's E category should be made.[8] These changes would clearly have a significant impact on the Court's salient-factors analysis, and while I withhold judgment

---

[7] The E–1 category is comprised of defendants who commit robbery murders with forced entry and particular violence or terror.

[8] Specifically, the Special Master recommends that the robbery salient factor be divided into "residential, business and other" subcategories. *Special Master Report, supra*, at 59.

on whether the Special Master's remedies are appropriate, his finding that the subcategories are not meaningful must be heeded.

In all the proportionality reviews conducted by the Court to date, the composite salient-factors category in which the defendant is placed has formed the basis for comparison cases (the broader E category in Harvey's case). The Court set the standard for determining how large the universe of comparison cases should be in its first proportionality review, *Marshall II, supra,* stating that cases in which "there are no striking factual dissimilarities between [them] and [defendant's]" should form the basis for the precedent-seeking review comparisons. 130 *N.J.* at 181, 613 *A.*2d 1059; *see also State v. Cooper,* 159 *N.J.* 55, 72–74, 731 *A.*2d 1000 (1999) (*Cooper II* ) (comparing defendant to all C-category defendants); *State v. Chew,* 159 *N.J.* 183, 214, 731 *A.*2d 1070 (1999) (*Chew II* ) (comparing defendant to all I-category defendants); *Loftin II, supra,* 157 *N.J.* at 326–27, 724 *A.*2d 129 (comparing defendant to all B category defendants); *DiFrisco III, supra,* 142 *N.J.* at 186, 662 *A.*2d 442 ("the relevant factor ... is the statutory factor that [defendant] committed the murder for a pecuniary motive," the I category); *Martini II, supra,* 139 *N.J.* at 51, 651 *A.*2d 949 (comparing defendant to cases involving "kidnapping of non-strangers with particular violence or terror, kidnapping of strangers with particular violence or terror, contract-murder principals, contract killers, and other non-robbery pecuniary-advantage killers"); *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685 (comparing defendant to all other defendants with prior murder conviction). The Court's drastic step to limit its salient-factors review to the E–1 subcategory (and, as a result, its precedent-seeking review, *see infra* at 302 – 03, 731 *A.*2d at 1134 – 35), is insupportable in light of our established methodology for frequency review and the Special Master's findings.

The majority explains its decision to limit its comparison of cases in two ways. First, it contends that in prior proportionality reviews our comparison class has only been extended to a defen-

dant's composite category in order to make up for small sample sizes in the subcategories. *See ante* at 295 – 97, 731 *A*.2d at 1130 – 31 (stating that in *Chew II,* Court's comparison extended beyond Chew's I–3 subcategory because group consisted of only one other defendant; that in *DiFrisco III* defendant was compared to entire I category to provide for "a productive statistical analysis;" and that in *Loftin II* defendant was compared to all B-category defendants because of " 'exceedingly small number of cases' " in his B–1 subcategory).

The Court misconstrues our method for selecting a comparison group, as is demonstrated by its glaring failure to note the approach taken in the companion case *Cooper, supra,* 159 *N.J.* 55, 731 *A*.2d 1000. In *Cooper II,* the Court selected the entire composite C category for comparison not on the basis of the size of defendant's C–1 subcategory, which contained an ample forty cases, but because of the essential similarities between the defendant's crime and those of other defendants. In spite of the fact that Cooper did not even specifically request that the C–3 cases be compared to his, the Court stated, "We previously have performed the salient-factors test using both the assigned subcategory as well as the composite category ... and we will do so in this appeal." *Id.* at 76, 731 *A*.2d 1000 (citation omitted). The Court proceeded to compare defendant Cooper not only to all C category defendants, but also to two cases proposed by the defendant from other categories. *See id.* at 92, 731 *A*.2d 1000. The Court's focus was on the fact that Cooper's murder was accompanied by a sexual assault, the defining feature of the C category.

Further, the Court here mischaracterizes the approach to defining the universe of comparison cases taken in *DiFrisco III, supra,* where the rationale for defining the group of comparison cases was similar to that in *Cooper II.* Although it is indeed correct that DiFrisco's I–1 subcategory contained too few cases (nine) to provide for a meaningful proportionality review alone, *see ante* at 297, 731 *A*.2d at 1131, the Court did not expand the universe of

comparison cases to the composite category solely because of the deficiency in the size of the subcategory. In *DiFrisco III*, the Court examined not only the I-category defendants, but also the possibility of comparing defendant to cases *beyond* the composite I category, despite the adequate sample size contained in DiFrisco's composite group (fourteen). Although the Court ultimately rejected defendant's recommendations for expanding the comparison, it did so not because it had reached an adequate number of cases to provide for a "statistically productive review," but rather because the Court found that the proposed cases were not factually similar enough to defendant's to warrant their inclusion. *See DiFrisco III, supra,*142 *N.J.* at 168, 662 *A.*2d 442 (excluding proposed defendants from pecuniary gain category because "there appears to be no basis for an allegation that any of those defendants were either paid to commit murder or that they paid another to do so . . . .").

The Court's second reason for excluding E–2 and E–3 cases from its proportionality review is that because of the differences that distinguish the defendants in the E–2, E–3 and G–3 cases from Harvey, "such cases provide little insight into the propriety of the jury's decision in this case, and are inapplicable to our proportionality review." *Ante* at 299, 731 *A.*2d at 1132. The Court's examination of the cases, however, is both misguided and incomplete.

First, the Court bases its restriction of the comparison cases to defendant's subcategory on the fact that the other E-subcategory cases are distinguishable by the number of aggravating factors in their case, the mental problems of the defendants, the reduced age of the defendants, the prior records of the defendants, the level of remorse they demonstrated or their level of intoxication when they committed their crimes. *See ante* at 297 – 99, 731 *A.*2d at 1131 – 32. These kinds of comparisons, however, are the very heart of our precedent-seeking review, and should be made in the context of examining the actual crimes of the defendants. The initial basis for determining the class of comparison cases should

be premised solely on the categorical groupings made by the AOC, which are defined not by any of the above characteristics, but rather, as previously stated, by the essential elements of the defendant's offense.  In this case, the essential characteristic of the E category is that the defendant murdered in the course of a robbery.  The cases are then broken down into the E–1, E–2, and E–3 subcategories based on the particular violence or terror employed in the robbery and/or whether or not the robbery involved a forced entry.  The Court, therefore, can justify its decision to distinguish Harvey from the E–2 and E–3 subcategory defendants for purposes of selecting the comparison group only by determining first that these defendants have been correctly placed in their subcategories, *see Cooper II, supra,* 159 *N.J.* at 76–77, 731 *A.2d* 1000 (examining four defendants whom the State contended were improperly included in defendant's category and excluding two of them based on State's arguments);  and second, that the distinctions between the subcategories are meaningful for purposes of our proportionality review, *see Chew II, supra,* 159 *N.J.* at 253–54, 731 *A.2d* 1070 (Handler, J., dissenting) (arguing that I–3, "other pecuniary motive" defendants are more similar to some robbery-category defendants than to I–2 and I–3 contract killer defendants).  The Court has clearly failed to meet this burden.

Second, the Court discusses only five of the seven E–2 and E–3 defendants and only one of the four proposed A- and G–category defendants, *see ante* at 297 – 99, 731 *A.2d* at 1131– 32.  Notably, the Court fails to distinguish Jesus DeJesus (E–2) and Larry Durden (E–3) from defendant Harvey.  Not only are these defendants' crimes factually similar to Harvey's, the measure by which we ought to be determining our universe of comparison cases, *see supra* at 313, 731 *A.2d* at 1140, the defendants themselves are in many respects indistinguishable from Harvey.  Neither DeJesus nor Durden were young enough to claim their age diminished their culpability (DeJesus was thirty-one when he committed his murder and Durden was forty-four);  neither had a drug problem;  neither suffered from emotional or mental problems;  and both

had prior criminal histories. The Court's failure to address why these defendants should be excluded from the comparison group, given that they pass even the Court's misplaced test for determining the level of similarity between proposed cases and defendant's, makes one question the Court's basis for exclusion, and, indeed, if one exists.

The Court's reasons for limiting the comparison class here are based on selective analysis of precedent and utter disregard for the AOC's method of defining the categories, greatly compromising the completeness of our proportionality review.

b.

Next, the Court's salient-factors methodology is suspect due to the reliance on a comparison of the death-sentencing rate for the defendant's E–1 subcategory to the average rate for death-eligible cases, *see ante* at 301 – 03, 731 *A*.2d at 1133 – 35; *see also DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A*.2d 442 (stating that because death sentencing rates of contract killers were significantly higher than the average rates, contract killers are "viewed by society as 'significantly blameworthy.' ") (citation omitted). This approach renders the salient-factors test superfluous.

I believe the Court misinterprets the logical purpose of the salient-factors test. It is designed to classify defendants in subcategories purporting to measure similar characteristics of the crimes committed. Using the average death-sentencing rate as the benchmark of proportionality would defeat the purpose of dividing the death-eligible cases into subcategories at all. By comparing death rates in each category to the average death rates, the Court might as well be comparing defendant to all other death-eligible defendants who were not sentenced to death. Instead, the Court ought simply to be using the test results to assess defendant's culpability according to the actual death-sentencing rates in his assigned categories. *Accord Cooper II,* 159 *N.J.* at 169, 731 *A*.2d 1000 (Handler, J., dissenting).

Even if one accepts the Court's use of average rates as a basis of comparison to examine the disproportionality of a sentence, the majority's analysis is problematic. The Court chooses to apply selectively a relatively quantifiable standard, established in *DiFrisco III, supra,* when comparing the death sentencing rates within categories to the average rate: if the death sentencing rate of defendant's category is higher than the overall average, this leads "to the conclusion that society views those who commit particular violence or terror in a residential forced entry as significantly blameworthy." *Ante* at 301, 731 *A.*2d at 1133–34 (citing *DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A.*2d 442). From this, one can also conclude that if the sentencing rate of defendant's category is *lower* than the overall average, society views these defendants as not particularly blameworthy when compared to other defendants. In spite of the finding, however, that E–1 defendants are sentenced to death only ten percent of the time, two percent *lower* than the average death sentencing rate for all death-eligible defendants, the Court concludes, "Such a deviation [does not show] that robbery killings are viewed by society as less blameworthy," *ante* at 303, 731 *A.*2d at 1134, thereby implying that the salient-factors test does not indicate a disproportionate sentence.

This duplicitous application of the one standard that the Court has developed that is even remotely concrete calls into question the Court's desire to craft any meaningful, consistent standard in proportionality review. The statistics show that only ten percent of death-eligible defendants in the E–1 sub-category and thirty-three percent of those advancing to the penalty trial are sentenced to death. *CCH Report, supra,* tbl 7. Even more compelling, when the E category as a whole is examined, the death-sentencing rate for death-eligible defendants is only six percent, and for those proceeding to a penalty trial only twenty-four percent. *Ibid.* Both of these figures are below the average rates of sentencing for all death-eligible defendants. These numbers, in my opinion, are adequate for a finding that such cases will " 'generally receive sentences other than death....' " *See ante* at 289, 731 *A.*2d at

1127 (quoting *Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949) (other citations omitted).

2. Index–of–Outcomes Test

The index-of-outcomes test is a different attempt to examine the blameworthiness of the defendant: the categories are created not according to similarities between the crimes, but rather similarities between the defendants. Characteristics meant to measure the defendant's culpability, both statutory and non-statutory, are examined regardless of whether the crimes themselves are similar in nature. Each factor is weighted and assigned a coefficient according to how often a death sentence is imposed when the factor is present. Then each case is assigned a culpability score based on the factors present and their weighted coefficients.

As the majority correctly points out, there is a persistently wide range in culpability scores assigned to defendants across the four regression models. *See ante* at 303 – 04, 731 *A.*2d at 1135 (noting defendant's culpability scores here range from thirteen to forty-three percent; DiFrisco's culpability scores ranged from eleven to seventy-four percent; Martini's culpability scores ranged from five to eighty-eight percent; Bey's culpability scores ranged from twenty-five to seventy-six percent; and Marshall's culpability scores ranged from seventeen to fifty-two percent). This wide range renders the accuracy of the models highly questionable.[9] *See Loftin II, supra,* 157 *N.J.* at 422 n. 22, 724 *A.*2d 129 (Handler, J., dissenting).

In addition, the wide range of confidence intervals among the cases detracts significantly from the reliability of the test.[10] *See ante* at 305 – 06, 731 *A.*2d at 1135 (detailing results of defendant's four regression models with confidence intervals displaying, at

---

[9] The Special Master agrees, recommending that for this reason, and various others, the index-of-outcomes test be eliminated from the Court's proportionality review. *Special Master Report, supra,* at 90–107.

[10] Again, the Special Master agrees. *Special Master Report, supra,* at 95.

their greatest, fifty-seven percent range between the upper and lower levels for predicted probability of death); *accord Loftin II, supra,* 157 *N.J.* at 422 n. 21, 724 *A.*2d 129 (Handler, J., dissenting).

Beyond the flaws in the test itself, the majority misinterprets its results by relying not on death sentencing rates for the various culpability levels as indicators of proportionality, but on defendant's predicted probability of receiving a death sentence. *See ante* at 305 – 06, 731 *A.*2d at 1135 – 36. Predicted probabilities are used to place the defendant in a culpability level and are not meant to provide a basis for a finding of proportionality.

> [T]he Constitutional mandate of individualized consideration in capital sentencing requires that we rely on *actual* decisions by sentencing juries, and the characteristics of *actual* felons and their crimes, to determine when a death sentence is generally imposed upon similarly situated defendants. Certainly, we could not point to our surprise at defendant's death sentence as grounds for reversal; nor should our expectation that a certain defendant will receive the death penalty serve as adequate support for a finding of proportionality.
>
> [*Loftin II, supra,* 157 *N.J.* at 423, 724 *A.*2d 129 (Handler, J., dissenting) (emphasis added).]

Our focus, therefore, should be on sentencing rates for the levels of culpability in which the defendant has been placed for each model (as it is in the salient-factors test for each crime category).[11]

The death sentencing rates for the culpability levels to which defendant was assigned in the four models are thirty-five percent (culpability level 2), thirteen percent (culpability level 1), forty-three percent (culpability level 3), and nineteen percent (culpability level 1). Not one of these rates indicates general imposition of

---

[11] Another problem with the Court's analysis is its comparison of Harvey to other defendants who have not been classified within the same culpability level. By comparing defendants across categories this way, the entire purpose of the test—to measure defendant's culpability and establish the sentencing rate of similarly culpable defendants—is eviscerated. *See Loftin II, supra,* 157 *N.J.* at 423–24, 724 *A.*2d 129 (Handler, J., dissenting). "[T]he singular fact that a defendant was the subject of a prior proportionality review does not justify his comparison with the present defendant." *Id.* at 424, 724 *A.*2d 129 (Handler, J., dissenting).

the death penalty and two of the four strongly indicate that, by any standard, defendant's sentence is disproportionate. This conclusion is supported by the fact that defendant's confidence intervals are much lower than those of other defendants. His upper limit for all four models never exceeds sixty-nine percent, while all other defendants examined by the Court for proportionality reviews have at least one confidence interval that reaches ninety-four percent. This suggests that defendant's low numbers are more stable predictions than those of the other defendants.

Under the old methodology, both the salient-factors and the index-of-outcomes tests, in my view, suggest that defendant's sentence might be disproportionate. Accordingly, the Court should apply precedent-seeking review in only one way: unless defendant is one of the most culpable defendants in his category, *see supra* at 291, 731 *A.*2d at 1128, unless we can point to some justification for the break in the pattern of life sentences, *see Marshall II, supra,* 130 *N.J.* at 181, 613 *A.*2d 1059, we must find Harvey's sentence to be disproportionate. Although these statistical tests have their limitations, they can serve as a useful kaleidoscope through which to examine precedent-seeking review, which is designed to help us identify possible justifications for a defendant's seemingly-arbitrary sentence.

### B.

Precedent-seeking review is the Court's attempt to engage in an individualized approach to proportionality review by making factual comparisons between death-eligible defendants and their crimes. Because precedent-seeking review is not statistical in nature, it is inevitably more qualitative and less quantitative than the salient-factors and index-of-outcomes determinations. *Loftin II, supra,* 157 *N.J.* at 425, 724 *A.*2d 129 (Handler, J., dissenting). Precedent-seeking review is meant to complement frequency analysis, and the Court has defined this functional relationship as follows: "[T]he lower the overall rates and the reliability of our frequency analysis, the greater the need for precedent-seeking

review." *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442 (citation omitted). Because defendant's frequency analysis rates are quite low in comparison to those of other defendants, precedent-seeking review must take on added significance in this case. *See Marshall II, supra,* 130 *N.J.* at 154, 613 *A.*2d 1059 ("The greater the statistical frequency of life sentencing in the comparison group of similar cases, the greater will be the need for the Court to focus on the "real people" involved in the defendant's and other similar cases.").[12]

In addition to statutory aggravating and mitigating factors, precedent-seeking review takes into account non-statutory factors "rooted in traditional sentencing guidelines," *Marshall II, supra,* 130 *N.J.* at 159, 613 *A.*2d 1059 (citation omitted), which fall within three categories: defendant's moral blameworthiness, the degree of victimization resulting from defendant's crime, and defendant's character. *See ante* at 309, 731 *A.*2d at 1138 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059).

Defendant's case demonstrates as much or more than past cases presented to this Court that precedent-seeking review is an inherently subjective exercise that "invokes culpability assessments by the Court, which are, essentially, moral judgments." *Loftin II, supra,* 157 *N.J.* at 426, 724 *A.*2d 129 (Handler, J., dissenting). As some features of defendant's case demonstrate, a death sentence can always be justified given the level of individuality afforded the analysis. *Accord Chew II, supra,* 159 *N.J.* at 268, 731 A.2d 1070 (Handler, J., dissenting) (stating that proportionality review has been reduced to "whatever works" to justify a finding of proportionality).

---

12 In the face of the Court's acknowledgement that precedent-seeking review has heightened significance in this case, *see ante* at 307, 731 *A.*2d at 1137, the majority's decision to drastically limit the universe of comparison cases to the E–1 subcategory is especially puzzling. We should make very effort to afford the defendant a comprehensive precedent-seeking review when the individual comparisons of cases plays such an important role in that review.

1.

The Court first examines defendant's case independent of other cases, taking into account Harvey's moral blameworthiness and character, as well as the level of victimization resulting from his crime. The majority concludes that "[w]ith respect to defendant's moral blameworthiness and character, defendant is highly culpable." In contrast, defendant's culpability is merely moderate with respect to the degree of victimization. *Ante* at 315, 731 *A.*2d at 1141. I disagree with the Court's assessment of defendant's moral blameworthiness.

In determining a defendant's blameworthiness, the Court is to examine the following: motive; premeditation; justification or excuse; evidence of mental disease, defect or disturbance; knowledge of victim's helplessness; knowledge of effects on nondecedent victims; defendant's age; and defendant's involvement in planning the murder. *See ante* at 300, 731 *A.*2d at 1133 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059) (other citation omitted).

Defendant's motive for committing the murder was, according to the jury, to escape detection. Although this aggravating factor (c(4)(f)) is considered to increase defendant's moral blameworthiness, its widespread, almost universal application, regardless of the lack of evidence presented to establish it in various cases, destroys its efficacy as an appropriate aggravating factor. Its unbounded, amoebic application is inherently expansive, making it impossible to narrow the class of death-eligible defendants adequately to allow for meaningful distinctions regarding defendants' blameworthiness. *See Loftin II, supra,* 157 *N.J.* at 428, 724 *A.*2d 129 (Handler, J., dissenting).

Harvey's case demonstrates the problem: the prosecution presented no evidence at trial that would indicate defendant murdered to escape detection. The only evidence that defendant tried to escape detection came *after* the murder (he tried to clean up the blood). The jury most likely found the aggravating factor by mistakenly or inappropriately projecting defendant's post-murder

actions onto the murder itself. The evidence actually proves only that defendant was concerned about escaping detection for the murder, not that he murdered the victim to escape detection for the robbery. The conclusion that defendant murdered to escape detection is wholly speculative; its application, given the lack of evidentiary support for it, demonstrates that the factor is a highly suspect measure of culpability. Similarly, in cases where the evidence that a defendant killed to escape detection is overwhelming, the jury may fail to find the factor. *See State v. Mejia*, 141 *N.J.* 475, 662 *A.*2d 308 (1995) (defendant shot fleeing victim in back of head and jury did not find c(4)(f) factor); *State v. Alexander, CCH Report, supra,* Narratives for "No Penalty Trial/Life" Cases at 1 (defendant shot fleeing victim in back and AOC did not classify case with aggravating factor c(4)(f)). The record in this case points strongly to the conclusion that the motive of defendant is unknown and cannot be used to increase his blameworthiness. *Accord Loftin II, supra,* 157 *N.J.* at 428, 724 *A.*2d 129 (Handler, J., dissenting).

Next, defendant's murder involved no premeditation. He entered the house to rob it and killed Irene Schnaps in the process of doing so when he found her. No evidence was presented to suggest that the murder was planned.

Third, defendant had no apparent justification or excuse for the murder, thus this factor fails to decrease his moral blameworthiness.

Although the jury did not find the mitigating factors indicating that defendant suffered from mental disease, defect or disturbance, when ten non-statutory mitigating factors were presented to the jury as part of the catch-all c(5)(h) factor, some members found evidence that defendant suffered from emotional trauma for various reasons: six jurors found that defendant was traumatized when he witnessed his sister die as a result of a kerosene accident in which she caught on fire; one juror found that defendant was physically and verbally abused when he was sent to live with his grandparents; and four jurors found that defendant suffered

feelings of abandonment when his parents promised to but did not take him with them when they moved from their home. *See ante* at 312, 731 *A.*2d at 1139. These factors decrease the moral blameworthiness of defendant.

Fifth, we have no evidence indicating the victim was helpless when defendant attacked her. In fact, the State presented evidence at trial that DNA tests conducted on blood found in Schnaps's apartment indicated that the blood was consistent with defendant's DNA. *State v. Harvey,* 151 *N.J.* 117, 143–44, 699 *A.*2d 596 (1997) (*Harvey II* ). We have no way of knowing, therefore, if defendant struck first, or if he responded to an attack from the victim with disproportionate force.[13] Without more information, this factor cannot be used to heighten defendant's blameworthiness.

Defendant had no knowledge of the effects of his actions on nondecedent victims. He did not know the victim, and therefore could not have known how her death would affect those left behind.

Defendant's age does not decrease his blameworthiness because he was forty when he committed the offense. *See ante* at 313, 731 *A.*2d at 1140.

Finally, because defendant's murder involved no premeditation, the factor regarding defendant's involvement in planning the murder is irrelevant and does not increase his level of blameworthiness.

In sum, a extremely low level of blameworthiness: He did not plan the murder, his motive (to escape detection) is a motive that

---

[13] The fact that defendant's blood at the scene of the crime might be an indication he was attacked first is consistent with defendant's confession, in which he told the police that Schnaps woke up when she heard him and then punched defendant in the nose, causing him to bleed. *See State v. Harvey,* 121 *N.J.* 407, 412, 581 *A.*2d 483 (1990) (*Harvey I* ). While the confession was suppressed in defendant's second trial, this background information should make the Court especially wary of assuming the victim was helpless when there is no evidence to support that conclusion.

indiscriminately accompanies many other defendants' crimes when a burglary/robbery is involved, and defendant had no particular knowledge of the effect his crime would have on nondecedent victims. Although defendant's murder was not a random or senseless act, he had no excuse or justification for the murder; still some jury members found that defendant had suffered and does suffer from severe emotional trauma as a result of incidents throughout his childhood. Defendant's age neither increases nor decreases his blameworthiness.[14] Finally, we have no evidence indicating that the victim was entirely helpless.

The majority reaches a different conclusion. It relies heavily on Harvey's motive, to escape detection, a factor that fails to lend much insight into the overall blameworthiness of defendants, *see supra* at 312, 313, 731 *A*.2d at 1139, 1140. By way of explaining the alleged helplessness of the victim, the Court provides only a detailed description of the murder itself, not the condition or position of the victim before the homicidal attack: "She was attacked with blunt instruments and struck so hard that her skull was fractured, her brain lacerated, and her jaw broken. She was beaten about the face and sustained many bruises in a brutal murder." *Ante* at 313, 731 *A*.2d at 1140. The Court is not correct in concluding without evidence that the victim was helpless when she was attacked, *supra* at 388 n. 13, 731 *A*.2d at 1180 n. 13 —the detailed description of injuries should be considered only when evaluating the degree of victimization. If the savagery of the homicide can without more, serve to characterize the victim "helpless," this, like the aggravating factor c(4)(f) to escape detection, will lose any utility as a measure of blameworthiness. All victims are, to some degree, ultimately helpless if they have been murdered. What we should be looking for here is a *particular*

---

[14] Defendant's age and lack of justification are not factors that *increase* defendant's blameworthiness, such as knowledge of the effect on nondecedents or helplessness of the victim—they simply fail to distinguish defendant as *less* blameworthy than others of average maturity who murder without justification.

helplessness, such as a victim's handicap, young age or uncon-sciousness, of which the defendant knowingly takes advantage.

The Court finds that knowledge of the effects of the decedent's death on nondecedent victims weighs against defendant, stating, "Although defendant may not have specifically known that Irene had family and friends, we have previously recognized that '[w]hile a defendant might be unaware of the specific characteristics of his victims or of the particular survivors that the victim will leave behind, it is completely foreseeable that the killing will eliminate a unique person and destroy a web of familial relationships.'" *Ante* at 313, 731 *A.2d* at 1140 (quoting *State v. Muhammad*, 145 *N.J.* 23, 46, 678 *A.2d* 164 (1996)). The fact that defendant "must have realized that Irene had family and friends because there were personal photographs in her apartment and he stole a man's Seiko LaSalle watch," *ante* at 313, 731 *A.2d* at 1140, only adds to the transparency of this Court's fictionalized assessment. Defendant is to be compared to others who committed robberies. The majority, in seriously proffering this rationale, implies that only by entering a bare house containing no personal effects indicating that the victim has relationships with other people, and perhaps then only if the person actually does not *have* such relationships, would the Court decline to find that a defendant had knowledge that his crime would impact and victimize other unknown or unknowable persons. The Court's emphasis on a factor of such universality which requires no evidence fails to narrow the field of comparable cases in any meaningful way.

Next, the Court fails to address any evidence of defendant's mental state when considering his blameworthiness, even though prior to its analysis it fills almost four pages with details regarding defendant's presentation of relevant mitigating evidence beginning in his early childhood, as well as the jury's findings on that evidence, *ante* at 310 – 12, 731 *A.2d* at 1138 – 40. Similar factors have been considered by the Court in prior cases even when the mitigating factors indicating mental disease or defect are not

found by the jury. Indeed, in this very case, the Court, in concluding that E–1 defendant Walter Gerald is less culpable than Harvey, notes that "Gerald's sister testified about their family life, how their father's death affected Gerald and Gerald's use of alcohol and drugs." *Ante* at 316, 731 *A.*2d at 1142. Surely, then, it would be worth mentioning in the Court's examination of Harvey's blameworthiness that defendant was deeply affected by the abuse he suffered in childhood and the death of his sister in a kerosene fire which he accidentally caused.[15]

Finally, the majority ignores the premeditation factor completely. There was none here.

The Court's conclusion that defendant is "quite blameworthy," *see ante* at 312, 731 *A.*2d at 1139, on this record is, in my view, an inaccurate assessment of this factor and, on a comparative scale, an unjust conclusion.

I agree with the Court's assessment of the two other factors used in precedent-seeking review—level of victimization and defendant's character. The victimization resulting from the murder is accurately described as "moderate." *See ante* at 316, 731 *A.*2d at 1142.[16] Defendant's character is certainly highly culpable: he

---

[15] When examining moral blameworthiness, the Court has cited evidence of a defendant's childhood abuse or emotional trauma. *See, e.g., Bey IV, supra*, 137 *N.J.* at 384, 645 *A.*2d 685 (observing that despite jury's failure to find catch-all mitigating factor and no submission by defendant Koedatich of any other mitigating factors, "Bey suffered an abusive childhood. His violent childhood, however, does not differ materially from that of ... Koedatich, ... who also had suffered from child abuse or other violence.").

[16] Again, however, the subjectivity of precedent-seeking review is revealed in the Court's analysis. Having acknowledged that the victim was struck from behind and rendered unconscious by the blows, and was therefore not aware of much of the brutality forced upon her, the Court states, "Even when the victim is not ·aware of impending death, as was the case in *DiFrisco III*, this Court has observed that 'at the end of the day there is still a victim, a [woman] who was [brutally] murdered....'" *Ante* at 314, 731 *A.*2d at 1140 (quoting *DiFrisco III, supra*, 142 *N.J.* at 205, 662 *A.*2d 442). What, then, is to distinguish defendant's

has a serious criminal history, including guilty pleas to rape, sexual assault, assault, second-degree attempted kidnapping, second- and third-degree burglary, and receiving stolen property. *See Ante* at 313 – 15, 731 *A*.2d at 1140 – 41.[17]   He showed no remorse, there was no evidence that he cooperated with the authorities, and there was no evidence presented that he was susceptible to rehabilitation, although his allocution statement and his positive relationships with his children could perhaps speak to this factor.

I conclude that defendant has a low level of culpability.   His bad character is counteracted by his relatively low moral blameworthiness and the moderate degree of victimization.

2.

The second part of precedent-seeking review is a comparison of defendant's case to those of similarly situated defendants.   As in its salient-factors analysis, the Court here limits the universe of comparison cases for precedent-seeking review to only those placed in the E–1 salient-factors subcategory.   *See ante* at 296, 731 *A*.2d at 1131.   By failing to compare defendant to other factually similar cases in the broader E category, the Court conducts only a partial proportionality review.   The Court's decision to so drastically limit the universe of comparison cases in this case, one in which the frequency analysis results are so low as to require a greater emphasis on precedent-seeking review, *see ante* at 307, 731 *A*.2d at 1137, is a grave mistake.

---

blameworthiness from other capital defendants?   There will, at the end of the day, always be a victim who was brutally murdered, unless the Court means to assert that not all murders are brutal.   The Court implies that it could never find a low level of victimization and, indeed, it never has.

[17] Although I agree with the Court that defendant's record of prior convictions is both violent and lengthy, I oppose the Court's inclusion of the two robberies to which he confessed on the day of his arrest for Schnaps's murder.   *See ante* at 314, 731 *A*.2d at 1141.   Because defendant's confession was not admitted into evidence in Harvey's retrial, the jurors had no knowledge of these alleged robberies and therefore could not have factored them into their sentencing decision.   *See Harvey II, supra,* 151 *N.J.* 117, 699 *A*.2d 596.

The only difference between the E–1 and E–2 subcategories is that E–1 cases involve forced entry into a residence. The questionable wisdom of adhering to such a seemingly inconsequential distinction for purposes of precedent-seeking review, in light of the crimes committed, is clear on its face; but when the cases are examined more closely, we see a marked inconsistency in the placement of cases within these categories, further calling into question the Court's decision to limit precedent-seeking review here to the E–1 group. Harvey's case provides the perfect example. The Court states in its presentation of the facts that "[d]efendant broke into the apartment of Irene Schnaps." *Ante* at 309, 731 *A.*2d at 1138. There is, however, no evidence to support this statement. Harvey is placed in the forced entry category in spite of the fact that the "investigating police detected no signs of a forced entry." *Ante* at 284, 731 *A.*2d at 1124. In fact, the person who discovered Schnaps's body "entered through an unlocked doorway," *Harvey II, supra,* 151 *N.J.* at 138, 699 *A.*2d 596, and defendant confessed to the police that he had entered through that same unlocked doorway. *See Harvey I, supra,* 121 *N.J.* at 412, 581 *A.*2d 483. The AOC, with full knowledge of all of these details, nonetheless placed defendant in the E–1, forced entry category.

Gerald Williams's case provides another apt example. Williams, an E–1 defendant, entered the apartment he robbed through an ajar door, finding his victim asleep inside. Why, then, is he classified as a defendant committing a robbery that involved forced entry? Another E–1 defendant, Charles Ploppert, and his accomplice gained entrance to the home they robbed by identifying themselves to the inhabitant, whom defendant knew, and getting him to open the door. They then even sat talking with the man at his kitchen table before they eventually attacked him. There is no evidence, therefore, that the co-defendants forced their way into the house. Ploppert, however was also placed in the forced entry category.

These clear categorization errors, combined with the meaninglessness of the distinction between the E–1 and E–2 categories to begin with, render the Court's decision not to include E–2 defendants in its proportionality review indefensible.

The distinction between the E–1 and E–3 categories, while not as inconsequential as that between the E–1 and E–2 categories (it is based on whether or not the murder was committed with particular violence or terror), still lends itself to rather subjective line-drawing that is not always wholly understandable. Many of the cases placed in the E–1 category seem to belong there due to the extremely violent components of their crimes. What is more difficult to discern are the justifications for placing many of the E–3 defendants in the less blameworthy category. Defendant Aaron Huff is a good example. The jury found the c(4)(c) aggravating factor, indicating that Huff caused the murder by extreme suffering, having struck his victim's head on a coffee table and beaten him until he died. Yet Huff was placed in the E–3 subcategory, indicating that the robbery was not committed with particular violence or terror. The fact that prosecutors have sought the death penalty against E–3 killers at more than twice the rate they have sought the death penalty for E–1 killers (comparing sixty-seven percent and thirty-percent, excluding defendant), *CCH Report, supra,* tbl. 7, should be indication enough that E–3 cases are not necessarily less blameworthy than E–1 cases. Many of the AOC narratives describing these crimes indicate much more terror and violence used against the victims than in Harvey's case. Comparison of defendant's case to these E–3 defendants is warranted given the subjectivity of the line-drawing between the two subcategories.

The Special Master agrees that the distinctions between the salient-factors subcategories should be eliminated given their failure to adequately measure blameworthiness. *Supra* at 309 – 10, 731 *A.2d* at 1138; *Special Master Report, supra,* at 57, 62 ("I recommend that we abandon the current hierarchical structure which is based primarily on intuition."). The Court's decision to reduce the universe of comparison cases of the general E category

to the far more restrictive and even, at times, arbitrarily drawn subcategory of E–1 defendants is a serious departure from past proportionality reviews. Further, this drastic step is taken in a case in which precedent-seeking review plays a particularly crucial role in our overall proportionality review given the results of the frequency analysis.

Defendant also seeks to compare himself to several defendants outside the E category. Some of the cases presented by defendant are factually similar to his case and, therefore, I disagree with the Court's decision not to include them in its precedent-seeking review.

First, Daniel Hart, who was classified as a G-category defendant (murder while committing a burglary) was also convicted for robbery. Because robbery is more serious than burglary, and the cases are meant to be classified in the most serious category that applies, see *CCH Report, supra,* at App. E–3 (classifying G category as "Burglary murder not involving a robbery or sexual assault"), Hart should have been placed in the E category and should therefore be among the cases to which defendant is compared.

Next, defendant argues that William Godette, a defendant from the B category, should be in the comparison group. I agree. Godette is in the prior murder conviction category because in addition to his New Jersey murder, he was convicted of killing his step-father in North Carolina. Defendant suggests that Godette should not be classified as a prior murderer, however, because Godette had not yet been convicted of his step-father's murder at the time of his New Jersey murder. In fact, Godette was arrested for the North Carolina murder a full ten months after the New Jersey murder. It is unclear why the AOC placed Godette in the B category, given that the prosecutor and jury for his New Jersey trial would not have been able to consider a prior murder conviction at the time the defendant was tried and convicted.[18] Because

---

[18] The AOC may have based its placement of Godette in the prior murder category on the prosecution's submission to the trial court of notice of the prior

Godette's crime was strikingly similar to Harvey's, and because the essential element of his crime that the AOC should have used to categorize him was his robbery, he should be included in defendant's comparison universe.

Finally, defendant suggests that some A-category defendants (involving multiple victims) would have been in the E category but for the fact that they committed multiple murders. Defendant's assertion should again alert the Court to some potential problems with simply deferring to the AOC's judgment on its category groupings. Walter Gerald and his accomplices attacked three people, killing two of them; and yet he is placed in the E–1 category and not the multiple victim category. Gerald plays a significant role in the Court's finding of proportionality because he is one of only two defendants in the E–1 category other than Harvey to have received a death sentence (though his sentence was later reversed and the prosecution declined to capitally prosecute at retrial). For the Court to place so much emphasis on a multiple-victim defendant, placed in the E–1 category for no identifiable reason, and then to decline to compare defendant to similar cases in the multiple-victim A category makes no sense. Further, although I find that the number of victims is an important distinction between these categories, some of the A-category cases are factually similar enough in all other ways to warrant comparison. The Court must agree, or it would remove Gerald's case from its analysis.

In three separate instances, the Court has conducted comparisons with defendants that fall outside the AOC-designated salient-factors grouping for the defendant subjected to proportionality review. *See Cooper II, supra,* 159 *N.J.* at 93, 731 *A.2d* 1000 (including two cases relied on by defendant outside defendant's

---

murder aggravating factor (c(4)(a)), but such reasoning would be misplaced. In order to make a c(4)(a) finding, the jury must find that "[t]he defendant has been *convicted,* at any time, of another murder ... [A] conviction shall be deemed final when sentence is imposed...." *N.J.S.A.* 2C:11–3(c)(4)(a) (emphasis added).

composite C category); *Martini II, supra,* 139 *N.J.* at 50–51, 651 *A.*2d 949 (including cases outside defendant's I category involving pecuniary motives); *Marshall II, supra,* 130 *N.J.* at 175, 613 *A.*2d 1059 (comparing cases proposed by defendant). In *DiFrisco III, Loftin II, Chew II,* and now *Harvey III,* the Court has opted to "'defer generally to the AOC's expertise, and particularly to its unique assignment of defendants to only one comparison category....'" *Ante* at 295, 731 *A.*2d at 1130 (quoting *Loftin II, supra,* 157 *N.J.* at 327, 724 *A.*2d 129 (citing *DiFrisco III, supra,* 142 *N.J.* at 167, 662 *A.*2d 442) (citations omitted)). This deference is ironic in light of the Court's past acknowledgement that there is "danger inherent in 'any attempt to define in advance all characteristics of a murder case [to] capture the critical facts of a defendant's case' because that 'would fail to distinguish between individual defendants.'" *DiFrisco III, supra,* 142 *N.J.* at 164, 662 *A.*2d 442 (quoting *Martini II, supra,* 139 *N.J.* at 24, 651 *A.*2d 949) (other citation omitted). Indeed, in the past, even when stating that it will "defer generally to the AOC's expertise," *see id.* at 167, 662 *A.*2d 442, the Court has allowed for adjustments to the AOC's categories when necessary, *see id.* at 170, 662 *A.*2d 442 ("Williams's exclusion [from defendant's comparison group] is justified on the grounds that the jury rejected the pecuniary motive aggravating factor at the penalty trial."). Although defendant's case cannot realistically be compared to all other death-eligible defendants, *see Loftin II, supra,* 157 *N.J.* at 436, 724 *A.*2d 129 (Handler, J., dissenting), limiting the comparison group solely to the E–1 subcategory is too restrictive. Such a limitation fails to recognize the factual similarities between cases in the same composite category, and indeed, in others.

Adding the factually similar cases proposed by defendant from the E–2, E–3, G, B and A categories,[19] highlights the dispropor-

---

[19] I agree with the majority that to compare defendant to all 126 cases classified as E cases would be impractical, *see ante* at 297, 731 *A.*2d at 1131; but the Court should, at a minimum, examine all the cases proposed by the State and

tionality of defendant's sentence. *See supra* at 297 – 99, 731 *A*.2d at 1131 – 32. A close examination of the facts of each case renders problematic the Court's conclusion that because of the differences that distinguish defendants in the E–2, E–3 and G–3 cases from Harvey, "such cases provide little insight into the propriety of the jury's decision in this case, and are inapplicable to our proportionality review." *Ante* at 299, 731 *A*.2d at 1132.

### 3.

The Court concludes that the E–1 category defendants are distinguishable from defendant's and therefore defendant has not made a case for disproportionality. *See ante* at 385, 731 *A*.2d at 1179. I strongly disagree and explain the basis for that disagreement by a detailed analysis of the compared cases.

Defendant is compared first to Walter Gerald and Rigoberto Mejia, the only other two defendants in the E–1 subcategory who were sentenced to death, both of whom are currently serving life sentences. First, the majority concludes that defendant is more blameworthy than both Mejia and Gerald because the jury found a rational basis that they intended only to inflict serious bodily injury on the victims, while Harvey intended to kill Irene Schnaps. *Ante* at 316, 731 *A*.2d at 1141. In addition, the Court points out that the jury found that Gerald suffered from emotional disturbance and mental disease or defect, that he had expressed remorse, that his father's death affected Gerald, that defendant used

---

the defendant to determine which are factually similar enough to defendant's case to warrant inclusion in the analysis. Following that approach, I do not incorporate into my analysis several of the cases proposed by defendant, including one B-category defendant (prior murder convictions) and all of his proposed C-category defendants (sexual assault). Barring any misplacement of defendants in these categories, *see supra* at 396, 731 *A.2d* at 1185 ( discussing why B-category defendant Godette should be included in defendant's comparison class), I agree with the Court's general finding that these types of cases are too dissimilar to defendant's to contribute meaningfully to our proportionality review. *See ante* at 295, 731 *A.2d* at 1130.

alcohol and drugs, and that Gerald had no significant prior record. *See ibid.*

The Court's comparison of Harvey to Gerald is suspect given that Gerald's death sentence was reversed and that the State did not seek the death penalty again on retrial.[20] If anything, the case highlights the disproportionality of Harvey's sentence because the facts demonstrate, in many ways, that Gerald is more blameworthy·than defendant, and yet the prosecutor concluded the case was not worthy of a second capital prosecution.

Gerald and his two co-defendants broke into a house to steal a television set. They had been observing the household for some time, so they knew the number of inhabitants and entered according to a formulated plan. There were three intruders and three victims, all of whom were helpless (the two men were not self-sufficient, one eighty-five years old and one fifty-five years old; and the woman who took care of them had no weapon). Gerald knew of all of the victims' vulnerabilities before breaking in. The woman was punched in the face, stomped on and threatened with a knife, suffering numerous serious injuries, including contusions of the face, neck and chest. As a result, she was hospitalized for twelve days and her jaw was wired shut for six weeks. The younger of the men was killed after having been beaten by all three perpetrators and then, finally, struck in the face with a television set. He drowned in the blood from his broken nose and suffered contusions and swelling to the brain. It was unclear whether the nose was broken by a foot stomp to the head (evident by a sneaker print across the victim's face) or by the television set. The third victim, the eighty-five-year-old, was beaten and dragged from his bed, suffering bruises and lacerations to his face caused

---

[20] The comparison is also problematic because Gerald's crime involved multiple victims. The Court's willingness to compare Gerald's case to Harvey's in spite of its denial of defendant's request that other, A-category, multiple-victim defendants be included in the comparison, is suspect. *See supra* at 396, 731 A.2d at 1185.

by blunt-force blows with a lamp and his own cane. He died shortly after the incident.

While Gerald's prior criminal history is minimal in comparison to Harvey's and he suffered from drug addiction, the jury made no findings regarding a troubled childhood as in Harvey's case.[21] In addition, the jury that sentenced Gerald to death believed that his crime was outrageously or wantonly vile, finding the c(4)(c) aggravating factor. This finding surely counteracts the Court's contention that because Gerald only intended serious bodily injury, he is less culpable than defendant. *See ante* at 382, 731 *A*.2d at 1177. Though the State submitted the c(4)(c) aggravating factor to the jury in Harvey's case, the jury did not find his crime to be outrageously or wantonly vile.

Further, there were three victims (two of whom died) resulting from Gerald's crime, whereas Harvey had one victim. Although the Court describes Harvey as a "cold and calculating murderer," *ante* at 319, 731 *A*.2d at 1143, there is more evidence that Gerald's crime involved calculated premeditation and the exploitation of the helplessness of his three victims. Confrontation was part of Gerald's plan because he knew the inhabitants were home. Harvey, by contrast, seems to have come upon his victim merely by chance.

The only other E–1 defendant sentenced to death is Rigoberto Mejia. Inclusion of Mejia's sentence as a death sentence is also not appropriate, given that on retrial he received only a life sentence because his crime was deemed not death-eligible. The AOC chose to exclude Mejia's non-death-eligible, life sentence from the database, and yet the AOC included his death sentence. Either Mejia's case is death-eligible and therefore both his life and death sentences should be included; or his case is non-death-eligible and both sentences should be excluded.

---

[21] The Court's emphasis on Gerald's childhood and its concurrent disregard for defendant's, in this context, is therefore all the more problematic. *See supra* at 390 – 98, 731 *A*.2d at 1182 – 86.

Mejia and an accomplice attacked Balbino Garcia in a hotel basement. When Garcia ran, Mejia and his accomplice chased him into a bedroom, where Mejia pointed the gun at Garcia and one of his relatives. When Garcia tried to take the pistol, Mejia struck him in the face with it, fracturing his skull. He then chased Garcia and shot him from within inches of the victim's back.

Mejia had a similarly troubled childhood to that of defendant, resulting in the jury's finding of the catch-all mitigating factor, but his crime was more aggravated than defendant's. Mejia armed himself with a pistol and sought to confront a specific victim. He did not simply kill the person unfortunate enough to catch him in the middle of a robbery; he threatened an individual and shot him when he ran away. The jury's failure to find the aggravating factor that defendant shot Garcia to escape detection is important to note: either this finding demonstrates that the factor is indiscriminately applied (to defendant in spite of the lack of evidence that he killed to escape detection but not to Mejia in spite of the seemingly overwhelming evidence that he did, since he shot Garcia as he was running away); or it demonstrates the cruelty with which Mejia carried out his crime—to shoot Garcia as he ran away, if not to escape detection, could only have been a conscious choice to make Garcia suffer, to kill for killing's sake. Harvey's case does not demonstrate this kind of calculated choice.

Finally, when all is said and done, neither Mejia nor Gerald is on death row. Even, therefore, if their crimes, characters and blameworthiness indicate less culpability than defendant's, for the Court to base its finding of proportionality on these cases is suspect. The fact that less culpable defendants received life sentences does not mean that a more culpable defendant deserves death.

The majority reduces its comparison of defendant's case to other E–1 cases to a simple discussion of the characteristics of the defendants, omitting any examination of the crimes themselves.

Although these factors are certainly an important part of our analysis, the Court's failure to examine the crimes renders its proportionality review startlingly incomplete.[22] When, as here, the salient-factors results indicate a low incidence of death, we must do everything we can to ensure defendant has not been unfairly singled out. *Marshall II, supra,* 130 *N.J.* at 154, 613 *A.*2d 1059. It is especially important, therefore, that we examine and compare the *facts* of the cases, along with the defendants, however lengthy and gruesome that endeavor might be. The crimes committed by these E–1 defendants are, without question, more heinous than that committed by defendant, and all of the E–1 defendants are currently serving life sentences or less.

---

[22] The Court perhaps tries to set the stage for its truncated analysis when it describes the nature of our proportionality review: "[P]rocedural or offender-oriented review presumes that the death penalty is proportional to the offense and focuses on the defendant, not the crime committed." In such review, the question is "whether the punishment fits the criminal." *Ante* at 290, 731 *A.*2d at 1127 (citing *Marshall II, supra,* 130 *N.J.* at 129, 613 *A.*2d 1059) (additional internal quotations and other citation omitted).

Although certainly it is true that our review here is not a substantive one, that is, it is not offense-oriented as described by the Court in *Marshall II, see* 130 *N.J.* at 127, 613 *A.*2d 1059 ("[T]he substantive or offense-oriented proportionality review looks to whether the punishment of death is excessive for a particular offense."), our procedural review specifically incorporates not only the characteristics of the defendants, but also the circumstances of the crime. Such factors as the particular violence or terror with which the crime was carried out, the premeditation involved, and the defendant's knowledge of non-decedent victims are critical when we are examining the defendants' culpability. *See ante* at 376, 731 *A.*2d at 1173–74. The Court harps on these factors in its assessment of Harvey, *see ante* at 379 – 81, 731 *A.*2d at 1175 – 76, and then fails to discuss them at all with regard to most of the other defendants.

Does the Court really mean to suggest that if a murder were carried out with particular torture and depravity against a helpless victim, something so insignificant as the defendant's immaturity would justify a life sentence if the death-sentenced defendant under review carried out his murder with no torture or premeditation but was older? By failing to examine the crimes of the comparison cases here, the majority does exactly that. *See ante* at 318, 731 *A.*2d at 1143 (citing age as the only difference between Harvey's murder and those of two defendants, Lance Phillips, age 20, and Charles Ploppert, age 24, whose crimes were significantly more brutal than defendant's).

Will Alexander and his co-defendants gained entry to an apartment in which the victim and his girlfriend were home with two small children. Upon entry, one of the defendants pushed the girlfriend to the floor. When the man attempted to flee, defendant shot him in the lower back, killing him. The defendants then forced the woman and her children into another room and ordered them to stay on the floor while they raided other apartments in the building. Alexander was not capitally prosecuted and was sentenced to life in prison.

Jerry Britton, against whom the State did not seek the death penalty, climbed through the window of a young woman's apartment and stabbed her sixteen times with two knives when she began to call the police. The stab wounds were in the head, neck, back and shoulder, and one of the knives was broken off in the victim's neck. The victim also appeared to have been beaten. Britton told a friend that he hoped that he had killed her so that she could not be a witness. Britton had a heroin habit, but no mental health problems. He was sentenced to life in prison.

David Brown planned a robbery with two other accomplices for drug and beer money. They went to a drug dealer's apartment to confront and rob him. When an argument ensued, Brown pulled out a knife and stabbed the victim multiple times all over his body. The State did not seek the death penalty in the case, and Brown was sentenced to thirty-five years in prison.

Alphonso Brunson broke into an eighty-two-year-old woman's home for the third time on the day she was killed. The woman was found two days later, having received several blows to the head which had caused her death. Brunson was sentenced to two concurrent terms of life and fifty years.

Duane Vance Caviness, accompanied by two co-defendants, entered an apartment of a fifty-four-year-old man, tied him up and beat him with a baseball bat. The man was later found dead on his apartment floor with severe head wounds, his hands and feet

bound. Caviness was permitted to plead guilty to felony-murder and two counts of burglary/robbery. He was sentenced to life.[23]

Albert Carrow Fains murdered his wheelchair-bound neighbor, Arthur Williams, by striking him in the head thirteen times with a claw hammer. Williams had sent Fains to buy him cigarettes, sandwiches and marijuana, but the following morning the victim was found on the floor with a knife in his back and blood everywhere, including on the chairs and walls. A plastic bag had been pulled over Williams's head. Williams suffered three fractures on the right side of the skull, a wound on the bridge of his

---

[23] The Court minimizes Caviness's culpability by asserting that the defendant's own confession indicated that he did not have the baseball bat, his co-defendant did. Because the Court effectively asserts here that Caviness's case should perhaps not be in the death-eligible universe at all because of an own-conduct problem, not only does the majority fail to "defer to the AOC's judgment" in the categorization of comparison cases, see ante at 317–18, 731 A.2d at 1142, as it does in all other instances in this opinion, it calls into question Caviness's sentence itself. If the defendant pled guilty under the assumption that he would face the death penalty if he went to trial, and the Court now questions his death eligibility, it must also question the voluntariness of Caviness's plea. If the Court is to make this kind of challenge to Caviness's plea, it should remove Caviness's case from the death-eligible universe. Having chosen to include him, it cannot then successfully argue that Caviness's lack of death-eligibility distinguishes his level of culpability from Harvey's. Either Caviness is death-eligible for purposes of our review or he is not.

Here, the Court has clearly redefined the scope of proportionality review, rendering it a re-examination of the judge or jury's sentence rather than a mere vehicle for quality-control. Accord Loftin II, supra, 157 N.J. at 426, 724 A.2d 129 (Handler, J., dissenting); see also Marshall II, supra, 130 N.J. at 223, 613 A.2d 1059 (Garibaldi, J., concurring in part and dissenting in part) ("Proportionality review is not a second appellate review nor a broad review of due process concerns. . . . It is a narrow concept directed to whether the defendant received a sentence disproportionate to that imposed on other defendants. . . .").

Although the Court and/or the AOC may want to engage in this kind of detailed analysis for the purpose of defining the class of comparison cases, see, e.g., Chew II, supra, 159 N.J. at 254, 731 A.2d 1070 (Handler, J., dissenting) (arguing that Walter Williams should not be included in group of contract killer defendants because improper trial jury instruction led to jury's finding of contract killer aggravating factor), it is entirely inappropriate to do so as part of its precedent-seeking review once the case has been included in the comparison group.

nose, and eight other wounds on the side of the head, the combination of which were determined to be the cause of death. Fains was sentenced to life.

Carlton Felder rang the bell at his seventy-five-year-old neighbor's apartment. When she opened the door, Felton pushed her inside and started stabbing her repeatedly in the left side of her chest. He then grabbed the gold chains from her neck and proceeded upstairs to look for money. At the time of the murder, the woman was babysitting three small children. The State did not prosecute Felder capitally and he was permitted to plead guilty to aggravated manslaughter, robbery and burglary. He was sentenced to fifty years.

Franklin Flowers Hudson entered a home through the basement window and tied up and gagged at knife-point the homeowner who found him. When the owner's sixty-five-year-old boarder returned home, Hudson confronted him, leaving the owner tied up. Even after the boarder gave Hudson his money and keys, Hudson stabbed him multiple times. Not yet dead, the boarder tried to run upstairs, and Hudson chased him and knocked him down by kicking him and repeatedly hitting him over the head with a baseball bat. The boarder did not die from his injuries until over a month later. Hudson was permitted to plead guilty to felony murder and he was sentenced to life.

Timothy Paul Lee took a knife and kicked in the back door to the home of a sixty-five-year-old man. When the man woke from the noise, defendant stabbed him in the chest, killing him. Lee was permitted to plead guilty to felony murder and was sentenced to life.[24]

---

[24] Although the Court suggests that Lee's mental capacity might have been impaired due to a drug addiction when he committed his murder, *see ante* at 317–18, 731 *A*.2d at 1142 ("There were facts in ... Lee ... that ... would allow a jury to conclude that defendant's capacity to appreciate the wrongfulness of his conduct was impaired by mental disease or defect or intoxication."), the Court misconstrues the evidence. At trial, evidence was indeed presented that Lee was addicted to heroin; the defendant, however, broke into his victim's house with

Dwayne Mann and two co-defendants broke into the home of a man with the intention of robbing him. When the man woke up, defendant shot him in the head, killing him. Mann was sentenced to two consecutive terms of life and five years in prison.

Incenzio Mendez, attempting a robbery, lay in wait for the approaching ninety-five-year-old woman who owned the farm on which he worked. Coming up behind her, defendant used a stick to knock down the woman with three hits to the head. The victim tried to get up, at which point defendant kneed her in the side and struck her in the neck. The woman died from the injuries. Defendant was capitally prosecuted and was sentenced to consecutive terms of life, twenty years and ten years.

Lance Phillips and his accomplices stormed a house armed with guns hoping to steal a kilogram of cocaine that Phillips had seen at the house earlier. During the course of the raid, Phillips and his co-defendant shot everyone in the house (a twenty-year-old man, his girlfriend, a seventeen-year-old-girl, and an eleven-year-old girl). Phillips shot the man five times, killing him. He also shot the seventeen-year-old in the arm. One of the co-defendants shot the eleven-year-old in the chest. The prosecutor did not seek the death penalty against Phillips and he was sentenced to consecutive terms of life and twenty years.

Charles Ploppert and a co-defendant knocked on the door of a blind man, whom Ploppert knew, with the intention of immediately hitting him on the head with a baseball bat in order to be able to

---

the intention of stealing money from her so he could buy heroin. The AOC narrative states, specifically, "Timothy Lee ... woke up feeling the need for drugs." Therefore, the defendant was not on drugs when he committed the murder. There was no other evidence presented at trial of mental disease or defect. In fact, the AOC narrative states, "D was in good health and has no mental health problems." Significantly, the defendant did not present any expert evidence at trial indicating that he was unable to control his actions because of his drug addiction, as, for example, defendant Walter Gerald had. The Court's conclusion, then, that Lee's mental state at the time of the murder distinguishes him from Harvey is highly flawed and affirms the application of disparate sentences for two similarly situated defendants.

rob the house. The man forced Ploppert to identify himself before he would open the door. When Ploppert did so, the man let him and his co-defendant in. After chatting amicably with the man, Ploppert attacked him, beating him unconscious by hitting him with his fists and kicking him. Before leaving, Ploppert piled wood on the unconscious victim, spread lighter fluid over him and around the house, and then set a fire. Ploppert was capitally tried and sentenced by the jury to life.

Thomas Reigle broke into the apartment of his uncle and aunt to steal money. Hearing his aunt stir in her bed as he was looking through her purse, Reigle beat her with a pipe. She survived. Reigle then went into his uncle's room and beat him to death with the same pipe. The prosecutor sought the death penalty and the jury sentenced Reigle to life.

Anthony Szadorski and a co-defendant broke into the home of a seventy-six-year-old woman whom Szadorski had met at an Alcoholics Anonymous meeting. When the woman jumped out of bed upon Szadorski's entering her bedroom, he stabbed her several times. He continued to do so as she tried to crawl away. Szadorski then asked his co-defendant for a BB gun that he used to beat the woman over the head. She eventually died from her injuries. The prosecutor did not seek the death penalty against Szadorski and he was sentenced to life.

Gerald Williams, a co-defendant and Williams's eight-year-old daughter entered an apartment they happened to be passing through an ajar door. Inside, they found a fifty-one-year-old man who awakened when Williams turned off the television set to steal it. The co-defendant punched the man and Williams threw a cover over the man's head and started beating him against the window sill. The man broke free and yelled for help, at which time Williams picked up the television set and hit the man over the head with it. He then put down the television set and threw the man out of the window. The man fell three stories and died. Unlike the other defendants, Williams had a significant criminal history, having served twelve terms of incarceration as an adult

and a juvenile. The prosecutor did not seek the death penalty and Williams was sentenced to life.

Herman Williams, armed with a handgun, entered a home planning to rob one of the family members whom he had observed. Upon entering, Williams found six residents there. He hit one in the face with his handgun and then got into a struggle with an older, handicapped man who had an artificial arm. After the man successfully knocked the gun out of Williams's hand, the defendant picked up the gun and shot the man in the chest. The man died seventeen days later in the hospital. The prosecutor did not seek the death penalty against Williams. The defendant was sentenced to life.[25]

In sum, many of these cases involve multiple victims, and those that do not, involve more extensive victimization than Harvey's. With the exception of Franklin Flowers Hudson and Gerald Williams, all of the defendants either knew their victims personally or had observed them enough to know of their vulnerabilities. Many of the victims were even selected, presumably, *because* of their vulnerabilities: one was in a wheelchair, one was blind, one was handicapped, two were unable to be self-sufficient (one fifty-five and one eighty-five-years old), two were women in their seventies, one was an eighty-two-year-old man, one was a ninety-five-year-old woman, and one was an eleven-year-old girl.

The fact that all of the defendants in these cases are serving life sentences and Harvey faces execution boggles the mind. Defendant is most definitely not among the one or two most culpable defendants in his category, as the salient-factors test indicates he

---

[25] The Court notes that "Herman Williams viciously shot his victims to death. However, Williams was characterized as "culturally retarded." This characterization alone should not have the capacity to distinguish Harvey from Williams. It does not provide an excuse or justification in the way that a finding of mental disease or defect would. The testifying doctor stated clearly that Williams is "not mentally retarded but culturally retarded." Without further explanation of the meaning of this term, I fail to see that it alone should justify a 45–year term of imprisonment for Williams and a death sentence for Harvey.

should be in order to be sentenced to death. Is the only difference here that Harvey is black and his victim was a white woman? [26] *See* data, *supra* at 297, 731 *A.*2d at 1131 (noting that five of six transracial cases were capitally prosecuted and three of those five resulted in death sentences even though transracial cases account for only twenty-seven percent of the E–1 subcategory). I can only hope that this is not the explanation. The Court provides no other.

When the universe of comparison cases is extended to similar cases in the E–2, E–3, G, B and A categories, the Court's holding becomes even more implausible.

Jesus DeJesus, an E–2 defendant, entered the apartment of a forty-nine-year-old woman living below him. He stabbed her to death and then set her bed on fire with her body on it. The remains were identified with her dental records. DeJesus stole some jewelry. He was not capitally tried and received consecutive life and fifteen-year sentences.

Wayne Busby, an E–3 defendant, should certainly have been classified as an E–1 defendant given the facts of the case. Busby broke into the apartment of a seventy-four-year-old woman who lived behind his residence. He had been watching her prior to the break-in to try to discern when she was home. When the woman came downstairs unexpectedly, half-dressed, the defendant hit her in the face, broke her ribs, and used a broom to strangle her to death. He used enough force to break the broom handle. While being strangulated, the woman tried to fight Busby off by scratching him about the neck. Busby took money, a camera, film and perhaps other items. This case clearly involves particular violence or terror. Busby was sentenced to life in prison.

Thomas Dollard and two co-defendants entered an apartment building in search of someone to rob. They encountered two people on a stairwell and forced them to take their pants down so

---

[26] Alphonso Bronson is the only minority defendant with a white victim who was not capitally prosecuted.

the defendants could search them for drugs. When they found none, defendants made the couple take them around the building to help them gain access to apartments. When a woman behind the door of the first apartment refused to let them in, defendants kicked in the door and brought the couple inside with them. They were confronted by a man in the bedroom, who asked "Why are you doing this? There is nothing here." Dollard shot the man immediately in the chest. The man, still alive and expressing incredulity, asked, "Why did you do that? You didn't have to do that." He died from the wound shortly afterward. The man from the couple encountered in the hall then jumped out the window from fear of being shot. Dollard was not capitally charged and received a life sentence.

· Larry Durden ate dinner at the home of a seventy-two-year-old woman who had offered to have him over if he changed the locks on her doors. At some time during the evening, Durden stabbed the woman with a small ax-type object. She died of wounds to the forehead and abdomen. Dollard took the woman's groceries, a television and a radio. Durden was sentenced to life.

The gruesome list goes on: Aaron Huff struck his victim's head on a coffee table and then beat him until he stopped moving. He was sentenced to life. Michael Suarez stabbed a man in the neck, back and chest. The victim was found in the fetal position lying between the wall and bed on top of blood-soaked clothes and wearing boxer shorts. The prosecutor did not seek the death penalty and Suarez was sentenced to life. Thomas Wolfe slashed a woman's throat three times and she also suffered from numerous puncture wounds. He was sentenced to life.

All of these cases involved a robbery, forced entry and murder of one victim, yet none of them was classified in the E–1 category requiring particular violence or terror.

Daniel Hart, who was convicted of both robbery and burglary, but was placed in the G category, is surely more blameworthy than defendant. Hart and a co-defendant formulated a plan to kill a twenty-three-year-old woman they thought was a snitch. When

the woman confronted them in the main entrance to her apartment, Hart tried to smother her with a pillow. He then killed her by slashing her throat and stabbing her thirty times in the neck, head and back. He took $25 from her. The prosecutor did not seek the death penalty and Hart was sentenced to fifty years in prison.

William Godette, a B-category defendant who was convicted of felony murder and robbery, went to the home of a seventy-nine-year-old man to demand payment for work done earlier in the day. When the man refused to pay, Godette pushed his way inside and pounced on the man. The defendant then tried to strangle his victim and finally killed him by striking him several times in the head with a hammer. Godette was permitted to plead guilty and was sentenced to life.

Several robbery cases classified as A-category, multiple murder cases highlight the disproportionality of defendant's sentence as well. Significantly more blameworthy defendants committing murder in the course of a forced-entry robbery were not sentenced to death. Felix Diaz and his co-defendant planned the robbery and murder of an older man who lived with a younger man and an eight-year-old girl. The defendants shot all three victims and burned their bodies. Diaz was given three consecutive life terms.

Peter Regan broke into his girlfriend's mother's house and, upon being found by a fifteen-year-old girl, hit her five times over the head with a baseball bat until she stopped screaming. Regan then killed his girlfriend's twelve-year-old sister by hitting her six times over the head with the same bat. He removed the dead girl's clothing from the waist down in order to make it appear as if there had been a sexual assault. He was convicted of robbery and the prosecutor did not seek the death penalty. Regan was sentenced to two concurrent terms of life.

Roy Watson broke into the home of an eighty-four and seventy-nine-year-old couple on his street. He went into the bedroom and beat the man to death. The attack was so severe that Watson

knocked out the lens of one of the man's eyes. The man's wife woke up during the attack and Watson then beat her to death. The penalty-trial jury sentenced Watson to two consecutive terms of life.

Harvey's crime, while certainly brutal, pales in comparison to other similar crimes in terms of victimization, and often in terms of moral blameworthiness given the number of victims who are elderly or handicapped in the aforementioned scenarios and the level of premeditation and knowledge of the helplessness of the victims involved. When other life-sentenced defendants committing robbery in a theoretically *more* blameworthy category are added to the universe of comparison cases, the Court's finding that defendant's sentence is proportionate seems even more unjustifiable, by any standard. While the Court is correct in pointing out that we do not require identical verdicts in all similar cases, *see ante* at 319, 731 *A*.2d at 1143, Harvey was placed in one of the least culpable categories and no defendant in that category but he now sits on death row. It is time for the Court to articulate what it means by disproportionate, rather than to continue to insist that it knows only when a sentence is *not* disproportionate. Only then will it be unable to keep moving the line by adding the very specific facts of each new defendant's case to justify including him or her to the increasingly growing list of proportionately-sentenced defendants.

## IV

I believe the Court's principal findings in this case are not only in error, but have grave implications for the defendant before us and those to come. In finding, once again, that the statistical models presented do not reflect an unconstitutional risk of race discrimination in our capital sentencing scheme, the Court ignores not only hard evidence that race plays an impermissible role in capital charging and sentencing procedures, but the general evidence all around us that racism is ubiquitous, and poses a clear, significant and present risk. In particular, the evidence that

prosecutors and juries are significantly more likely to charge with and sentence to death black defendants killing white victims, is overwhelming. We must no longer ignore the serious risk that these defendants are singled out because of the premium our society places on white life and its simultaneous degradation of minority life. No system of justice can operate fairly as long as this risk exists.

I find, also, that this case starkly underscores the fact that our individual proportionality review process is rife with subjectivity. *See Cooper II, supra,* 159 *N.J.* at 92, 731 *A.*2d 1000 ("[W]e acknowledge that the process of conducting precedent-seeking review is inherently subjective...."). Our methodology is devoid of the kind of quantifiable standards that are necessary to provide a real basis for comparison against which to measure all defendants claiming disproportionality. The Court has simply raised the bar for disproportionality with each new case, narrowing the class of comparison cases and reducing the discussion of the cases to cursory statements that lump together numerous defendants with complete disregard for the facts of their crimes. This blatantly incomplete review obscures the arbitrariness of Harvey's death sentence. While relying on nothing less than scientific certainty of race discrimination in response to defendant's systemic challenge, the Court has declined to define any numerical cut-off for disproportionality in its frequency analysis in defendant's individual proportionality review.

Proportionality review is the very last means available to us for correcting arbitrariness in capital sentencing. Yet, the Court's review seems almost to be guided by an effort to find proportionality at all costs, rather than to root out disproportionality. Our very first proportionality review portended this inevitable result:

> The majority depreciates and excuses the occasional unequal sentencing treatment of similar defendants by attributing that to sentencer "mercy" ... But that rationalization explains aberrational *life* sentences, not aberrational *death* sentences.

> [*Marshall II, supra,* 130 *N.J.* at 241, 613 *A.*2d 1059 (Handler, J., dissenting).]

Here, in spite of the salient-factors groupings indicating that defendant is in a category of defendants who are almost never sentenced to death, the Court has effectively begun with the contention that we would expect defendant to be sentenced to death. It requires defendant to show unusual circumstances warranting a life sentence in order to achieve such a sentence.[27] While the burden does indeed rest on the defendant's shoulders to prove disproportionality, a presumption in favor of proportionality was never intended to be integral to our method of proportionality review.

The Court in *Marshall II* stated that in recognizing disproportionate sentences, we are looking to see if an identifiable pattern of life sentences has been broken with no explanation. *See Marshall II, supra,* 130 *N.J.* at 181, 613 *A.*2d 1059 ("That [two other defendants] were spared their lives does not establish a pattern of life-sentencing for such killings."). Here, there is without a doubt a pattern of life sentences that has been broken with Harvey's death verdict. Because there are no defendants in Harvey's salient-factors category who await execution, we would expect that Harvey himself would also receive a life sentence. Although the fact that he is the only one in his category awaiting death cannot alone denote proportionality, *see id.* at 166, 613 *A.*2d 1059 ("[S]imply because Marshall may be the first does not mean that his death will be disproportionate under our statute."), we must demand some defensible reason to distinguish him from the others—to single him out for death—in order to avoid an arbitrary sentence. The Court fails to do so, trampling on the very heart of our Constitution's equal protection clause:

A capital sentencing system which results in differential treatment of similarly situated capital felons has effectively classified similar felons differently with respect to their rights to life ... Where capital sentences cannot be rationally distinguished from a significant number of cases where the result was a life sentence, more is present than the irremediable failure of an imperfect human

---

[27] I believe defendant has in fact met this high burden here, but contend, in any case, that such a hurdle is not the appropriate one to raise.

system. When this occurs, the capital sentencing system has become constitutionally arbitrary.

[*Id.* at 241, 613 *A*.2d 1059 (Handler, J., dissenting) (quoting Gary Goodpaster, *Judicial Review of Death Sentences,* 74 *J.Crim. Law & Criminology* 786, 788, 802–03 (1983).)]

This case demonstrates more compellingly than any to date the errant standard by which the Court has chosen to implement our final defense against arbitrariness: "a death sentence is disproportionate if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses *unless the Court concludes through its subjective intuitive examination of precedent that the sentence is fair.*" *Id.* at 250, 613 *A*.2d 1059 (Handler, J., dissenting). This "standard," of course, defies the Court's oft-stated goal of maintaining consistency: "[T]here can be no justice without a predictable degree of uniformity in sentencing." *Id.* at 239, 613 *A*.2d 1059 (Handler, J., dissenting) (quoting *State v. Hodge,* 95 *N.J.* 369, 379, 471 *A*.2d 389 (1984)). In employing its faulty and subjective method of review, the Court has managed to find a clearly disproportionate sentence proportionate.

I, therefore, dissent. Justice STEIN joins in the conclusions reached in Point III, 2B, and 3 of this opinion, and also dissents.

STEIN, J., concurs in part and dissents in part.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*For reversal*—Justices HANDLER and STEIN—2.